UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

KAHALA FRANCHISE CORPORATION)
A Delaware corporation,           )
      Plaintiff,           )
                    )
vs.                       ) Case No.
                    )
NABIL MAKHAMREH, Individually,  ) Judge:
MATTHEW CHEESESTEAK, Inc.,   )
an Illinois Corporation, and M & S   ) Magistrate:
CHEESESTEAK, INC. , a Virginia   )
corporation.               )
      Defendants.         )

FILED STAMP: AUG. 20, 2008
08CV4750
JUDGE DOW JR.
MAG. JUDGE BROWN
J. N.

## VERIFIED COMPLAINT FOR
## INJUNCTIVE RELIEF AND DAMAGES

Now comes **KAHALA FRANCHISE CORPORATION (hereinafter "KAHALA")** by

and through its attorneys, Gregory J. Ellis, Esq., Ltd., and files its Verified Complaint together

with a Petition for a Temporary Restraining Order and Preliminary Injunction seeking relief at

law and in equity as follows:

### The Parties

1.     Plaintiff, KAHALA FRANCHISE CORP. (hereinafter "KAHALA") is a Delaware

corporation and citizen of Arizona doing business as a Franchisor under the name "KAHALA"

and inter alia, "THE GREAT STEAK AND POTATO COMPANY" with their principal place

of business located in Scottsdale, Arizona.

2.     Defendant, Nabil Makhamreh is an individual who is a citizen of Illinois and a

citizen of the United States, he is the owner and principal officer of the other franchisee

Defendants (collectively "Defendants") who executed Franchise Agreements with Franchisor

KAHALA, to operate "Great Steak and Potato" franchises and who may be served with process at his residence located at 1901 Brier Glen Drive, Plainfield, Illinois or his business address at 10 FC Yorktown Mall, Lombard, Illinois.  Defendant Nabil Makhamreh, recently acquired as owner, directly or indirectly, performs services for, is an employee of, has a financial or equity interest in a business substantially similar to that established by defendants pursuant to their Franchise Agreements with Plaintiff, and in competition with the 224 "Great Steak and Potato" restaurants licensed by Plaintiff nationwide. The competing business, "Charley's Grilled Subs" ("Charley's") offers the same or similar menu as "The Great Steak and Potato" – Philadelphia-style cheesesteaks, hand-cut potatoes (French fries) fresh squeezed lemonade, etc. in competition with Plaintiff's restaurants.  Defendants' activities in connection with the Charley's franchise is in violation of the Franchise Agreements non-compete provisions.

3.    Defendant, Matthew Cheesesteak, is an Illinois corporation, a citizen of Illinois and a citizen of the United States who executed the KAHALA,  Great Steak and Potato Franchise Agreement, on September 7, 2007 for a restaurant at the Eastland Mall, Bloomington, Illinois, who may be served with process at its registered agents c/o Spiegel & Utrera, PA, 123 W. Madison #806, Chicago, Illinois or its business address at 10 FC Yorktown Mall, Lombard, Illinois.

4.    M & S Cheesesteak, Inc. is a Virginia corporation, a citizen of the United States and it executed a Franchise Agreement for a Great Steak and Potato franchise to be operated in the Greenbrier Mall, Chesapeake, Virginia  on February 5, 2004.

## Jurisdiction

5.    This Court has original jurisdiction under 28 U.S.C. Section 1332(a) because this case involves parties who are in complete diversity of citizenship and the amount in controversy

is in excess of $75,000.00 for the breach of the in-term covenants against competition in the KAHALA Great Steak and Potato (hereinafter "GSP") Franchise Agreements by the Defendants, for the use of confidential, proprietary and trade secret information to operate a competing franchised restaurant.

6.     Plaintiff is a resident and citizen of Arizona and a citizen of the United States.

7.     Each Defendant actively did business in the State of Illinois, committed one or more of the acts set forth in the Illinois Long Arm Statute, 75 ILCS 5/2-209. Each Defendant made, performed, or was cognizant of a contract subject to Illinois Jurisdiction, and substantially connected to Illinois, and participated in breaches of contract directed specifically at Plaintiff as set out below during the period of approximately July 2008 to the present in breach of the Franchise Agreements in-term non-compete provisions by owning and/or operating a competing similar business format franchise featuring Philadelphia style cheesesteaks, etc.

8.     The individual Defendant is a citizen of the State of Illinois and a citizen of the United States. All Defendants are necessary parties or are appropriately joined as parties under FRCP 19 and 20 since they all participated in the same acts described below. There are common issues and questions of fact and law, and it is appropriate to join them under FRCP 19 and 20.

## Venue

9.     Venue exists in this judicial district pursuant to 28 U.S.C. Section 1391. The causes of action asserted arose from or are connected with purposeful acts committed by Defendants in Lombard, Illinois, and Defendants' business, citizenship, and residences are located in this district. Defendants are breaching their Franchise Agreements with Plaintiff by violating the in-term covenant against competition and other terms of the Franchise Agreements

3

restricting the use and dissemination of confidential information.

### Background of Litigation

10.    KAHALA grants franchises to qualified persons to establish and operate various franchise systems [1] including GSP restaurants under a uniform system developed by it, including the right to use its federally registered proprietary marks, as well as, the name "GREAT STEAK AND POTATO." KAHALA is the owner of the trade name "GREAT STEAK AND POTATO " and the trademarks, service marks, and logos related thereto.

11.    Upon information and belief, such name and marks have become identified in the minds of the general public throughout the United States, and the world, with the products and services offered by KAHALA and its franchised chain of 224 GSP franchised restaurants.  The GSP name, trademarks, and service marks enjoy an excellent reputation and constitute property of the greatest value to KAHALA.

12.    KAHALA licenses the right to use GSP's names and marks in the operation of GSP restaurants.  The terms of the ten (10) year license granted by Kahala is governed by the KAHALA GSP Franchise Agreement ("Agreement"), which each franchisee is required to sign before he or she can display any KAHALA registered marks including GSP.  Under the terms of the Agreements, the franchisee pays to KAHALA a royalty in the amount of 6% of the gross revenue generated from a franchisee's business each month for the entire term of the Agreements.

13.    In connection with, and as condition of entering into the Franchise Agreements on February 5, 2004, *(Exhibit "A"),* and September 7, 2007 *(Exhibit "B"),* Defendants executed Non-Compete Agreements wherein they promised and agreed that they would not operate a

---

[1] Blimpie; Cerality; Cold Stone; Frulatti; Johnnies; Nrgize; Ranch*1; Rollerz; Samural Sams; Surf City Squeeze; Taco Time; Wafflo.

substantially similar business during the term of the Franchise Agreement. ¶ 15 and ¶ 14.5 respectively of the Franchise Agreements. *(Exhibits "A" & "B").*

14.  KAHALA and its predecessors, Franchisor of GSP, have over a period of time and at considerable expense developed and established a uniform and unique method of operation, customer service, advertising, publicity, processes, recipes, techniques and technical knowledge in connection with the restaurant business, specializing in its core and signature menu item, genuine Philadelphia cheesesteak sandwiches, and variations which include ham, chicken, turkey and vegetarian sandwiches, fresh-cut French fries, fresh-squeezed lemonade, and baked potatoes with all of the toppings and other fast food related menu items. *(Exhibits "A" & "B").* These restaurants do business under the trade name "*The Great Steak and Potato Company*" (sometimes referred to as "*Great Steak and Potato*", "outlets" or "restaurants"(s)"). Many of these recipes, techniques, and much of the information, constitute trade secrets. All of the outlets' knowledge, experience, processes, methods, specifications, techniques, and proprietary marks and information of Franchisor are referred to as the "System". *(Exhibit "C" photos of representative GSP food court mall locations)*.

15.  The market segment in which GSP operates is highly competitive, and KAHALA maintains its competitive advantage as a result of the quality and consistency of its food products, which in turn depends in its carefully developed confidential information, trade secrets and proprietary recipes and other operational techniques.

16.  KAHALA awards franchises to carefully screened and qualified individuals and/or business entities to operate GSP restaurants on a nationwide basis and pursuant to the terms of a comprehensive Franchise Agreement.

17.  Subject to the terms of the Franchise Agreement, KAHALA provides to each of its

franchisees one copy of the GSP Manual (the "Manual') pertaining to the operation of restaurants in the System.

18.    The Manual contains, among other things, proprietary and confidential information relating to the System, including but not limited to methods of site selection, marketing and public relations methods, product analysis and selection, food and beverage preparation techniques and analysis, service methods and skills relating to the development and operation of GSP restaurants.

19.    The GSP System and the Manual in which the System is described are the subject of reasonable measures to protect the secrecy of the System, and to prevent the dissemination of the confidential and proprietary information, materials, and Manuals that are provided to franchisees.

20.    A copy of the Manual was provided to each of the Defendants, and Defendants remain in possession of the Manuals.  Defendants utilized and relied on the Manual to learn the GSP business at their first 2 GSP locations.

21.    In addition to the two (2) GSP franchises, Defendant Makhamreh now owns operates, or has an interest in, directly or indirectly, or is otherwise affiliated with the franchised "Charley's Grilled Subs" ("Charley's") which is located at Yorktown Mall in Lombard, Illinois . *(Exhibit "D" - Photos of Defendant Charley's, a food court mall location similar to GSP.)*

22.    On information and belief Defendant Makhamreh  owns, operates, or has an interest in, directly or indirectly, or is otherwise affiliated with the competing Charley's pursuant to a Franchise Agreement with Charley's, a chain of more than 300 restaurants which engage in a business substantially similar to the businesses established by the Defendants pursuant to the Franchise Agreements. *(Exhibit "E" Lombard building department documents indicating Defendant Makhamreh as owner).*

6

23.    Defendants ownership or other affiliation and operation of Charley's constitutes ownership, affiliation and operation of a substantially similar restaurant business whose menu is similar to that used within the GSP System, which activity by Defendants is prohibited by the Franchise Agreements.

24.    Specifically Charley's prepares and sells the same or substantially similar items of Philadelphia style cheesesteak sandwiches, the core, and signature menu item offered by GSP, chicken subs, fresh-cut fries, and fresh squeezed lemonade. *Non-compete,¶15.4 Exhibit A; ¶1, ¶1A and ¶9.7 of Exhibit "B" and Yorktown Charley's website and others Exhibit "D".*

25.    Defendants, by their ownership, operation or other affiliation with Charley's, are breaching the In-Term Non-Compete Agreements which protects KAHALA's business interests, in the following respects:

   a.    Preventing Defendants from duplicating the business system and using trade secrets and confidential information to operate substantially similar restaurants;

   b.    Preventing confidential information supplied to GSP franchisees from being used by competitors of KAHALA (such as Charley's);

   c.    Enforcing the In-Term Non-Compete protects the integrity of the KAHALA GSP franchise system. 224 franchised GSP locations are in jeopardy of being compromised, economically damaged and potentially lost if franchisees of GSP were to believe the In-Term Covenant Not To Compete was not enforceable. KAHALA is justifiably concerned that the defendants' activities constitute a real and imminent threat that some or all of the existing GSP franchisees would be in jeopardy, and the revenues Kahala derives from these locations would be lost, and Kahala's GSP system and the value of its investment in the system irreparably harmed if the In Term Covenant Not To Compete is not enforced. This would pave the way for GSP franchisees to enter into competing businesses without restraint.

   d.    It is clear, that Defendants intend to compete against KAHALA because they have opened a similar restaurant serving the same menu items to the same or similar clientele;

7

e.      The Franchise Agreement prohibits just the specific conduct, i.e., establishing any type of business substantially similar to that of a KAHALA GSP system restaurant establishment.

26.      Defendants acknowledge in the Franchise Agreements that KAHALA possessed certain confidential information regarding ways of doing business which gave franchisees a competitive advantage.  Defendants agreed not to compete during the term of the Agreement in return for use of that information and the valuable property interest of the KAHALA trademarks.  Defendants have been so benefiting since February 2004.

27.      The Non-compete Agreements contained in the Franchise Agreements outlining the In-term covenant against competition state as follows:

Exhibit "A" – 2004 Franchise Agreement

15.      **NON-COMPETE**.

* * *

*15.1)  During the term of this Agreement, Franchisee and the officers, directors, shareholders and agents of a corporate Franchisee shall not without the prior written consent of Franchisor directly or indirectly , through corporations, partnerships, trusts, associations, joint ventures, or other unincorporated businesses, perform any service for, engage in or acquire, be an yee of, have any financial, beneficial or equity interest in, or have any interest based upon the profits or revenues of, any business substantially similar to that established pursuant to this Agreement; provided, however, that the foregoing restriction shall not apply to interests of 1% or less in a publicly traded entity.*

* * *

*15.4)    For purposes of Section 15.1, 15.2 and 15.3, a "substantially similar business" is a business which sells or prepares Philadelphia style cheesesteak sandwiches, and/or variations which include ham, chicken, turkey and vegetarian sandwiches.*
Exhibit "A". p 15

8

Exhibit "B" 2007 Franchise Agreement

## 9.7 CONFLICTING AND COMPETING INTERESTS

*You agree that during the term of this Agreement, neither you, nor your officers, directors and holders of more than ten percent (10%) of your stock (if you are a corporation), nor your partners (if you are a partnership), not your members who have a ten percent (10%) or greater interest (if you are a limited liability company), nor your designated manager will, directly or indirectly, maintain, engage in, have a controlling interest in, lend money to, consult with or otherwise assist any business that is engaged in the business of selling Philadelphia Cheesesteak sandwiches, fresh-cut French fries, and baked potatoes with all of the toppings.*
p. 22

## 14.5 CONFIDENTIALITY: COVENANT NOT TO COMPETE

\* \* \*

*c.  During the term of this Agreement ... Franchisee shall not engage in any business in competition with any Great Steak and Potato restaurant.   The provisions of this Agreement bind Franchisee in any capacity, including as a franchisee, sole proprietor, partner, limited partner, member employer, franchisor, stockholder, officer, director, or employee.  For purposes of this paragraph, "competition" means the franchising, ownership, or operation of a restaurant similar to Great Streak and Potato" outlet at the location identified in Section 1.1 of this Agreement, or within a geographical area consisting of:  (1) during the term of this Agreement, anywhere else.  The term of this covenant will be extended by any time consumed in litigation to enforce it in both trial and appellate courts.  If a court of competent jurisdiction determines that the restrictions in this paragraph are excessive in time, geographic scope, or otherwise, the court may reduce the restriction to the level that provides the maximum restriction allowed by law.*

*d.  During the Term of this Agreement, ... you shall not divert or attempt to divert any business, customers, or potential customers of the Great Steak and Potato System to any competitor, by direct or indirect inducement or otherwise.  In addition, you shall not at*

9

*any time do or perform any act, directly or indirectly, which harms*
*the goodwill or reputation of Franchisor or the System.*
Exhibit B – p.22 ¶9.7  and pp. 37-38  ¶14.5 (c) and (d).

28.    Defendants have opened a substantially similar business in Lombard, Illinois,

during the term of their GSP Franchise Agreements.  This violates the Franchise Agreements'

non-compete clauses.  Thus the Defendants are in default.  The facts compel the closure of the

competing Charley's restaurant – its menu is substantially similar to a KAHALA GSP restaurant.

Defendants' affiliation with the restaurant is in blatant violation of the  In-Term Covenants

against competition.  The competing Charley's' business is a substantially similar business to

KAHALA's GSP system.  The customers who patronize the competing business purchase the

same or similar food products.  Defendants' knowledge of GSP's confidential way of doing

business, use of its Operating Manual, and access to trade secrets, provide KAHALA GSP with

the need to protect its legitimate business interests.

## COUNT I

### (Injunctive Relief)

1-28.  KAHALA repeats and realleges by reference Paragraphs 1 through 28 above,

inclusive, as Paragraph 1-28 of this Count I.

29.    By reason of Defendants' aforesaid acts, KAHALA has suffered, and will

continue to suffer, damage to its business, reputation, and goodwill.  KAHALA owes a duty to

approximately 224 franchisees throughout the United States to protect them from any

unauthorized use of KAHALA's proprietary system.  These franchisees who have signed

Franchise Agreements with KAHALA in which KAHALA agreed to develop, promote, and

protect its system from unfair and illegal competition will suffer if KAHALA were unable to

protect its proprietary system from competition arising from the improper use of its confidential information and the illegal competitive activities of defendants. Though it is clear that Kahala has and will continue to sustain substantial monetary losses as a result of defendants acts, no amount of money damages alone could compensate KAHALA for the resulting loss of goodwill towards these innocent licensees and the loss of goodwill with the public in general.

30.    Defendants agreed in the Franchise Agreements ¶15 Exhibit "A" and ¶14.5 – Exhibit "B" not to compete with KAHALA during the term of the Franchise Agreement.

31.    Defendants are blatantly violating the In-term non-compete agreement by operating a competing Philly Cheesesteak franchise (Charley's) during the term of its two KAHALA Franchise Agreements.

32.    The In-Term Covenant Not-To Compete found in Sections 15 and 14.5 of the Franchise Agreements are ancillary to otherwise enforceable agreements and were executed on the same day on which the underlying Franchise Agreements were executed. The Covenant is in effect only as long as long as the Franchise relationship exists. It is limited to protecting KAHALA's legitimate business interests, and its scope of activity. These limitations do not impose a greater restraint than is necessary to protect the goodwill and other legitimate business interests of KAHALA from competition from their own franchisees.

33.    By reason of Defendants' acts, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and goodwill. Plaintiff owes a duty to over 224 franchisees throughout the United States to protect them from competition by current GSP restaurants owners. These innocent franchisees who also signed franchise agreements with Plaintiff and its predecessors in which they agreed to develop, promote and protect the Name and Marks, would suffer if Plaintiff were unable to enforce the In-Term Covenant Not-To-Compete. Without

enforcement of the Covenant, Plaintiff is deprived of the only means by which it may meet its obligations to other franchisees to halt the unauthorized and illegal competition by its existing GSP franchisees. No amount of money damages alone could compensate Plaintiff for the resulting loss of goodwill toward these innocent licensees and the loss of goodwill with the franchise-buying and the restaurant consuming public in general.

34.    Plaintiff is engaged in the solicitation of new franchisees and in assisting existing franchisees in Illinois and elsewhere. Plaintiff, may assist its existing franchisees who desire to sell their restaurants to find buyers for existing stores. Should Defendants be permitted to continue the operation of its competing franchise in contravention of its agreed upon In-Term Covenant Not-To-Compete, Plaintiff and its Illinois franchisees will suffer irreparable harm in their efforts to interest prospective franchisees in purchasing existing stores or in opening new locations.

35.    The parties to the Franchise Agreement contemplated the issuance of injunctive relief as an appropriate and needed remedy to prevent the very acts that these defendants have engaged in. It was agreed that actual damages would not have to be proven for a TRO that the irreparable harm is presumed.

> *15.6) In recognition of the irreparable harm that a violation of any of the covenants of Sections 15.1, 15.2, and 15.3 would cause Franchisor, Franchisee agrees that in addition to any other relief afforded by law, an injunction against such violation or violations may be sought against Franchisee and every other person concerned thereby, it being the understanding of the parties that both damages and an injunction shall be proper modes of relief and are not to be considered alternative remedies. In the event of any such violation, Franchisee agrees to pay, in addition to the actual damages sustained by Franchisor as a result thereof, the reasonable attorney fees incurred by Franchisor in pursuing its rights under this section.*
> Exhibit "A" – pp. 15-16.

> *14.8) Remedies.*
> *Upon violation of any of the covenants contained in this Article 14,*
> *it may be difficult to determine the resulting damages to us, and*
> *therefore, in addition to nay other remedies we may have, we will*
> *have the right to make application in  a court of competent*
> *jurisdiction for temporary and permanent injunctive relief, without*
> *the necessity of proving actual damages.*
> Exhibit B – p. 38.

36. Defendants continue to do the acts complained of by KAHALA, and unless enjoined by the Court, Defendants will continue to do so, to KAHALA's irreparable damage. Any potential harm to Defendants resulting from the grant of injunctive relief ceasing their activities is not sufficient to justify the damage to KAHALA of allowing defendants to continue conduct in violation of the Franchise Agreements. There is a strong likelihood that KAHALA will prevail on the merits of this case. Furthermore, it would be impossible to ascertain the amount of compensation which would afford KAHALA adequate relief for Defendants' acts. Therefore, KAHALA's remedy at law is not adequate to compensate it for injuries. (15 U.S.C. §1125).

## COUNT IV

### (Common Law Unfair Competition)

1-36. KAHALA repeats and realleges by reference Paragraphs 1 through 36 above, inclusive, as Paragraph 1- 34 of this Count IV.

37. Defendants' aforesaid acts, practices and conduct are likely to cause confusion or mistake by KAHALA's customers, franchisees, suppliers and the general public and constitute common law unfair competition by expropriating KAHALA's goodwill and reputation, through use of its business system and menu.

38.    As a direct and proximate result of the aforesaid acts, practices and conduct, KAHALA has been or is likely to be substantially injured in its business, including its reputation, resulting in lost revenues and profits and diminished goodwill and reputation.

39.    KAHALA has no adequate remedy at law in that its business system is  unique and represents to the general public KAHALA's identity, reputation and goodwill, such that damages alone cannot fully compensate KAHALA for Defendants' misconduct of competing during the term of the Franchise Agreement.

40.    Unless enjoined by the Court, Defendants will continue to engage in unfair trade practices and unfair competition to KAHALA's irreparable injury.  This threat of future injury to the general public and to KAHALA's business, identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued breach of the in-term covenant against competition and compel the closure of the competing Charley's restaurant in Lombard, Illinois until Defendants can divest  themselves of any ownership interest or other violative competitive affiliation, direct or indirect, in a bona fide, third party transaction.

## **PRAYER FOR RELIEF**

WHEREFORE, KAHALA prays for the following relief:

1.    A temporary restraining order, a preliminary injunction, and a permanent injunction by entering an Award:

> A.    Ordering Defendants to cease operating the competing "Charley's" restaurant located at:  10 FC Yorktown Mall, Lombard, Illinois;
>
> B.    Enjoin Defendants from conducting a substantially similar restaurant at the premises known as:   10 FC Yorktown Mall, Lombard, Illinois, or at any other location during the term of the Franchise Agreements pursuant to the Non-Compete provisions, ¶15 and ¶14.5 of the Franchise Agreements.

C.   In lieu of closing the business, Order the Defendants' competing restaurant to be transferred to a bona fide third party purchaser so that Defendant franchisees, their owner, Nabil Makhamreh, his family, any relatives, or any one connected with Defendants would not be associated with the competing business;

D.   Ordering Defendants to render an accounting to KAHALA of the gross receipts of its sales derived from the operation of the Charley's restaurant located at:  10 FC Yorktown Mall, Lombard, Illinois from store opening, to date; and

E.   Alternatively closing the competing restaurant the court should order Defendants to divest and disassociate themselves from the corporate business pursuant to the Franchise Agreements not be directly or indirectly connected with the competing business through officers, directors, shareholders, spouses, relatives or nay business relationship to perform any service for, be an employee; owner, or to have any financial or beneficial interest based upon the revenues or profits of the competing business at the Yorktown Mall, Lombard, Illinois.

F.   An award from Defendants of the damages arising from Defendants' breach of the Franchise Agreement, attorney's fees, expenses, and costs KAHALA incurred in this action.

G.   Such other further and different relief as the Court deems just and appropriate.

Date:  August 20, 2008                    KAHALA FRANCHISE CORPORATION.

By:    Gregory J. Ellis
       One of their attorneys

Gregory J. Ellis, Esq.
Gregory J. Ellis, Esq., Ltd.
1 Executive Court – Suite 1
South Barrington, IL 60010
IL ARDC #: 3127073
8/20/08

15

STATE OF NEW YORK    )
                     )
COUNTY OF ULSTER     )

## VERIFICATION

I, Joel R. Schweidel , being first duly sworn on oath, depose and state as follows:

1.    I am the Senior Vice President - Legal of KAHALA.;

2.    I am authorized to make this Verification on behalf of KAHALA.; and

3.    I have read the allegations of this Verified Complaint for Injunctive Relief and find that the facts stated therein are true and correct, except as to those matters alleged on information and belief, which, to the best of my knowledge, information, and belief, are true and correct.

_____
Joel R.Schweidel
Senior Vice President - Legal

Subscribed and sworn to
before me this 19th
day of August, 2008.

_____
Notary Public

Dorothea J. Fiero
Notary Public State of New York
No. #01FI6127204
Qualified in Columbia County
Commission Expires May 23, 20___

JUDGE DOW JR.

MAG. JUDGE BROWN

J. N.

## FRANCHISE AGREEMENT

AGREEMENT effective the __5__ day of __February__, __2004__ by and between Nicar Franchising, Inc., an Ohio Corporation, (Franchisor), 188 North Brookwood Avenue, Suite 100, Hamilton, Ohio  45013, and ____ __M&S  Cheesesteak Inc (Nabil S Makhamreh__ (Franchisee).

NOW THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1)    RECITALS - CAVEAT

Franchisor and its predecessors in interest have instituted, developed, promoted and established a unique restaurant business utilizing the service marks "The Great Steak & Fry Company" and "The Great Steak & Potato Company", which are registered with the U.S. Patent and Trademark Office, registration numbers 1,379,741 and 1,807,880 respectively as well as certain types of facilities, equipment, supplies, ingredients, and merchandising and business techniques and methods.  Franchisee recognizes the value of the business system developed by Franchisor to himself, Franchisor, and to other franchisees of Franchisor and desires to utilize the know-how and trade secrets of Franchisor and to use the marks "The Great Steak & Fry Company", "The Great Steak & Potato Company" as well as other trademarks, service marks or trade names which may be licensed by Franchisor, on the terms and conditions set forth in this Agreement. Franchisee further recognizes the registered marks will remain in force until January 21, 2006 and November 30, 2003, when applications for renewal may be filed.  In the event either registered mark is terminated prematurely, the Franchisee agrees this Agreement shall nevertheless remain in full force and effect and that all provisions of this Agreement relating to the licensing and use of the mark "The Great Steak & Fry Company" and "The Great Steak & Potato Company" shall apply with the same force and effect to whatever alternate mark or marks may be licensed by Franchisor to Franchisee.  This Agreement requires strict adherence to Franchisor's present and future requirements regarding menu items, advertising, physical facilities, etc., in order to maintain and enhance the value of the business system and the service mark and goodwill associated therewith.  Future investments may be required in Franchisee's location or locations by the terms of this Agreement.  THIS AGREEMENT SHOULD BE REVIEWED CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL BEFORE IT IS SIGNED BY FRANCHISEE.

FRANCHISEE ACKNOWLEDGES THAT (1) THE SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED HEREIN INVOLVES SUBSTANTIAL RISK AND DEPENDS UPON THE BUSINESS ABILITY OF FRANCHISEE AND FRANCHISEE'S PARTICIPATION IN OR SUPERVISION OF THE DAILY AFFAIRS OF THE BUSINESS; AND (2) NO WARRANTY OR OTHER ASSURANCE, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE, OR THE GROSS REVENUES, VOLUME OR EARNINGS LIKELY TO BE ACHIEVED, AND (3) NO STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION, EXCEPT AS SET FORTH HEREIN, IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

EXHIBIT
A

2)    GRANT OF LICENSE

2.1) Franchisor hereby grants to Franchisee, subject to all the terms and conditions of this Agreement, the exclusive right and license to use Franchisor's recipes, formulas and methods for the preparation and service of food and related items, together with the use of its service marks to the extent legally available, in the following locations:

Greenbrier Mall
Chesapeake, Virginia

2.2) Subject to the termination provisions of this Agreement, Franchisee agrees to operate during the term of this Agreement any and all locations established pursuant to this Agreement in accordance with the terms hereof.

2.3) The license granted herein shall be for the shorter of (a) a term equal in length to the term of a premises lease for the location or (b) ten years from the date the franchised business opens.

2.4) Franchisee expressly acknowledges and agrees that Franchisee does not acquire hereby any right, title or interest in or to the service marks "The Great Steak & Fry Company", "The Great Steak & Potato Company" or any other trademark, service mark or trade name which might be licensed pursuant to this Agreement.  Franchisor agrees to protect the service mark and/or tradename or trademark rights licensed hereunder from infringement and to prosecute infringers when such action may be reasonably necessary, proper and justified at its cost and expense.

2.5) Franchisee further acknowledges that the goodwill associated with the service marks is and shall remain the exclusive property of Franchisor and that Franchisee shall derive no benefit from such goodwill except through profit received from the operation or possible sale of one or more of the locations established pursuant to this Agreement during the term hereof.  Any enhancement of such goodwill during the term of this Agreement shall enure to the benefit of Franchisor except to the extent of such profits, if any, realized by Franchisee during the term of this Agreement, following which no value shall be attributable to any goodwill acquired or enjoyed by Franchisee pursuant to this Agreement and all right to use Franchisor's service marks, etc. shall revert automatically to Franchisor at no cost to Franchisor.

2.6) The service marks "The Great Steak & Fry Company" and/or "The Great Steak & Potato Company" shall be used only in connection with such products and services as may be approved or specified by Franchisor and shall at all times be used only in a manner approved by Franchisor.

2.7) Franchisee's rights to the use of Franchisor's service marks are specifically limited to the location or locations established pursuant to this Agreement.

2.8) Franchisee shall use no other trademarks, trade names or service marks in connection with such location or locations except as may be authorized in writing by Franchisor.

2.9) Nothing herein shall prevent Franchisor or any affiliated franchisor or franchisors from selling or granting licenses to others to sell, through grocery stores, food products which bear different trade names, trademarks, or service marks from those licensed hereunder at any location, whether within or without the area described in Section 2.1.

2.10) From time to time additional trademarks, service marks or trade names may be authorized by Franchisor for use by Franchisee in connection with the license granted hereunder. The parties agree that such trademarks, service marks or trade names shall be attached as an Appendix to this Agreement, which Appendix shall be separately subscribed to by the parties, prior to their use by Franchisee and that such marks or names shall be subject to all terms and conditions set forth herein.

3)    LOCATION SELECTION

3.1) Franchisor and Franchisee shall mutually select the sites of any and all locations established pursuant to this Agreement prior to execution of the Agreement.

3.2) Franchisee understands and acknowledges that Nicar Management, Inc., a sister corporation to Franchisor, may enter into a retail lease for a restaurant at the franchise location prior to or concurrently with the execution of this Franchise Agreement. In that event, Nicar Management shall sublease such premises to Franchisee pursuant to a Sublease. Franchisee understands and acknowledges that substantial time and expense must be expended by Nicar Management in negotiating such Lease. In the event Nicar Management enters into the lease for the location, Franchisee further understands and acknowledges that any default under the Sublease shall constitute a default under this Agreement and any default under this Agreement shall constitute a default under the Sublease.

4)    STANDARDS AND REQUIREMENTS

4.1) In order to establish proper and reasonable communications between the parties, all requirements and standards established by Franchisor must be in writing and receipt must be acknowledged by Franchisee.

4.2) Franchisee agrees that Franchisor's standardized design and decor of locations and uniformity of layout are essential to the image of the franchised business. In

3

recognition of the mutual benefits accruing from maintaining uniformity of appearances:

A. Franchisor shall make available to Franchisee standards, plans and specifications for the interior layout and where applicable, exterior layout and leasehold improvements to establish a Great Steak & Fry Company or Great Steak & Potato Company business, which Franchisee shall adapt at Franchisee's expense. Franchisor shall provide Franchisee with advice such as Franchisor determines is required in connection with the establishment of the location. Franchisee shall be responsible for contracting for and having completed all necessary work to comply with the requirements of this section, including all architectural and design fees associated therewith.

B. Franchisee agrees that each location established pursuant to this Agreement shall be constructed in strict compliance with standards, plans, and specifications approved in advance by Franchisor.

C. Franchisee agrees not to make any material alterations to the location without the prior written approval of Franchisor.

D. Franchisee shall promptly correct any deviations from approved standards, plans and specifications at Franchisor's request. Franchisee shall be responsible for any incurred expenses.

4.3) Franchisee shall, consistent with the terms of this Agreement, diligently develop the business of the location or locations established pursuant to this Agreement.

4.4) During the term of this Agreement, Franchisee shall strictly comply with all reasonable standards, specifications, processes, procedures, requirements and instructions of Franchisor regarding the operation of the location or locations established pursuant to this Agreement, which standards now exist or which may be established from time to time. Franchisee shall also strictly comply with all federal, state, and local health and consumer regulations concerning food handling, storage, preparation and serving. In the event the Franchisor's standards, specifications, processes, procedures, requirements and instructions differ from those set forth in the federal, state and local regulations, the most stringent must be adhered to by Franchisee. Franchisee shall take such action as is necessary to assure that:

A. A Franchisor certified manager devotes his full time to the supervision, management and operation of each location which may be established pursuant to this Agreement, the identity of whom shall be made known to Franchisor.

B. Franchisor's service mark is used only on and in association with the advertising and sale of products and services which shall in quality, mode and conditions of manufacture and sale, comply with such standards as are established or approved by Franchisor.

C. Franchisee offers for sale only items which appear on a menu approved in writing by Franchisor at least 45 days prior to the opening of the first location established pursuant to this Agreement.  Changes in Franchisee's menu or variations therefrom shall be made only with the written consent of Franchisor, which shall not unreasonably be withheld.

D. Only signs, menus and menu boards, advertising and promotional material, equipment, supplies, furnishings and fixtures, uniforms, paper goods, packaging, utensils, recipes, and food ingredients which meet Franchisor's standards and specification, as established from time to time, is used by Franchisee in connection with its business.

E. Equipment, signs, menu boards, supplies and other items are added, eliminated, substituted and modified at the location or locations established pursuant to this Agreement as soon as practicable in accordance with reasonable changes in Franchisor's specifications and requirements.

F. Cash registers with accessories or equipment to track sales and other data deemed necessary by Franchisor for its internal use are installed and used as specified by Franchisor.

G. Franchisee uses in preparing products only such ingredients, formulas, and supplies as are specified by Franchisor and in such portions, sizes and appearance and packaging as specified by Franchisor.

H. Each and every location established pursuant to this Agreement and everything located at such location and locations is maintained in first class condition and repair and is kept clean, neat and sanitary.  Such location or locations shall be adequately lighted and operated in a clean, wholesome and sanitary manner consistent with Franchisor's requirements.  All maintenance, repairs and replacements requested by Franchisor or needed in connection with such location or locations shall be promptly made and all employees shall be sanitary and clean and neat in appearance.

I. Each location established pursuant to this Agreement and its business complies with applicable laws, ordinances and governmental rules, regulations and other requirements including but not limited to health and sanitation requirements.

J. Such advertising materials as may be furnished by Franchisor from time to time for use by Franchisee is used only in the manner and during the periods specified by Franchisor.

K. All debts and taxes incurred in connection with the operation of Franchisee's business, except those duly contested in a bona fide dispute, are paid when due, including but not limited to debts payable to Franchisor.

L. Each location established pursuant to this Agreement is open for business a minimum of 360 days each calendar year this Agreement is in effect during such hours as may be specified by Franchisor, except such days as a location is closed for repairs as described in Section 14 (Condemnation and Casualty).

4.5) Franchisee shall treat any confidential operating manuals provided by Franchisor and all trade secrets and know-how of Franchisor as confidential. Franchisee shall take reasonable precautions to cause Franchisee's employees to keep such information confidential. All such information furnished by Franchisor in connection with the business of Franchisor or Franchisee shall be and shall remain the property of Franchisor, and, if in tangible form, shall be returned to Franchisor upon termination of this Agreement for any reason. Franchisee shall not copy, duplicate, record or otherwise reproduce all or any part of any material containing the trade secrets or confidential information of Franchisor and shall take all reasonable precautions to prevent Franchisee's employees from doing so.

4.6) Franchisor and its representatives shall have the right at all times to enter and inspect any location established by Franchisee pursuant to this Agreement to meet with and question Franchisee and personnel at such location concerning all matters that may pertain to compliance with this Agreement and with standards, specifications, requirements, instructions and procedures hereunder. Franchisee shall in all respects cooperate with Franchisor in its exercise of rights under this section.

4.7) Franchisor and its representatives shall have the right to enter the location for the purpose of installing, repairing or replacing any of the items required by Sections 4.2 and 4.4 to meet Franchisor's standards and specifications if, after first giving 30 days written notice to Franchisee, such items have not been installed, repaired or replaced. Reasonable expenses incurred by Franchisor for such actions shall be paid for by Franchisee within 30 days of receiving a statement for the expenses from Franchisor.

5)    MAINTENANCE AND UPGRADING OF LOCATIONS

5.1) Franchisee shall at all times strictly comply with all standards and specifications of Franchisor regarding the maintenance of the physical facilities of the location or locations established hereunder, including the layout of the furnishings and fixtures.

5.2) Franchisor may require Franchisee at any time Franchisor determines is necessary to refurbish or replace menu boards, photographs and graphics.  After three years from the opening of a location, Franchisor may require Franchisee to remodel and upgrade all or a part of the location, including the menu boards, photographs and graphics.  Franchisee shall from time to time abide by any other reasonable requirement of Franchisor with regard to the remodeling and upgrading of such location or locations to comply with standards then applicable to new franchisees.  Provided, however, that such requirements shall not impose an undue economic burden, as measured by the recognized value of the location or locations.

5.3) If any changes or additions of equipment or changes in or additions to the location or locations are required by Franchisor in connection with upgrading, Franchisee shall bear the entire cost thereof.  FRANCHISEE ACKNOWLEDGES THAT POSSIBLE ADDITIONAL INVESTMENTS MAY BE CALLED FOR PURSUANT TO THIS SECTION.

6)    PERSONNEL TRAINING AND ASSISTANCE

6.1) Franchisor requires Franchisee and managers for the location to obtain Franchisor training certification. Franchisor agrees to provide, prior to the opening of any location, a management certification training program of up to two weeks duration for the manager or managers of such location of Franchisee at a time mutually agreed upon by Franchisor and Franchisee.  The training program shall be at Franchisor's National Training Center in Hamilton, Ohio. Franchisee agrees to send such manager or managers through the training program and to bear the costs of salary, travel, hotel, meal and other expenses of persons attending.  Should Franchisee elect, with Franchisor's approval to attend a training program at a site other than Franchisor's National Training Center, all travel, hotel, meal and associated expenses incurred by Franchisor shall be paid by Franchisee.

6.2) Franchisor agrees to provide at Franchisor's expense at least one trained person for a total of one week to assist Franchisee on-site for the opening of the first location established pursuant to this Agreement.

6.3) During the term of this Agreement, Franchisee must have a manager with Franchisor training certification at the location.

7)   LICENSE FEE

In consideration of the rights granted herein, Franchisee shall pay to Franchisor a license fee of $20,000 for each restaurant location contemplated by this Agreement. A sum equal to 50% of the license fee for each location provided for herein shall be due upon the date of execution of this Agreement and the remaining 50% shall be due within 30 days of the opening date of each restaurant. In no event shall any license fees paid to Franchisor by Franchisee be refunded.

8)   ROYALTY FEE

8.1) On or before the 10th day of each month, Franchisee shall submit to Franchisor a statement as to gross revenues. The statement shall be in such form and detail as may be prescribed by Franchisor from time to time. Failure to submit the required statement as to gross revenues by the 10th day of any month shall be a breach of this Agreement. In addition, in the event Franchisee fails to timely submit the required statement, Franchisor may estimate the gross sales for purposes of determining royalties.

8.2) Royalties for each location established pursuant to this Agreement are due on the 10th day of each month for sales during the preceding month or partial month during the term of this Agreement. Royalties per unit opened hereunder shall be 5% of sales per unit. If the royalty is not received by the 10th day of the month for reasons beyond Franchisor's control, the royalty for the preceding month shall be 6% of sales.

8.3) Franchisee shall execute and deliver to Franchisor appropriate bank authorizations to allow Franchisor to automatically debit Franchisee's checking account for royalties due pursuant to this Agreement.

9)   GROSS REVENUES

9.1) No mention of products or services in this section is intended to  mean or imply that such products or services are approved for sale by Franchisee.

9.2) For purposes of this Agreement, gross revenues include the total of all monies and receipts derived from products prepared and services performed at the location or locations established pursuant to this Agreement and from all sales and orders made, solicited or received at such location or locations and from all other business whatsoever conducted at or from such location or locations, whether such revenues are evidenced by cash, credit, checks, gift certificates, services, property or other means of exchange, and whether such sales are of food, beverages, liquor, tobacco products, vending machine items, services, merchandise or products of any nature whatsoever.

9.3) However, gross revenues shall not include: (a) sales taxes imposed by governmental authorities directly on sales and collected from customers, provided the taxes are added to the selling price and are in fact paid by Franchisee to the appropriate governmental authorities; or (b) promotional or discount coupons to the extent that Franchisee realizes no revenue therefrom through issuance, redemption or otherwise. Cash refunded and credit given to customers, and receivables uncollected from customers, shall be deducted in computing gross revenues to the extent that such cash, credit and receivable represent amounts previously included in gross revenues on which royalties were paid.

9.4) Gross revenues shall be deemed received by Franchisee at the time the products, merchandise or services from which they derive are delivered, or at the time the relevant sale takes place, whichever occurs first. Gross revenues consisting of property or services shall be valued at the prices applicable to such products or service at the time they are received.

## 10)    ADVERTISING

10.1) Franchisee shall submit all advertising material to Franchisor 25 days prior to use and Franchisor shall have ten days to approve or disapprove the use, provided that if Franchisor takes no action, Franchisee may use the material and provided further, that Franchisor shall have no participation in establishing prices and charges by Franchisee for products or services of any kind.

10.2) Promotion and Advertising Fund: Franchisor shall have the right, in its sole discretion, to establish a national promotion and advertising fund (the "National Fund"), one or more regional promotion and advertising funds (the "Regional Fund(s)"), one or more local promotion and advertising funds, including for a single location site (the "Local Fund(s)") or designate a third party to promote Great Steak & Fry Co. and Great Steak & Potato Co. restaurants. In any event, Franchisor shall give 30 days notice to Franchisee and Franchisee shall begin making contributions to the National Fund, Regional Fund for Franchisee's regional market area, Local Fund for Franchisee's local market area, or third party at a rate up to 2% of gross sales per month, as determined by Franchisor. If the National Fund, Regional Funds, or Local Funds (collectively "the Funds") are established, they will be administered by Franchisor as follows:

A. Franchisor shall direct all promotion and advertising programs, with discretion over the cost, content and use. Franchisee understands and acknowledges that the respective Funds are intended to maximize public recognition of Great Steak & Fry Co. and Great Steak & Potato Co. restaurants and that Franchisor undertakes no obligation to make expenditures of the Funds for Franchisee which are equivalent or

proportionate to Franchisee's contribution or to ensure that Franchisee benefits directly or pro rata from the placement of advertising;

B. The Funds shall be used exclusively to meet the cost of preparing and maintaining promotion and advertising for Great Steak & Fry Co. and Great Steak & Potato Co. restaurants. The Funds shall be maintained in an account separate from other funds of Franchisor, and shall not be used to defray any of Franchisor's other operating expenses. Separate bookkeeping accounts will be maintained for the respective Funds;

C. The Funds are not an asset of Franchisor and a non-certified audit of the operation of the Funds will be prepared annually by an independent certified public accountant selected by Franchisor and will be made available to Franchisee upon request; and

D. Franchisor maintains the right to terminate each of the Funds, but shall not do so until the entire respective Fund has been expended for promotion and advertising purposes.

If a third party is designated to promote Great Steak & Fry Co. and Great Steak & Potato Co. restaurant, it shall be unaffiliated in any manner with Franchisor.

10.3) For non-food court locations, including but not limited to shopping strip sites, service stations, and free-standing buildings, Franchisee shall contribute $10,000 to a special bank account at the time of executing this Agreement for use solely in advertising and promoting opening of the business. Franchisee and Franchisor shall have joint control over the special bank account and shall mutually decide on the advertising and promotion expenditures until the account is depleted of all its funds.

11)  RECORDS AND AUDITS

11.1) All gross revenues shall be recorded on cash registers equipped with non-resetable gross revenue totals control devices or such other type of cash register as may be approved by Franchisor.

11.2) Franchisee may subscribe to Franchisor's accounting services system for the maintenance of books and records and the preparation of financial statements, if currently offered. A one time fee of $350 is due and payable to Franchisor within 30 days of the opening date of Franchisee's first location. When applicable, a one time fee of $250 is due and payable to Franchisor within 30 days of each of the opening dates of Franchisee's second and subsequent locations, whether granted pursuant to this Agreement or another Franchise Agreement. A monthly fee is due and payable to Franchisor by the 10th day of the month for the

preceding month for which the accounting services were rendered. The monthly fee for calendar years 2003 and 2004 ranges up to $600 depending on the level of service Franchisee desires. The monthly fee may thereafter, in Franchisor's sole discretion, be increased to reflect any increase in Franchisor's costs of maintaining and operating the accounting services. Franchisor may in the future, in its sole discretion, discontinue the accounting services system.

11.3) Franchisee shall, in addition to the provisions of Section 11.2 and in a manner and form satisfactory to Franchisor, prepare on a current basis, and preserve for no less than three years, complete and accurate records concerning gross revenues and all financial, operating, marketing and other aspects of the business conducted at the location or locations established pursuant to this Agreement. Franchisee shall also maintain an accounting system which fully and accurately reflects all aspects of such business. Such records shall include but not be limited to books of account, tax returns, register tapes, daily reports, statement of gross revenue, profit and loss statements on at least an annual basis, balance sheets on at least an annual basis, and such reports as Franchisor may reasonably request to evaluate or compile research data on any aspect or aspects of Franchisee's business. Franchisee shall submit to Franchisor within 120 days of the end of Franchisee's fiscal year a complete financial statement for the preceding fiscal year, including both a profit and loss statement and a balance sheet prepared or reviewed by an independent certified public accountant. In addition, if Franchisee's landlord of its leased or subleased premises conducts an audit of Franchisee's business, Franchisor shall have the right to inspect any resulting audit report.

11.4) From the date hereof until three years elapse following termination of this Agreement for any reason, Franchisor and its authorized agent shall have the right to request, receive, inspect and audit, at all reasonable times, any and all of the records referred to above wherever they may be located or at any other reasonable locations specified by Franchisor.

12)    PURCHASE OF EQUIPMENT AND SUPPLIES

12.1) Except as otherwise provided in Sections 12.8 and 12.9, Franchisee shall have the right to purchase the equipment, paper goods and other products required by Franchisor to be utilized in the establishment or operation of Franchisee's location or locations directly from any source which Franchisor has approved in advance.

12.2) Franchisor shall within 30 days of a request by Franchisee furnish Franchisee the then-current standards and specifications applicable to any equipment, supplies, trademark paper goods, or other products required by

Franchisor to be utilized in the establishment or operation of Franchisee's location or locations, provided that Franchisor shall not be obligated to disclose any of its trade secrets.  In addition, Franchisor shall within 30 days of a request by Franchisee furnish Franchisee the names and addresses of all manufacturers and distributors currently approved by Franchisor from whom such equipment, supplies, trademark paper goods and other products are available for sale to Franchisee.

12.3) Franchisor may make available to Franchisee at Franchisee's expense trademark paper products required for use in Franchisee's location or locations.

12.4) If Franchisee desires to purchase the required products from a manufacturer or distributor not then approved by Franchisor, Franchisee shall provide Franchisor with all information regarding such manufacturer or distributor reasonably required by Franchisor, and where appropriate, the manufacturer or distributor may be required to provide Franchisor with samples of the products that Franchisee desires to purchase.

12.5) Any tests reasonably required by Franchisor to determine whether any products meet Franchisor's current standards and specifications shall be performed by or under the direction or supervision of Franchisor but at the cost of the manufacturer or distributor.  Upon completion of any such tests and any other procedures reasonably required by Franchisor, and on  completion of Franchisor's determination as to whether the manufacturer or distributor possesses adequate capacity and facilities to supply Franchisee's need in the quantities, at the times and with the reliability requisite to an efficient operation, Franchisor shall promptly notify Franchisee and the manufacturers or distributor whether Franchisor approves the manufacturer or distributor as a source of supply of the products involved; and, if not, Franchisor shall advise Franchisee and the manufacturer or distributor of the basis of its decision. Franchisor shall not be required to approve sources of equipment, paper goods, or other products which do not meet Franchisor's standards and specifications or which constitute or embody trade secrets of Franchisor.  Franchisor shall not be arbitrary or capricious in establishing applicable standards and specifications.

12.6)  Franchisor shall from time to time review the quality of equipment, supplies, paper goods and other products produced or supplied by approved manufacturers or distributors.  On the basis of such review, Franchisor may remove manufacturers or distributors from the list of approved sources.  In such event, Franchisor shall promptly advise Franchisee of such action.

12.7) Franchisor shall have the right, in its sole discretion, to institute a national or local rebate advertising program with a bottler of its choice. Any rebate received by Franchisor shall be used to pay for national advertising programs and for bottler equipment rentals. Franchisee shall subscribe to the program within 30 days of receipt of written notice from Franchisor informing it of the program.

12.8) Franchisor shall have the right, in its sole discretion, to require Franchisee to purchase food items and single-use serving items from designated sources.

12.9) Franchisor shall have the right, in its sole discretion, to require Franchisee to purchase a cash register and auxiliary equipment to track sales and gather data required by Franchisor. Franchisee shall purchase the cash register and auxiliary equipment directly from Franchisor or from a source which Franchisor shall designate. Any revenue which Franchisor receives from Franchisee shall be used to defray its costs in acquiring the cash register and auxiliary equipment.

13)    INSURANCE AND INDEMNIFICATION

13.1) At all times during the term of this Agreement, Franchisee shall maintain in effect such insurance as may be required by the terms of any lease or mortgage covering Franchisee's location or locations, and in any event shall maintain:

A. Fire, extended coverage and vandalism and malicious mischief - 80% of actual cash value of building, contents, and improvements.

B. Employer's liability and workers compensation insurance as prescribed by applicable law.

C. Comprehensive general liability insurance on an occurrence basis naming Franchisor as a co-insured and underwritten by any reputable insurance carrier approved by Franchisor, covering the following risks in no less than the following amounts, subject to reasonable increase by Franchisor after five years and based upon inflation or future experience with claims asserted against businesses similar to Franchisee's.

| TYPE OF RISK | LIMIT OF LIABILITY |
| --- | --- |
| Bodily injury to or death of one or more persons. | $300,000 each accident or each person |
| Property damage or destruction | $100,000 each accident |
| Public and product liability | $300,000 each occurrence |

13.2) Simultaneously herewith, annually hereafter and each time a change is made in such insurance or insurance carrier, Franchisee shall furnish Franchisor with certification by the insurance carrier or carriers evidencing the term and coverage of the insurance in force and persons insured. Such certificates shall provide that the insurance coverage shall not be canceled, altered or permitted to lapse or expire without 30 days advance written notice to Franchisor.

13.3)  If Franchisor shall be subjected to any claim, demand or penalty or become a party to any suit or other judicial or administrative proceeding by reason of any claimed act or omission by Franchisee, Franchisee's employees or agents, or by reason of any claimed act or omission occurring at Franchisee's location or locations or with respect to the business or operation of such location or locations, Franchisee shall indemnify Franchisor against and hold it harmless from all judgements, settlements, penalties, losses liabilities, attorneys' fees, court costs and other expenses that may be incurred by or imposed on Franchisor in connection with any such claim, demand, penalty, suit or proceeding, or the investigation or defense thereof, and at the election of Franchisor, Franchisee shall also defend Franchisor against the same.  This obligation is in addition to Franchisee's obligation to purchase insurance as provided in Section 13.1.

14)   CONDEMNATION AND CASUALTY

14.1) Franchisee shall give Franchisor notice of any proposed taking through the exercise of the power of eminent domain at the earliest possible time.  If in the opinion of Franchisor a location or a substantial part thereof is to be taken, Franchisor shall give due and prompt consideration to transferring the license granted hereunder to a nearby location selected promptly, and in any event within four months of Franchisor's determination of taking.  If such transfer is authorized by Franchisor and Franchisee opens for business at such other location within one year of the closing of the old location, the new location shall thenceforth be deemed to be licensed under this Agreement in the same manner and for the same term as was the old.  If such a condemnation takes place and the new location does not, for whatever reason, become licensed under this Agreement in strict accordance with this paragraph, then the exclusive rights granted by this Agreement shall extend only to an area within a six mile radius of each of the other locations, if any, previously licensed under this Agreement. If there are no such other previously licensed locations, this Agreement shall terminate.

14.2) If a location established by Franchisee pursuant to this Agreement is damaged by fire or other casualty, Franchisee shall expeditiously repair the damage.  If such location is closed for repairs for more than six months, the effect on Franchisee's exclusive license and on this

14

Agreement shall be the same as if such location had been condemned and no new location licensed, as described in Section 14.1 above.

14.3) The term of this Agreement shall not be extended by any interruption in the operation of any location established by Franchisee pursuant to this Agreement and no event during the term of this Agreement shall excuse Franchisee from paying royalties as provided herein.

15) NON-COMPETE

15.1) During the term of this Agreement, Franchisee and the officers, directors, shareholders and agents of a corporate Franchisee shall not without the prior written consent of Franchisor directly or indirectly, through corporations, partnerships, trusts, associations, joint ventures, or other unincorporated businesses, perform any service for, engage in or acquire, be an employee of, have any financial, beneficial, or equity interest in, or have any interest based upon the profits or revenues of, any business substantially similar to that established pursuant to this Agreement; provided, however, that the foregoing restriction shall not apply to interests of 1% or less in a publicly-traded entity.

15.2) For two years following the termination of this Agreement for any reason, the same restrictions as in Section 15.1 shall apply, but only with respect to substantially similar businesses operated within a one hundred mile radius of the restaurant location described in Section 2.1.

15.3) For three years following the termination of this Agreement for any reason, the same restrictions as in Section 15.1 shall apply with respect to substantially similar businesses operated in the same shopping center or building in which the restaurant is located.

15.4) For purposes of Sections 15.1, 15.2 and 15.3, a "substantially similar business" is a business which sells or prepares philadelphia style cheesesteak sandwiches, and/or variations which include ham, chicken, turkey and vegetarian sandwiches.

15.5) If any court or other tribunal having jurisdiction to determine the validity or enforceability of the preceding section determines that, strictly applied, it would be invalid or unenforceable, the definition of a "substantially similar business" and the time and geographical provisions of the preceding sections shall be modified to the extent necessary, but only to that extent, so that the restrictions in that section, as modified, shall be valid and enforceable.

15.6) In recognition of the irreparable harm that a violation of any of the covenants of Sections 15.1, 15.2 and 15.3 would cause Franchisor, Franchisee agrees that in addition to any

15

other relief afforded by law, an injunction against such violation or violations may be sought against Franchisee and every other person concerned thereby, it being the understanding of the parties that both damages and an injunction shall be proper modes of relief and are not to be considered alternative remedies. In the event of any such violation, Franchisee agrees to pay, in addition to the actual damages sustained by Franchisor as a result thereof, the reasonable attorney fees incurred by Franchisor in pursuing its rights under this section.

16) ASSIGNMENT OR TRANSFER BY FRANCHISEE

16.1) Franchisee may not assign or transfer any of Franchisee's rights or obligations under this Agreement without prior written consent of Franchisor, such consent not to be unreasonably withheld.

16.2) No change in the stock ownership or control of a corporate Franchisee or issuance of new stock shall occur without prior written consent of Franchisor, such consent not to be unreasonably withheld.

16.3) No assignment or transfer pursuant to this section shall relieve any assignor or transferor from obligations of Franchisee which have accrued when the assignment or transfer takes place.

16.4) Franchisor shall not consent to the assignment or transfer of the license granted hereunder, or any part thereof, or any change in the ownership of the stock of a corporate Franchisee or issuance of new stock unless Franchisee first offers to Franchisor in writing to enter into such transaction with Franchisor upon the same terms and conditions and for the same or equivalent consideration. Franchisor shall have 30 days following the receipt of any such offer to accept the offer. The making of any such offer to Franchisor shall be a breach of this Agreement if it is not based upon a bona fide offer received by Franchisee.

16.5) Consent to an assignment or transfer permitted or permissable as reasonable may be refused by Franchisor unless prior to the effective date of the assignment or transfer (1) the assignee or transferee agrees to avail itself of the training required of new franchisees, (2) Franchisee has paid a sum of $5,000 to reimburse Franchisor for its reasonable legal and accounting fees, credit and investigation charges and expenses incurred as a consequence of such assignment or transfer, and (3) the assignee or transferee has executed Franchisor's then current standard Franchise Agreement for the remaining term of Franchisee's franchise.

## 17) ASSIGNMENT OR TRANSFER BY FRANCHISOR

Franchisor shall have the right to assign or transfer all or any part of its rights or obligations under this Agreement to any person or entity; provided, however, such person or entity in Franchisor's good faith and judgement is willing and able to assume Franchisor's obligations under this Agreement.

## 18) TERMINATION OF LICENSE BY FRANCHISOR

18.1) The License granted hereunder shall terminate immediately upon receipt by Franchisee of written notice from Franchisor of the occurrence of any of the following events:

A. Voluntary abandonment of the franchise relationship by Franchisee by failing to open for business for seven consecutive days during which Franchisee is required to open the business, or any shorter period after which it is not unreasonable under the facts and circumstances for Franchisor to conclude that Franchisee does not intend to continue to operate the franchise, without notice to Franchisor or cause.

B. The conviction of, or plea of no contest, by Franchisee or the manager or corporate officer of Franchisee in a court of competent jurisdiction of an offense directly related to Franchisee's business.

C. Failure to cure a default under this Agreement which materially impairs the goodwill associated with any trade name, trademark, service mark, or other commercial symbol licensed by Franchisor after Franchisee has received written notice to cure of at least 24 hours in advance of such notice of termination.

D. Franchisee is adjudicated as bankrupt, or files any petition or pleading under Chapter 11 of the Federal Bankruptcy or insolvency laws, or any involuntary petition is filed with respect to Franchisee under such laws, and is not dismissed within 30 days after it is filed.

E. Franchisee contests in any court or proceeding the validity of, or Franchisor's ownership of, any trade name, trademark, service mark or any other rights licensed hereunder or associated with Franchisor's business.

18.2) Franchisor may terminate the License granted hereunder 30 days after delivery of written notice to Franchisee upon the occurrence of any of the following events without the opportunity to cure:

A. Franchisee submits any financial statement or sales report which understates gross sales by 2% or more.

B. The business of Franchisee is sold, leased, or for any reason, passes from the actual supervision or control of Franchisee except as provided for in Section 16 of this Agreement.

C. Franchisee fails on three separate inspections to prepare products in accord with the Restaurant Operations Handbook and as required by Section 4.4F of this Agreement.

D. Franchisee fails on two separate occasions within a six month period to timely pay royalties, accounting services fees or any other fees due under this Agreement.

E. Repeated breaches of any of the other provisions of this Agreement.

18.3) Franchisor may terminate the License granted hereunder 30 days after delivery of written notice to Franchisee upon the occurrence of any of the following events and the failure of Franchisee to rectify within the 30 days, unless otherwise noted:

A. Franchisee fails to maintain and operate the business in accordance with the Restaurant Operations Handbook and the standards as required by Sections 4.2 and 4.4 of this Agreement.

B. Franchisee fails to submit any financial statement or sales report when required.

C. Franchisee denies Franchisor the right to inspect the business as provided for in Section 4.6 of this Agreement.

D. Franchisee denies Franchisor the right to examine Franchisee's books and records as provided for in Section 11.4 of this Agreement.

E. Franchisee fails to pay all amounts due under this Agreement within a period of 15 days after written notice of the default has been delivered by Franchisor to Franchisee.

F. Franchisee fails to pay all amounts due other parties under any premises lease or sublease agreement for the location which adversely affects Franchisor's interests or a related company's interests in any manner.

G. Franchisee operates the business at the location in a manner so as to cause a default under any premises lease or sublease agreement.

H. Franchisee fails to reimburse Franchisor for expenses incurred in installing, repairing or replacing items at the business as provided for in Section 4.7 of this Agreement.

I. Franchisee's failure to perform any other material provision of this Agreement.

19) TERMINATION OF LICENSE BY FRANCHISEE

Franchisee may terminate the License granted hereunder on any grounds available by law; provided, however, all non-compete obligations contained in this Agreement shall survive any such termination and remain in full force.

20) POST TERMINATION OBLIGATIONS

In the event of the expiration or termination of this Agreement for whatever reason, all rights granted to Franchisee shall terminate, and:

A. Franchisee shall immediately cease to operate the location or locations established pursuant to this Agreement and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a franchisee of Franchisor.

B. Franchisee, and the officers, directors, shareholders and agents of a corporate Franchisee, shall immediately discontinue use of all of Franchisor's service marks or trademarks, recipes, formulas and methods for the preparation and service of food related items, know-how and trade secrets and shall immediately and at no cost to Franchisor remove signs and designs from both the exterior and interior of any and all locations established pursuant to this Agreement, which signs or designs bear the service marks, designations or marks similar thereto. If Franchisee fails immediately to remove the signs and make such changes, Franchisor may do so by entering the premises of any or all of Franchisee's locations as established pursuant to this Agreement and Franchisee shall pay Franchisor the costs it so incurs.

C. Franchisee shall return to Franchisor all confidential operating manuals and other confidential materials.

D. Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within 30 days after termination or expiration of this Agreement.

E. Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates. In the event of termination for any default of Franchisee, such sums shall include all damages, costs and expenses, including reasonable attorneys' fees incurred by Franchisor as a result of the default, which obligation shall give rise

to and remain until paid in full, a lien in favor of Franchisor against any and all of the personal property, fixtures, equipment and inventory owned by Franchisee and on the premises at the time of default.

F.   Franchisee shall, within three days after receipt of written notice from Franchisor to do so, execute such documents as may be necessary to assign to Franchisor or such party as Franchisor may designate all of Franchisee's rights, duties and obligations under and pursuant to its premises lease for the restaurant location.   In the event that Franchisee fails or refuses within the three day period to execute such assignment, Franchisor shall have the right, for and on behalf of Franchisee, to execute such assignment. Franchisee grants to Franchisor the irrevocable right, power and authority to execute, on Franchisee's behalf, and in its name and stead such documents as may be necessary in order to effect such an assignment.   Nothing contained herein shall be deemed to require Franchisor to assume Franchisee's obligations under or pursuant to its said lease, nor to require Franchisor to exercise the power of attorney herein granted to Franchisor.   Should Franchisee fail to transfer possession of the premises to Franchisor, Franchisor shall have the right to enter upon Franchisee's premises, forcibly if necessary, without being guilty of trespass or any other tort, and without prejudice to Franchisor's other rights and remedies, for the purpose of taking possession without legal process.

G.   Franchisee shall destroy, or at Franchisor's option, upon payment of the fair market value thereof by Franchisor, return to Franchisor all signs, advertising materials, supplies and inventory and any other items bearing Franchisor's service marks, trademarks or trade names licensed pursuant to this Agreement.

H.   Franchisee shall, within three days after receipt of written notice from Franchisor to do so, offer to transfer ownership and possession of all equipment and furnishings of the business to Franchisor.   Franchisor or it designee shall have the right, but not the duty, to be exercised by notice of intent to do so within 30 days after termination or expiration, to purchase any or all of Franchisee's equipment and furnishings at fair market value or to assume Franchisee's leases for Franchisee's equipment. With respect to any purchase by Franchisor as provided herein, Franchisor shall have the right to set off all amounts due from Franchisee under this Agreement and any amounts which are payable to Franchisor's subsidiaries or affiliates.   Should Franchisee fail to transfer ownership and possession of all the aforementioned equipment and furnishings to Franchisor upon request, Franchisor shall have the right to enter upon Franchisee's premises, forcibly if necessary, without being guilty of trespass or any other tort, and without prejudice to Franchisor's other rights and remedies, for the purpose of taking possession of such

assets without legal process.

    I.  Franchisee shall comply with the non-compete covenants contained in Sections 15.2-15.6 of this Agreement.

    J.  This section shall not apply to the operation by Franchisee of any other franchised restaurant pursuant to any other franchise agreement between Franchisor and Franchisee.

21) RENEWAL

Franchisor agrees to renew this franchise for an additional term equal in length to the option term of the underlying lease, but not to exceed ten years, if the following conditions are met:

    A. Franchisee signs a current form of this Agreement.

    B. Franchisee, in Franchisor's judgement, has complied with all of its obligations under this Agreement.

    C. Franchisee gives Franchisor written notice of its desire to renew. This notice is to be delivered to Franchisor not earlier than six months before nor later than three months before the expiration of the term of this Agreement.

    D. Franchisee pays a renewal fee of $10,000 or, if fewer than five full years are left on a premises lease for the location, $2,000 per year for each year remaining on the premises lease.

22) ABSENCE OR INCAPACITY

22.1) If Franchisee dies or becomes incapacitated, subject to the conditions in Section 16, the personal representative may sell or assign the Franchisee's interest herein. If Franchisee is a corporation at the time of the demise of Franchisee's controlling stockholder, subject to the conditions in Section 16, the personal representative may sell the stockholder's shares.

22.2) If Franchisee dies or becomes incapacitated and his personal representatives have not received (or do not wish to accept) a bona fide offer to sell, and if under controlling local law or the deceased franchisee's Will, his interest in this Agreement and in the Franchisee's business is distributable to heirs or legatees who are members of his immediate family, or if a personal guardian or member of Franchisee's immediate family desire to run Franchisee's business, and who otherwise would qualify as assignees under the terms of Section 16, then such attempted assignment by operation of law or Will shall not be deemed in violation hereof or consent thereto unreasonably refused, provided, such heirs, legatees, personal guardians or immediate family

members accept the conditions imposed in Section 16 otherwise permitted assignees.

22.3) In the event that Franchisee is absent or incapacitated by reason of illness or death and the Franchisee is not, in the sole judgement of Franchisor, able to operate the business, Franchisee authorizes Franchisor to operate the business to prevent any interruption of Franchisee's business which would cause harm to such business and thereby depreciate the value thereof until the provisions of Sections 22.1 and 22.2 have been fulfilled or complied with and without waiver of any other rights or remedies Franchisor may have under this Agreement. Notwithstanding the authorization by Franchisee to Franchisor to operate the business, Franchisor shall not be obligated and nothing contained herein shall be deemed to obligate Franchisor to operate such business. All monies from the operation of the business during such period of operation by Franchisor shall be kept in a separate account and the expenses of the business, including reasonable compensation and expenses for Franchisor's representatives, shall be charged to such account. If, as herein provided, Franchisor temporarily operates for Franchisee the business, Franchisee and his heirs, representatives and assigns shall indemnify and save harmless Franchisor and any representative of Franchisor who may act hereunder from all claims, demands, liabilities and expenses arising out of or in connection with the operation of the business by Franchisor.

23) INDEPENDENT CONTRACTOR

Franchisee is an independent contractor and shall have no authority to act as Franchisor's agent or to bind Franchisor in any manner whatsoever.

24) WHOLE AGREEMENT

This Agreement supersedes and cancels all prior agreements, except for or other than those contained in the Uniform Franchise Offering Circular (UFOC), between the parties hereto. It incorporates the complete agreement of both parties and may not be altered, modified or changed in any way except by a subsequent written amendment subscribed to by both parties hereto and attached hereto.

25) NON-WAIVER

The failure of Franchisor at any time to require the performance of any of the provisions of this Agreement shall in no way affect its rights thereafter to require full performance of the same.

26)  SEVERABILITY

Should any one or more provisions of this Agreement be determined to be illegal or unenforceable, such determination shall not invalidate the whole Agreement, and all other provisions shall nevertheless remain valid and effective.

27)  NOTICES

Any notices required or desired to be given pursuant to this Agreement shall be mailed to the parties at their respective addresses as shown on the first page of this Agreement.  Such addresses may be changed by the parties by giving of proper notice.  Notices shall be deemed to have been received two days after being deposited in the U.S. mail, postage paid.

28)  GOVERNING LAW AND VENUE

28.1) This Agreement shall be interpreted in accordance with and governed by the laws of the State of Ohio and any applicable federal laws.  If any of the provisions of this Agreement are inconsistent with the law of the state where the franchised restaurant business is located, then the law of the latter state shall apply.

28.2) Any action brought by either party in any court, whether federal or state, shall be brought within the County of Butler, State of Ohio, or in the federal district for Hamilton, Ohio and the parties do hereby waive all questions of personal jurisdiction or venue for the purposes of carrying out this Section.

28.3) Either party to this Agreement named as a defendant in an action brought in connection with this Agreement in any other court outside of the County of Butler, State of Ohio or the federal district for Hamilton, Ohio shall have the right to have the venue of said action changed to the aforesaid county or district, or, if necessary, have the case dismissed, requiring the other party to refile said action in an appropriate court in the aforesaid county or federal district.

29)  CAPTIONS AND SECTION NUMBERS

This Agreement shall be construed without reference to titles of Articles and Sections, which are inserted only for convenience of reference.

30)  SUBMISSION OF AGREEMENT

Submission of this Agreement to Franchisee does not construe an offer to License; this Agreement shall become effective only upon execution and delivery thereof by Franchisor and Franchisee.

31)  OBLIGATIONS OF FRANCHISEE'S PRINCIPALS

If Franchisee is a corporation, general or limited partnership, or limited liability company, then all obligations of Franchisee under this Agreement shall also be the obligation of each shareholder, officer, general partner, limited partner, or member of Franchisee. By their respective signatures hereto, each shareholder, officer, general partner, limited partner, and member of Franchisee acknowledges and accepts the duties and obligations imposed upon each of them individually by the terms of this Agreement and each shall execute a Guarantee attached to this Agreement.

32)  ACKNOWLEDGEMENTS

Franchisee acknowledges that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits, or expenses from the franchise except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement. Franchisee further acknowledges receiving Franchisor's Uniform Franchise Offering Circular at least ten business days before, and a copy of this Agreement at least five business days before, signing this Agreement and paying all or part of the License Fee.

IN WITNESS WHEREOF, the parties hereto have set their hands.

NICAR FRANCHISING, INC., (an Ohio Corporation)

By: _____        _____
                                                    witness

FRANCHISEE

By: Nabil Makhamreh   _____
    Neebil Makhamra    witness   Faten Makhamreh

YOU, THE PURCHASER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH BUSINESS DAY AFTER THE DATE YOU SIGN THIS AGREEMENT. SEE THE ATTACHED NOTICE OF CANCELLATION FOR AN EXPLANATION OF THIS RIGHT.

## NOTICE OF CANCELLATION

TRANSACTION DATE_____

　　　　YOU MAY CANCEL THIS TRANSACTION, WITHOUT PENALTY OR OBLIGATION, WITHIN FIVE BUSINESS DAYS FROM THE ABOVE DATE.  IF YOU CANCEL, ANY PAYMENTS MADE BY YOU UNDER THE AGREEMENT, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING THE SELLER'S RECEIPT OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.  IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR BUSINESS ADDRESS ALL GOODS DELIVERED TO YOU UNDER THIS AGREEMENT; OR YOU MAY IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.  IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THEM WITHOUT FURTHER OBLIGATION.  IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THEM TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR THE PERFORMANCE OF ALL OBLIGATIONS UNDER THIS AGREEMENT.  TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM, TO NICAR FRANCHISING, INC., AT 188 NORTH BROOKWOOD AVENUE, SUITE 100, HAMILTON, OHIO 45013 NOT LATER THAN MIDNIGHT OF _____.

　　　　I HEREBY CANCEL THIS TRANSACTION.


_____　　　　_____
DATE

08CV4750
JUDGE DOW JR.
MAG. JUDGE BROWN
J. N.



# FRANCHISE AGREEMENT



# FRANCHISE AGREEMENT

## between

## KAHALA FRANCHISE CORP.

## and

## MATTHEW CHEESESTEAK, INC., an Illinois corporation

ARTICLE 1.   GRANT OF FRANCHISE TERRITORY ..................................................2

   1.1   Franchise Grant. ..................................................................................2
   1.2   Exclusive Territory. .............................................................................3
   1.3   Franchisee Representations. ...............................................................3
   1.4   Term of Agreement. .............................................................................3

ARTICLE 2.   SITE SELECTION AND FRANCHISE DEVELOPMENT ......................4

   2.1   Site Selection Procedures. ..................................................................4
   2.2   Lease and Purchase Approval. ............................................................4
   2.3   Construction. ........................................................................................4
   2.4   Signage. ...............................................................................................5
   2.5   Relocation. ...........................................................................................6
   2.6   Restricted Use of Restaurant Site .......................................................6

ARTICLE 3.   OPERATIONS ...................................................................................6

   3.1   Commencing Operations. .....................................................................6
   3.2   Supplies and Promotional Materials; Roll-Outs. ...................................7
   3.3   Fixtures, Furnishings, and Equipment ..................................................7
   3.4   Internet Site Hosting. ...........................................................................7

ARTICLE 4.   TRAINING, ASSISTANCE AND START-UP MATERIALS...................8

   4.1   Initial Training Program. .......................................................................8
   4.2   Employee Training. ...............................................................................8
   4.3   Additional Programs; Continuing Assistance. ......................................9
   4.4   Confidential Operations Manuals. .........................................................9
   4.5   Computer Systems; Debit and Credit Card Processing. ......................10

ARTICLE 5.   FEES AND DEPOSITS ...................................................................10

   5.1   Initial Franchise Fee. ..........................................................................10
   5.2   Royalty Fee. ........................................................................................11
   5.3   Advertising Fees. ................................................................................11
   5.4   Depository Account .............................................................................12
   5.5   Lease Guarantee Fee. .........................................................................13
   5.6   Lease Negotiation Fee. ........................................................................13
   5.7   Lease Procurement Fee. ......................................................................13
   5.8   Additional Training Fee. .......................................................................13

5.9     Renewal Fee.................................................................13

5.10    Transfer Fee................................................................14

5.11    Training Fee................................................................14

5.12    Late Report, Non-Sufficient Funds and Default Fees.....................14

5.13    Audit Fees..................................................................14

5.14    No Accord or Satisfaction...............................................15

ARTICLE 6.     PROPRIETARY MARKS..................................................15

6.1     Ownership and Right to Use..............................................15

6.2     Covenants of Franchise Owners..........................................15

6.3     Limitations on Franchise Owner's Use of Proprietary Marks.............16

6.4     Non-Exclusive License of Proprietary Marks............................17

6.5     Notification of Infringement and Claims................................17

ARTICLE 7.     TRADE SECRETS AND PROPRIETARY INFORMATION.........................17

7.1     Ownership and Use........................................................17

7.2     Confidentiality Agreement...............................................18

ARTICLE 8.     RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION...................18

8.1     Relationship of the Parties.............................................18

8.2     Indemnification of Franchisor...........................................18

8.3     Indemnification of Franchisee...........................................19

8.4     Survival....................................................................19

ARTICLE 9.     OPERATING STANDARDS AND DUTIES OF FRANCHISE OWNER................19

9.1     General Operating Standards and Compliance with Operations Manuals....19

9.2     Authorized Products and Services........................................19

9.3     Specifications and Standards for Supplies; Approved Suppliers; Roll-Outs..............................................................20

9.4     Compliance with Legal Requirements and Good Business Practices.........21

9.5     Maintenance of Insurance.................................................21

9.6     Management of the Franchised Business..................................22

9.7     Conflicting and Competing Interests....................................22

9.8     Inspections by Franchisor...............................................23

9.9     Shareholder Guaranty.....................................................23

9.10    Ownership Reports........................................................23

ARTICLE 10.    ADVERTISING AND PROMOTION ................................................24

  10.1  Advertising by Franchisor. ..........................................................24

  10.2  Advertising by Franchisee. .........................................................24

ARTICLE 11.    ACCOUNTING PROCEDURES AND REPORTS ...................25

  11.1  Maintenance of Records. ............................................................25

  11.2  Audit by Franchisor. ....................................................................26

  11.3  Ownership Information. ................................................................27

ARTICLE 12.    ASSIGNMENT, SALE OR TRANSFER .................................27

  12.1  Prior Consent of Franchisor to Assignment. ..........................27

  12.2  Advance Notice of Proposed Terms and Right of First Refusal. ..........................27

  12.3  Requirement for Consent to Transfer .....................................28

  12.4  Death or Incapacity of Franchisee. ..........................................29

  12.5  Assignment by Franchisor. .........................................................30

  12.6  Restrictions on Security Interests and Subfranchising. ........30

ARTICLE 13.    RENEWAL OF FRANCHISE .................................................31

ARTICLE 14.    DEFAULT AND TERMINATION ............................................32

  14.1  Default; Termination. ...................................................................32

  14.2  Opportunity to Cure. ....................................................................33

  14.3  Remedies ......................................................................................34

  14.4  Effect of Termination or Expiration. ..........................................35

  14.5  Confidentiality; Covenant Not to Compete. .............................37

  14.6  Continuing Obligations. ...............................................................38

  14.7  Right to Use. ..................................................................................38

  14.8  Remedies. ......................................................................................38

ARTICLE 15.    NOTICES ...............................................................................38

ARTICLE 16.    CONSTRUCTION AND ENFORCEMENT; MISCELLANEOUS ...................39

  16.1  Independent Contractors. ...........................................................39

  16.2  Severability and Substitution of Provisions. ..........................39

  16.3  Applicable Law and Forum; Waiver of Jury. ...........................39

  16.4  No Guarantee of Franchisee's Success. .................................40

  16.5  Existence of Various Forms of Franchise Agreements. .........40

16.6   Franchise Owner May Not Withhold Payments. ........................................40

16.7   Remedies Are Cumulative. ........................................40

16.8   Interpretation. ........................................40

16.9   Waiver. ........................................40

16.10  Litigation Expense. ........................................41

16.11  Cross Default. ........................................41

16.12  Cross Termination. ........................................41

16.13  No Third Party Beneficiaries. ........................................41

16.14  Binding Effect; Modification. ........................................41

16.15  Entire Agreement; Nature and Scope; Construction. ........................................41

16.16  Terminology. ........................................42

16.17  Counterparts. ........................................43

16.18  Offerings. ........................................43

16.19  Time. ........................................43

16.20  Gender, Name and Captions. ........................................43

16.21  Nature of Liability. ........................................43

ARTICLE 17.    ACKNOWLEDGMENTS AND REPRESENTATIONS OF FRANCHISEE....43

17.1   Certain Representations and Warrants of Franchisee. ........................................43

17.2   Additional Information Respecting Franchisee. ........................................45

17.3   Acknowledgements of Franchisee. ........................................46

ARTICLE 18.    SUBMISSION OF AGREEMENT ........................................47

18.1   No Offer by Franchisor. ........................................47

Exhibits

Exhibit 1    Ownership Information Sheet

Exhibit 2    Required Lease Terms

Exhibit 3    Electronic Funds Transfer Authorization

Exhibit 4    Guaranty of Contract Franchise Agreement

Exhibit 5    Addendum to Franchise Agreement and Related Franchise Documents for Non-Traditional Locations (applicable only for Non-Traditional Locations)

Exhibit 6    State Specific Addendum (applicable only for the following states: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Washington, & Wisconsin)

# THE GREAT STEAK & POTATO COMPANY
# FRANCHISE AGREEMENT

**PARTIES:**

KAHALA FRANCHISE CORP.,                                    ("Franchisor")
a Delaware corporation
7730 East Greenway Road, Suite 104
Scottsdale, Arizona 85260


MATTHEW CHEESESTEAK, INC.,                                 ("Franchisee")
an Illinois corporation
1901 Brier Glen Drive
Plainfield, IL 60586
Telephone No.: 815-439-9895

**STORE NAME AND NO.:**    Eastland Mall; Store No.: 7139

**EFFECTIVE DATE:** September 7, 2007

**TRADITIONAL OUTLET (YES or NO):**    Yes

**OUTLET DESCRIPTION IF NON-TRADITIONAL:**    N/A

A Traditional location offers a full menu selection, and a Non-Traditional location offers a limited menu selection. Non-Traditional locations consist of an event cart, kiosk, express or co-branded location, or an outlet located within a health club, travel plaza, or convenience store.

To simplify the language in this Agreement, the terms "we," "us," "our" and the like may be used to refer to the Franchisor, and the terms "you," "your" and the like may be used to refer to the Franchisee.

**RECITALS:**

This Agreement is entered into with reference to the following facts and circumstances:

A.    Franchisor has over a period of time and at considerable expense developed and established a uniform and unique method of operation, customer service, advertising, publicity, processes, recipes, techniques and technical knowledge in connection with the restaurant business, specializing in genuine Philadelphia Cheesesteak sandwiches, fresh-cut French fries, fresh-squeezed lemonade, and baked potatoes with all of the toppings and other fast food-related menu items. These restaurants do business under the trade name "*The Great Steak & Potato Company*" (sometimes referred to as "*Great Steak & Potato*", "outlets" or "restaurant(s)"). Many of these recipes, techniques, and much of the information, constitute trade secrets. All of the outlets' knowledge, experience, processes, methods, specifications, techniques and proprietary marks and information of Franchisor are referred to in this Agreement as the "System."

B.    Franchisor owns and has issued franchises to others for the operation of outlets in the United States of America and in other countries. Franchisor has registered the trademarks and service marks "*The Great Steak & Potato Company*" and other related proprietary marks with the United States Patent and Trademark Office and, if necessary, with offices in other countries serving similar functions.    These proprietary interests, trademarks, service marks, logos, insignias, copyrights, domain names, trade names and trade dress are referred to in this Agreement as the "Proprietary Marks."

C.    Franchisor is engaged in the business of licensing to independently-owned businesses the right to use the Proprietary Marks in connection with the operation and promotion of the System.

D.    Franchisee understands and recognizes that: (1) the developments and properties of Franchisor as recited above are of considerable value; and (2) it is of importance to Franchisor and all of its franchisees to maintain the development of the System in a uniform and distinctive manner, allowing Franchisee and all other franchisees of Franchisor to enjoy a public image and reputation greatly in excess of that which any single Franchisee could establish.

E.    Franchisee desires to make use of the trademark and service mark "*The Great Steak & Potato Company*" and to enjoy the benefits of that mark, the other Proprietary Marks, and the System; and to establish a "*Great Steak & Potato*" franchise to be operated in accordance with the methods, practices and procedures set forth from time to time by Franchisor in its confidential Operations Manuals, Construction and Design Manuals, and related documents, both now existing and hereinafter developed (collectively, the "Operations Manuals").    Franchisor is willing to grant Franchisee the right to do so under the terms, conditions and provisions set forth in the following Agreement. (This Agreement, along with the Appendices, Addenda, Attachments and Exhibits, attached to it and/or executed with it constitute the Franchise Agreement, and are referred to in this Agreement as the "Franchise Agreement" or this "Agreement.")

F.    Franchisee recognizes the necessity and desirability of protecting the reputation, goodwill, trade secrets, and confidential business information of Franchisor; and that disclosure of trade secrets and confidential business information, including specifics of the System to any third party, will cause irreparable damage and harm to Franchisor.

## AGREEMENT:

The parties agree as follows:

## ARTICLE 1.    GRANT OF FRANCHISE TERRITORY

### 1.1    Franchise Grant.

Franchisor grants Franchisee a *Great Steak & Potato* Restaurant Franchise that includes the right to use the System and the Proprietary Marks as provided in this Agreement, at the following location (the "Franchised Business"):

Enclosed Structure Description:        Eastland Mall _____
(if applicable)

Street Address:            <u>1615 East Empire Street, Space FC-G</u>

City/State/Zip Code:         <u>Bloomington, Illinois 61701</u>

**1.2     Exclusive Territory.**

a.     For franchises located in shopping malls or within another enclosed structure (i.e. airport, medical center, office building, health club, entertainment and sports complex, etc.), as identified under the "Enclosed Structure Description" in *Section 1.1* above, Franchisee's exclusive territory is limited to the identified shopping mall or other enclosed premises. In all other cases, we will not establish or franchise another "*Great Steak & Potato*" restaurant within a radius of one (1) mile of the above address, unless the parties have agreed to a different exclusive territory, as set forth below, due to the Franchised Business being located in a highly dense area or a highly remote area, as applicable (as applicable, the "Territory"), unless Franchisee first gives its written consent, and except for the sale of pre-packaged *Great Steak & Potato* branded products in grocery stores and other distribution outlets in the Franchisee's exclusive Territory. You hereby acknowledge that Franchisor also currently franchises the following quick service restaurants that may be similar to the Franchised Business: (i) Taco Time, (ii) Samurai Sam's, (iii) Rollerz, (iv) Surf City Squeeze, (v) Frullati Café and Bakery, (vi) Ranch *1, (vii) Wafflo, (viii) Johnnie's Pizza, and (ix) Blimpie (collectively, the "Additional Concepts"). You further acknowledge that Franchisor may sell franchises of its Additional Concepts to third parties and/or operate one or more locations of its Additional Concepts as company-owned locations within your exclusive Territory. You may relocate the Franchised Business within its granted Territory only with our prior written consent and approval of the relocation site as set for in *Section 2.5* below.

Different Exclusive Territory: _____ N/A _____

b.     This franchise is granted only for the specific location (the "Site" or the "Premises") and Territory identified above, and grants no rights outside that Site and Territory; nor does it include any territorial protection against competition. We reserve the sole and unlimited right to establish and operate, or to permit others to operate, *Great Steak & Potato* franchises at, or grant *Great Steak & Potato* franchises for, any other locations.

c.     There is no minimum sales quota to maintain your Territory.

**1.3     Franchisee Representations.**

Franchisee and all shareholders, partners, and members of Franchisee represent and warrant that each individual is a United States citizen or a lawful resident alien of the United States; that each corporation or other business entity that is a party to this Agreement is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information that Franchisee has provided to us in connection with Franchisee's application for this *Great Steak & Potato* franchise is true and accurate.

**1.4     Term of Agreement.**

The term of this Agreement will commence on the Effective Date of this Agreement and will terminate on the earlier of the following: (i) the ten (10) year anniversary of the date of this Agreement; or (ii) the expiration of the term of the real estate lease for the Premises of the Franchised Business, including any renewal options thereto (the "Term"), unless terminated

earlier in accordance with *Article 14* of this Agreement or any other provisions of this Agreement, or renewed in accordance with *Article 13* of this Agreement.

## ARTICLE 2.   SITE SELECTION AND FRANCHISE DEVELOPMENT

### 2.1   Site Selection Procedures.

You must select a Site approved by us in writing, for the *Great Steak & Potato* restaurant within two (2) years after the date of this Agreement. If you cannot secure an acceptable Site for your restaurant in your Territory within two (2) years after the date of this Agreement, then we may terminate this Agreement by giving you written notice to that effect. We will have no obligation to refund to you all or any part of your Initial Franchise Fee (as defined in *Section 5.1* of this Agreement) in the event of such a termination, as the retention of the Initial Franchise Fee by us will be deemed liquidated damages.

### 2.2   Lease and Purchase Approval.

If you intend to lease the Site for your *Great Steak & Potato* restaurant, the lease will be subject to our prior approval, and you must provide us with a copy of the lease and details relating to square footage, rental per square foot, the term of the lease, and such other terms as we reasonable require at least ten (10) days prior to executing the lease. Each such lease must contain the provisions set forth in <u>Exhibit 2</u> attached to this Agreement, and must specifically state that we are a third party beneficiary of the lease. If we cure any default by you under the lease, any amounts that we pay to cure the default will be payable by you to us on demand, together with interest thereon, at the rate of one and one-half percent (1½%) per month from the date we make such payment; or, if less, at the maximum rate that does not violate applicable state usury laws (the "Default Rate").

If you intend to purchase the Site for your *Great Steak & Potato* restaurant, the terms of such purchase shall be subject to our prior approval, and you must provide us with a copy of the purchase agreement and details relating to square footage, price per square foot and such other terms as we reasonably require, at least ten (10) days prior to executing the purchase agreement.

You acknowledge and understand that our approval of any specific location, lease or purchase agreement does not in any way guarantee or ensure its success or profitability, or its conformity to applicable laws, and such approvals are only for our own benefit.

### 2.3   Construction.

a.   You must, at your own cost and expense, construct, furnish and equip the *Great Steak & Potato* restaurant at the Site selected by you and approved by us, in accordance with plans and specifications approved by us and/or our third party approved architect. You must, at your own cost and expense, use our designated and approved third party architect and project management firm (the "Firm") and one of the approved contractors as set forth in the pre-opening section of the Operations Manuals. You or the Firm must provide us with one (1) set of detailed plans and specifications, including landscaping and parking space, if applicable, (the "Plans") for your Franchised Business within fifteen (15) days after selection of the Site. We will have fifteen (15) days thereafter to approve or disapprove of the Plans (the "Review Period"). If we do not advise you or the Firm of our disapproval in writing prior to the end of the Review Period, the Plans will be deemed to have been approved by us. If we disapprove of the Plans,

we will so advise you or the Firm in writing prior to the end of the Review Period and specify the reasons for our disapproval. In this event, we will meet with you or the Firm and attempt in good faith to agree upon acceptable Plans.

b.    If such an agreement is not reached within ten (10) days after the expiration of the Review Period, we may terminate this Agreement by giving you written notice to that effect. We will have no obligation to refund to you all or any part of the Initial Franchise Fee in the event of such a termination. If such an agreement is reached, you or the Firm will, as soon as practical, provide to us at your expense, a revised set of Plans reflecting the agreed-upon changes.

c.    Any material modifications to the approved Plans must be submitted to us for approval, and you will not undertake any construction until such modifications have been approved by us. Any modifications to approved Plans thereto are for our benefit only and not for your benefit or that of any third party. Such modifications do not constitute any representation by us that the Plans comply with applicable zoning laws, building codes or other laws.

d.    You will be responsible for the cost of obtaining all necessary governmental construction permits and licenses, and you, with the assistance of the Firm, must, at your expense, comply with all laws, zoning ordinances, rules and regulations of any governmental agencies that may govern the construction of the *Great Steak & Potato* restaurant in accordance with the approved Plans. We will have the right, but are not required, to meet with the Firm and/or inspect the construction during its course (for our sole benefit and not for your benefit or the benefit of any third party) in order to assure that the provisions of this *Section 2.3* are being observed; and you agree to allow our authorized representatives, at any and all times while construction is in progress, to meet with the Firm and enter onto the Site for this purpose. If we determine in good faith that the provisions of this *Section 2.3* are not being observed, you will, at your expense, immediately take all necessary corrective action.

e.    You acknowledge that the design and appearance of the *Great Steak & Potato* restaurant is part of the System, and that uniformity is essential to the success of the System. Therefore, you agree that after the restaurant has been constructed, you will not make any material changes to the building plan or design or its appearance without our prior written consent, and you will, at your expense, maintain the interior and exterior decor of the restaurant in a first class condition and in such manner as we may reasonably prescribe from time to time. In addition to any remodeling required by us upon the renewal of this Agreement and upon the assignment of the Franchised Business, as set forth in *Sections 13* and *14*, respectively, you will, upon thirty (30) days written notice from us, and at your sole cost and expense, remodel and make all improvements and alterations in and to your *Great Steak & Potato* restaurant as reasonably determined by us to reflect the then-current *Great Steak & Potato* specifications, standards, format, image and appearance.

## 2.4    Signage.

You will acquire signs for advertising and identifying the Franchised Business as a *Great Steak & Potato* restaurant. All signs must be in accordance with the standards and specifications of Franchisor and any local governing body (i.e. city, county, etc.). You acknowledge that quality control is essential to protect and promote our Proprietary Marks, standards, and uniform image; and you shall acquire all signs only from approved suppliers specified in the Operations Manuals or approved by us in writing. In addition, you shall prominently display on all forms, advertising, literature and business cards, and in a sign easily visible to consumers at the Franchised Business,

- 5 -

the following words: "Each Great Steak & Potato Restaurant is Independently Owned and Operated."

**2.5    Relocation.**

If you desire to relocate the Franchised Business in the Territory, you may request our consent upon the following conditions:

a.    Not less than 60 days prior to the desired date of relocation (unless prior notice is impractical because of a required relocation in which event notice shall be made as soon as possible), you must make a written request for consent to relocate, describing the reasons for the relocation and providing details respecting any proposed new location.

b.    Within 21 days after receiving your written request, we shall either approve or disapprove in writing such closure or relocation in our sole discretion.  In the event of disapproval of a relocation, you may request an alternative proposed new location pursuant to the provisions of this *Section 2.5*.

**2.6    Restricted Use of Restaurant Site**

You shall not wholly or partially sublet the Site without our prior written consent.  The Site may be used only for the operation of a *Great Steak & Potato* restaurant in compliance with this Agreement and the Operations Manuals.  Franchisee shall not conduct other businesses or activities on the Site without our prior written consent.

**ARTICLE 3.    OPERATIONS**

**3.1    Commencing Operations.**

You agree to start operating your *Great Steak & Potato* restaurant at the approved Site within two (2) years after the date of this Agreement. You acknowledge that before starting operations you must, at your own expense, do the following (in addition to any other requirements set forth in this Agreement):

a.    Complete, at your cost, the SERVSAFE national certification course available through your local county health department.  You must provide us with a copy of your Certificate of Completion prior to opening the *Great Steak & Potato* restaurant covered by this Agreement;

b.    Complete the Initial Training Program described in *Section 4.1* of this Agreement;

c.    Purchase, lease or otherwise acquire all the signage, supplies, equipment, fixtures, inventory and all other items necessary to operate the *Great Steak & Potato* Franchised Business from approved sources as described in the Operations Manuals or in this Agreement; and

d.    Obtain liability insurance in accordance with the requirements described in *Section 9.5* of this Agreement and provide to us evidence that such insurance has been obtained.

Prior to opening the Franchised Business, you must notify us that you have satisfied all

requirements to begin operations, and provide us with such documents as we may reasonably request that show your compliance with all such requirements. Upon receipt of our acknowledgment that such requirements have been satisfied, you will have five (5) days to begin operations of your *Great Steak & Potato* restaurant. If you do not begin operations of your restaurant at the approved Site before the expiration of the two (2) year period, then we may terminate this Agreement by giving you written notice to that effect. We will have no obligation to refund to you all or any part of the Initial Franchise Fee (as defined in *Section 5.1* of this Agreement) in the event of such a termination, as the retention of the Initial Franchise Fee by us will be deemed liquidated damages.

**3.2    Supplies and Promotional Materials; Roll-Outs.**

You agree to sell only those menu items, products and services authorized under the terms of this Agreement and as specified in the Operations Manuals, and you shall use only supplies and ingredients in making those menu items that are in compliance with the standards as set forth in the Operations Manuals or other documents provided by, or approved by, us as they presently exist or exist in the future. You shall purchase all such supplies and ingredients only from approved vendors and utilize approved distributor(s) as specified in the pre-opening section of the Operations Manuals, or other documents provided by, or approved by, us as they presently exist or exist in the future. You must purchase supplies containing the Proprietary Marks only, including stationery, business cards, promotional and advertising materials and similar items, from suppliers approved by us, except that we must first approve all such promotional and advertising materials before you use them, and all such printed materials containing any of the Proprietary Marks shall be accompanied by the words "INDEPENDENTLY OWNED AND OPERATED." Additionally, during the term of this Agreement, Franchisee agrees to participate in any Roll-Out of new products and/or suppliers, as detailed in *Section 9.3* of this Agreement.

**3.3    Fixtures, Furnishings, and Equipment**

Unless otherwise approved by us in writing, you will (1) acquire fixtures, furnishings, and equipment to be used in the operation of the *Great Steak & Potato* Franchised Business that is in accordance with the standards and specifications set forth by us in the Operations Manuals or other documents provided by, or approved by, us as they presently exist or exist in the future; and (2) procure the fixtures, furnishings, and equipment from suppliers or vendors previously approved in writing by us.

**3.4    Internet Site Hosting.**

You may not maintain a World Wide Web site or otherwise maintain a presence or advertise on the Internet or any other public computer network in connection with the Franchised Business without our prior written approval, which we may withhold for any reason or no reason. If we grant you written approval, you agree to submit to us for approval before use true and correct printouts of all Web site pages you propose to use in your Web site in connection with the Franchised Business. You understand and agree that our right of approval of all such Web materials is necessitated by the fact that such Web materials will include and be inextricably linked with our Proprietary Marks. You may only use material that we have approved. Your Web site must conform to all of our Web site requirements, whether set forth in the Operations Manuals or otherwise. You agree to provide all hyperlinks or other links that we require. If we grant approval for a Web site, you may not use any of the Proprietary Marks on the site except as we expressly permit. You may not post any of our proprietary, confidential or copyrighted material or information on the Web site without our prior written permission. If you

wish to modify your approved site, all proposed modifications must also receive our prior written approval. You explicitly understand that you may not post on a Web site any material which a third-party has any direct or indirect ownership interest in (including, without limitation, video clips, photographs, sound bites, copyrighted text, trademarks or service marks, or any other text or image which any third-party may claim intellectual property rights in). If we grant approval, you agree to list on the Web site any Web site maintained by us, and any other information we require in the manner we dictate. You agree to obtain our prior written approval for any Internet domain name and/or home page address. The requirement for our prior approval set forth in this *Section 3.4* will apply to all activities on the Internet or other communications network to be conducted by you, except that you may maintain one or more e-mail addresses and may conduct individual e-mail communications without our prior written approval. You agree to obtain our prior approval as provided above if you propose to send advertising to multiple addressees via e-mail.

## ARTICLE 4.   TRAINING, ASSISTANCE AND START-UP MATERIALS

### 4.1    Initial Training Program.

We will provide you and one (1) of your employees (i.e., two natural persons), with an Initial Training Program designed to inform the participants as to the fundamentals of operating the Franchised Business, prior to your opening of the Franchised Business. All personnel attending the Initial Training Program must have a demonstrable relationship to the management and operation of the Franchised Business. The Initial Training Program and all requisite materials will be provided for you and one (1) of your employees for no additional fee. If you will employ an on-Site supervisor, that individual must complete the Initial Training Program, and must read and write English fluently. If you desire to have more than two (2) people attend the Initial Training Program, you must pay an additional Training Fee of Five Hundred Dollars ($500.00) for each such person. You will be responsible for your transportation costs, food, lodging and other personal expenses and those of your employees in connection with the Initial Training Program. The Initial Training Program will generally last about ten (10) days, and will be conducted in the Phoenix, Arizona metropolitan area, and/or at such other location as we may designate at our sole discretion. You acknowledge that adequate knowledge regarding the operation of the Franchised Business is essential to the success of your franchise and to the promotion of the System. You shall have an option to obtain additional training and promotional services at $300 per person per day of additional training. Based upon your prior experience in the food service industry and subject to our approval, you may waive all or a portion of the Initial Training Program.

### 4.2    Employee Training.

You acknowledge that the employees of your *Great Steak & Potato* Franchised Business are an integral and important part of the Franchised Business, as they will have substantial contact with customers. You are responsible for the hiring, terms of employment and compensation of your employees, and for their compliance with the policies and procedures set forth in the Operations Manuals. You agree to appropriately train new employees as they are hired. You must insure that your employees are able to read and write English fluently and any other language that may be required to adequately meet the public needs in your Franchised Business. You must purchase any videotaped training programs that we may make available from time to time, and you must provide a VCR or DVD player in your Franchised Business for employees to view such tapes or DVDs.

**4.3    Additional Programs; Continuing Assistance.**

We will provide one (1) of our representatives to come to your restaurant during opening week for up to five (5) days, at our expense, to work with you or your manager on your grand opening, and on operating and marketing your restaurant. We may, in the future, request that you and your executive personnel participate in refresher or additional training programs. We may also hold an annual conference to introduce new products, discuss sales and marketing techniques, personnel training, advertising programs, merchandising procedures and other appropriate subjects. You may be charged a nominal registration fee for these programs, and you must also bear the cost of transportation, food, lodging and other personal expenses of your attendance and those of your executive personnel at any such program. Attendance at these additional training programs and conferences is mandatory. They will be held in the metropolitan Phoenix, Arizona area, or at other locations in the United States chosen by us, at our sole discretion.

In addition to the initial training available under *Section 4.1* of this Agreement, we shall provide such periodic supervision and assistance as we deem appropriate, utilizing our field representatives who may visit the Franchised Business from time to time. The frequency and duration of such visits to a Franchised Business by our representatives shall be in our sole discretion. In addition, we will be available on an ongoing basis at our offices for consultation and guidance with respect to the operation and management of the Franchised Business. In addition to the Operations Manuals, we may, but are not required to, from time to time provide you with additional materials relating to the Franchised Business.

**4.4    Confidential Operations Manuals.**

To protect the reputation and goodwill of the System and to maintain the uniform standards of operation under the Proprietary Marks, you must conduct your business in accordance with our Operations Manuals (as defined in the Recitals above), which may be revised, amended, restated or supplemented by us from time to time. All equipment, decor, fixtures, leasehold improvements, supplies and inventory used by you in the operation of the Franchised Business must conform to our specifications and quality standards and be purchased from approved sources, all as set forth in the Operations Manuals.

The Operations Manuals will be provided to you at the Initial Training Program referred to in *Section 4.1* above.

So that you may benefit from new knowledge gained by us as to improved techniques in the operation of the Franchised Business, we may from time to time revise, amend, restate or supplement the content of the Operations Manuals. However, no revision, amendment, restatement or supplementation will alter your fundamental status under this Agreement. All revisions amendments, restatements and supplementations will be in writing and will be deemed to be received by you as provided in the notice provisions of *Article 15* of this Agreement. You will at all times ensure that your copy of the Operations Manuals is kept current and up to date. In the event of a dispute regarding the content of the Operations Manuals, the master copy maintained by us at our corporate office will be controlling. You agree to incorporate and implement any improvements to the System as reasonably required by us, which improvements will be reflected in amendments to the Operations Manuals.

### 4.5    Computer Systems; Debit and Credit Card Processing.

a.    Prior to the opening of your restaurant, you will be required to acquire and to exclusively use an approved cash register/computer system during the operation of the Franchised Business.   The components and specifications of this system are specifically identified in the Operations Manuals, including approved vendors for such systems (the "POS System"). You and your employees must complete training for the POS System as we require, and you will be required to use the POS System to produce sales reports, keep inventory control and post sales tax, refunds, credits and allowances and submit that information to us immediately upon our request. The POS System may be configured so that we will have remote access to the information and data stored in it. This access will allow us to download sales and other information on such bases as we will communicate to you from time to time. You will be required to maintain the POS System in good working order at all times, and to upgrade or update the POS System during the term of this Agreement as we may require from time to time. It will be your responsibility to enter into contracts for the maintenance, support, upgrades and updates to the POS System with an approved supplier of such services identified in either the Operations Manuals or other notification to you from us advising of suppliers for your market area. In addition, you shall, within 30 days of receipt of written notice from Franchisor, obtain and purchase, at the sole expense of Franchisee, a cash register system or computerized point of sale system acceptable to us to permit store sales to be polled from the corporate offices of Franchisor. You shall also be required to own a personal computer or similar device that allows you to send and receive e-mails with us, and a fax machine to allow communication with us. In addition to email with Franchisor, the computer equipment will be used for providing reports to Franchisor, for communications with Franchisor, and for communications between third parties and Franchisee. We may provide specifications that you must follow for the hardware, software, and Internet provider for such computer equipment. We may require you to upgrade the hardware and software as reasonably necessary to provide reports and information required by us. We may require you to allow us to have independent electronic access to your POS System and the data relating to the Franchised Business.

b.    You are required to accept debit and credit cards from consumers at the Franchised Business. Prior to the opening of your restaurant, you will be required to acquire an approved debit and credit card processing system to use during the operation of the Franchised Business.   The components and specifications of this system are specifically identified in the Operations Manuals, including approved vendor(s) for such items. Additionally, you must utilize Franchisor's approved third party debit and credit card processor, as identified in the Operations Manuals, for processing all such debit and credit card transactions.

## ARTICLE 5.   FEES AND DEPOSITS

You agree to pay each of the following amounts to us in accordance with the following provisions:

### 5.1    Initial Franchise Fee.

The Initial Franchise Fee is Thirty Thousand Dollars ($30,000.00) (the "Initial Franchise Fee"). The Initial Franchise Fee will be due and payable by you to us by cashier's check, wire transfer or other form of immediately available funds acceptable to us, upon your execution of this Agreement.   You and we agree that our grant of the franchise and your payment of the Initial Franchise Fee provided for in this *Section 5.1* does not give you any rights with respect to

other franchises, if any, as we in our sole discretion may elect to make available in the future. No portion of the Initial Franchise Fee is refundable.

**5.2    Royalty Fee.**

For the period of time commencing on the date that you sign this Agreement, and for the duration of the Term of this Agreement, you must pay to us a weekly royalty fee equal to the greater of the following: (i) six percent (6%) of total Gross Sales (as defined below); or (ii) $400.00 for the Term of this Agreement (the "Royalty Fee"). In the event of a unilateral termination of this Agreement by you, we shall be entitled to the average of the prior 6-month (or if less than 6 months, the Term) royalties multiplied by the remaining number of months on the initial Term of this Agreement, or any extension thereof, less a discount of eight percent (8%).

The Royalty Fee shall be due and payable no later than Thursday of each week, which week shall end on the preceding Sunday in which applicable Gross Sales were earned from the Franchised Business. The weekly Royalty Fee shall be paid by electronic funds transfer, as detailed below.

You are required to report Gross Sales to our designated accounting office via facsimile or other approved electronic communication medium, as set forth in the Operations Manuals, by the close of business on each Monday for the week ending the preceding Sunday, commencing on the Effective Date and continuing through the Term of the Franchise Agreement. You shall be required to establish a Depository Account at the time you execute this Agreement as set forth in *Section 5.4* below. Payment of Royalty Fees, Advertising Fees (as defined in this *Article 5*), and all other fees due under this Agreement to us shall be made via electronic transfer of funds from the Depository Account described in *Section 5.4* below. To accomplish this electronic transfer of funds from the Depository Account, you must complete, sign and deliver to us a current Electronic Funds Transfer Authorization in the form attached to this Agreement as <u>Exhibit 3</u>.

As used in this Agreement, "Gross Sales" means all sales, money or things of value, received or receivable, directly or indirectly, by Franchisee on account of the Franchised Business, less applicable sales taxes and any documented refunds, credits and allowances given by you to customers in accordance with the Operations Manuals, but without deducting any of Franchisee's costs and expenses.

**5.3    Advertising Fees.**

a.    Unless your Franchised Business is located in an enclosed shopping mall or other enclosed structure identified in *Section 1.1* above, and in addition to the Advertising Fees under *Section 5.3(b)* below, you shall spend on advertising and on promotion at least Five Thousand Dollars ($5,000.00) within the first six (6) months following opening of the Franchised Business.

b.    You shall pay to us or directly into a national advertising fund designated by us, and/or, at our sole discretion, to a designated Franchisor-approved regional advertising fund (any such funds are referred to below as "Advertising Fund(s)") a total amount of up to four percent (4%) of Franchisee's weekly Gross Sales as defined in *Section 5.2* above, as applicable (the "Advertising Fee"). The Advertising Fee currently being collected by Franchisor that is applicable to this Agreement is immediately set forth below this subsection. The Advertising Fee shall be due and payable with the Royalty Fee under *Section 5.2* above. Advertising Fees are the property of the Franchisor and may be deposited by Franchisor into its general operating

account. Upon thirty (30) days notice by Franchisor to Franchisee, Franchisor may unilaterally increase the Advertising Fee from it's current level up to four percent (4%), but the Advertising Fee may not exceed four percent (4%) of Franchisee's weekly Gross Sales.

Applicable Advertising Fee payable by Franchisee under this Agreement:

<u>            One percent (1%)            </u>

      c.    The Advertising Funds will be used for marketing, advertising, production and media expenses to promote the *Great Steak & Potato* name, System, products and services. Franchisor is entitled to receive the following from the Advertising Fund: reimbursement of expenses, overhead, and employee salaries for services provided; and rent for office space provided to the Advertising Fund. We have no fiduciary obligation to you in connection with the operation of any Advertising Fund. The fee required to be paid to any designated Franchisor-approved regional Advertising Fund will be determined by us at our sole discretion; provided however, that the total monthly advertising obligation required by this Section will not exceed four percent (4%) of Franchisee's weekly Gross Sales. No interest on unexpended Advertising Fees shall be imputed for the benefit of, or payable to, Franchisee, and no interest on Franchisor's expenditures in excess of Advertising Fees collected shall be imputed for the benefit of, or payable to, Franchisor.

      d.    You understand and acknowledge that the products currently offered by the Franchised Business are an impulse purchase, not a destination product. As such, Franchisee's own local marketing and advertising should be developed to maximize your particular customer base. You should not rely upon a marketing program or plan by the Franchisor in the success or failure of your own Franchised Business.

## 5.4    Depository Account

      You are required to establish, at the time you execute this Agreement, and maintain a depository account (the "Depository Account") at a bank or other federally insured financial institution (the "Depository"). You will initially deposit $3,000 into the Depository Account and are required to maintain a balance of $3,000 in the Depository Account at all times by replenishing the Depository Account to $3,000 after Franchisor makes withdrawals. On Monday of each week, you must submit a report to us regarding the weekly period which ended on the preceding Sunday, including details on Gross Sales and other statistical data as specified from time to time by us or the Operations Manuals. We will withdraw funds electronically on Thursday of each week from the Depository Account. The withdrawals are based upon the figures Franchisee reports and constitute Royalty Fees and Advertising Fees as described in *Sections 5.2* and *5.3* of this Agreement. If you do not submit a report on any Monday, we may estimate the Royalty Fee and Advertising Fee based upon prior reports and withdraw the estimated amounts up to the entire $3,000. We will return any overage within 30 days of our receipt of your report(s). We shall not be responsible to you for any interest charges for any overage collected due to your failure to timely report your sales. Additionally, we shall not be responsible for any bank service charges incurred by you which result in the withdrawal of funds from your Depository Account. You shall instruct the Depository to disburse each week to our designated bank, via electronic funds transfer by the close of business on Thursday of each week (or preceding banking business day, if Thursday is a bank holiday), the weekly Royalty Fee and Advertising Fee and other fees due for that week, which week shall end on the preceding Sunday. Under no circumstances shall such access to the Depository Account be deemed control or joint control of the Depository Account by Franchisor. You shall pay us Fifty Dollars ($50.00) for each electronic funds transfer attempted from your Depository Account

pursuant to this *Section 5.4* that is returned for non-sufficient funds. You shall also reimburse us for all extraordinary costs incurred by us in collecting or attempting to collect funds due Franchisor from the Depository Account (for example, without limitation, charges for non-sufficient funds, uncollected funds or other discrepancies in deposits or maintenance of the Depository Account balance in accordance with the terms hereof). The Depository Account shall be established and maintained solely for the purposes set forth in this *Section 5.4* and the Operations Manuals.

**5.5    Lease Guarantee Fee.**

If, in order to obtain the lease agreement for the Site of your *Great Steak & Potato* restaurant, the landlord requires you to obtain a lease guarantee, and Franchisor or one of its affiliates agrees to serve as such guarantor (with such determination to be made in Franchisor's sole discretion), you will pay Franchisor a fee in the amount of ten percent (10%) of the total amount of the rental obligations being guaranteed under the lease during its term ("Lease Guarantee Fee".) The Lease Guarantee Fee will be due and payable to Franchisor upon Franchisor's (or any affiliate of Franchisor) execution of the applicable lease guarantee agreement with the landlord. Neither Franchisor nor any of its affiliates is required to serve as a guarantor of your lease for the Site of your restaurant; rather, the decision of whether to serve as a guarantor shall be made in Franchisor's sole and absolute discretion.

**5.6    Lease Negotiation Fee.**

If Franchisee requests and obtains assistance from Franchisor's real estate department in negotiating a term sheet to secure a lease or negotiating terms of the actual lease with the landlord or broker/agent for the Site of the Franchised Business, a Two Thousand Five Hundred Dollar ($2,500.00) lease negotiation fee ("Lease Negotiation Fee") will be payable to us by the Franchisee. The final approval and execution of the term sheet and/or lease and the provisions therein remain the sole responsibility of the Franchisee.

**5.7    Lease Procurement Fee.**

If Franchisee requests and obtains assistance from Franchisor's real estate department in identifying a Site, visiting the Site, and negotiating the terms of the actual lease with the landlord or broker/agent for the Site of the Franchised Business, a Five Thousand Dollar ($5,000.00) lease procurement fee ("Lease Procurement Fee") will be payable to us by the Franchisee. The final approval of the Site and the provisions in the lease, along with the execution of the lease, remain the sole responsibility of Franchisee. The services provided by Franchisor's real estate department when a $5,000.00 Lease Procurement Fee is paid includes all of the services as provided as part of the $2,500.00 Lease Negotiation Fee detailed in item 5.6 above in addition to assisting the Franchisee in identifying the Site.

**5.8    Additional Training Fee.**

We will train two (2) persons free of charge; thereafter, you will pay us Five Hundred Dollars ($500.00) per person for initial training (see *Section 4.1* of this Agreement).

**5.9    Renewal Fee.**

A Five Thousand Dollar ($5,000.00) renewal fee is payable to us when you renew your Franchise Agreement (see *Section 13(h)* of this Agreement).

**5.10    Transfer Fee.**

A transfer fee of either Seven Thousand Five Hundred Dollars ($7,500.00) or Twenty Thousand Dollars ($20,000.00) is payable to us when you sell your Franchised Business (see *Section 12.3(f)* of this Agreement).

**5.11    Training Fee.**

In addition to the Transfer Fee in *Section 5.10* above, Franchisee shall pay to Franchisor a non-refundable Training Fee of Two Thousand Five Hundred Dollars ($2,500.00) to cover the Franchisor's costs and expenses in providing the necessary training for the transferee of Franchisee (training is provided for two individuals, and a fee of $500 will be charged for each additional individual trained over two).

**5.12    Late Report, Non-Sufficient Funds and Default Fees.**

If you fail to submit to us any financial statements, forms, reports or records required to be provided under this Agreement by its due date, including your weekly Gross Sales report for calculating your Royalty and Advertising Fees, you must pay to us a Late Report Charge of One Hundred Dollars ($100.00) per report.

If any fees or assessments due under this Agreement, including Royalty Fees and Advertising Fees, are not paid when due, interest shall accrue on the late payment (from the date payment is due until the date it is paid) at the Default Rate of one and one-half percent (1½%) per month, or the maximum legal interest rate (whichever is higher)(the "Default Rate"), which amount, plus a Fifty Dollar ($50.00) late fee, shall be added to each late payment. For any payments made by Franchisee to Franchisor under this Agreement which are returned for non-sufficient funds of a processed check, Franchisee shall be charged a non-sufficient funds fee of Twenty-Five Dollars ($25.00) per occurrence. Pursuant to *Section 5.4* of this Agreement, for each electronic funds transfer that is attempted from the Depository Account but returned for non-sufficient funds, Franchisee shall be charged a Fifty Dollar ($50.00) non-sufficient funds fee per occurrence.

If, as a result of your failure to remit payments required under any provision of this Agreement, we retain an attorney or a collection agency to collect such payments, you must pay all collection costs, including reasonable attorneys' fees, whether or not legal proceedings are initiated. Our rights under this *Section 5.12* are in addition to any other rights or remedies that we may have as a result of your default under this Agreement.

**5.13    Audit Fees.**

For the purpose of this *Section 5.13*, we will have the right, at any time during business hours, and with or without prior notice to you, to inspect and audit, or cause to be inspected and audited, the business records, cash control devices, bookkeeping and accounting records, sales and income tax records and returns and other records of the Franchised Business and your corporate, partnership or limited liability company books and records (if you are a corporation, partnership or limited liability company).

You agree that we may have access to any computers utilized by you for such purposes and will have the ability at all times via modem to obtain daily and weekly sales reports and other financial records that the POS System provides. You will fully cooperate with our

representatives and independent accountants hired by us to conduct any such inspection or audit. In the event any such inspection or audit discloses an understatement of your Gross Sales for any period in question, you will pay to us, immediately after receipt of the inspection or audit report, any additional Royalty Fees and/or Advertising Fees as a result of any such understatement, plus interest at the Default Rate from the date originally due until the date of payment.

In addition, in the event such inspection or audit is made necessary by your failure to furnish reports, supporting records or other information, as required herein, or to furnish such reports, records or information on a timely basis, or if an understatement of Royalty Fees or Advertising Fees for the period of any audit (which shall not be for less than one month) is determined by any such audit or inspection to be five percent (5%) or greater, you must reimburse us for such audit or inspection, including the charges of any independent accountants, and the travel expenses, room, board and compensation of such accountants and our employees.

The remedies in this *Section 5.13* will be in addition to all our other remedies and rights under this Agreement or under applicable law.

### 5.14    No Accord or Satisfaction.

If you pay, or we otherwise receive, a lesser amount than the full amount provided for under this Agreement for any payment due hereunder, such payment or receipt shall be applied against the earliest amount due us. We may accept any check or other payment in any amount without prejudice to our right to recover the entire balance of the amount due or to pursue any other right or remedy. No endorsement or statement by you on any check or payment or in any letter accompanying any check or payment or elsewhere shall constitute or be construed as an accord or satisfaction.

## ARTICLE 6.    PROPRIETARY MARKS

### 6.1    Ownership and Right to Use.

We warrant to you that:

a.    We are the owner of all right, title and interest in and to the Proprietary Marks;

b.    We have granted to you the non-exclusive right to use the Proprietary Marks in connection with the operation of your *Great Steak & Potato* Franchised Business;

c.    We have taken and will take all steps reasonably necessary to preserve and protect our rights in the Proprietary Marks; and

d.    We will only use and permit you and other persons to use the Proprietary Marks in accordance with the System and its standards and specifications.

### 6.2    Covenants of Franchise Owners.

a.    You acknowledge the ownership of the Proprietary Marks by us, and you agree that during the term of this Agreement and after its expiration or termination, you will not directly or indirectly contest, or aid in contesting, the validity of the Proprietary Marks or the ownership

of the Proprietary Marks by us, nor will you take any action which might impair or prejudice the ownership of the Proprietary Marks by us. You shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use "*Great Steak & Potato*", or any other of the Proprietary Marks, or any confusingly similar form or variation, in any place or jurisdiction either within or outside the United States; nor will you assist any others to do so.

b.      You agree that the license granted pursuant to this Agreement authorizes you to use the Proprietary Marks solely in connection with the Franchised Business only at the location identified in this Agreement, and for no other purpose. You have no right to license or sublicense Franchisor's trade names, any aspect of the System or the Operations Manuals, or any of the·Proprietary Marks.

c.      You agree to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. You further agree that any unauthorized use or continued use of the Proprietary Marks after the termination or expiration of this Agreement will constitute irreparable harm subject to injunctive relief.

d.      The license granted by this Agreement includes no other Proprietary Marks of ours now existing or to be developed by us that are not referred to herein or otherwise included in the Operations Manuals. You agree that any and all goodwill associated with and identified by your use of the Proprietary Marks will inure directly and exclusively to the benefit of us, and that, on the expiration or termination of this Agreement, no monetary amount will be payable to you as a result of any goodwill associated with your ownership or operation of the Franchised Business.

## 6.3    Limitations on Franchise Owner's Use of Proprietary Marks.

To develop and maintain high and uniform standards of quality and service and thereby protect our reputation and goodwill and that of the System, you agree to:

a.      Operate and advertise the Franchised Business only under the Proprietary Marks authorized by us and as specified in the Manuals;

b.      Maintain and display signs reflecting the current image of the System; and

c.      Adopt and use the Proprietary Marks licensed by this Agreement solely in the manner prescribed by us.

You agree that your corporate, partnership or other entity name will not include any of the Proprietary Marks or phrases similar thereto as a part thereof. You further agree that any communications, documents or writings (including advertising) sent or utilized by you in connection with the Franchised Business will state that your restaurant is independently owned and operated.

You agree to submit all advertising promotional materials and all printed matter, including stationery and business cards, Web page(s), and any materials to be used on a Web page or on the Internet to us for our written approval before you may use any of these items.

You acknowledge that certain portions of the Premises' décor and design constitute unique and protectable images to the consumer, which are identified with Franchisor and that are part of the goodwill associated with *Great Steak & Potato* and the System. This "trade dress" is exclusively owned by Franchisor, and this Agreement does not grant any ownership or

other interests in the trade dress to Franchisee. Usage of the trade dress by Franchisee, and any goodwill established by that usage, inures to the exclusive benefit of Franchisor.

You agree that we may from time to time change or modify the System, including, without limitation, modifying existing Proprietary Marks or adopting new marks. You agree, at your own expense, to adopt, use and display any such new or modified Proprietary Marks within ninety (90) days of notification from us to you as if they were specifically identified herein as Proprietary Marks at the time of the execution of this Agreement.

Upon termination or expiration of this Agreement, you must immediately cease to use, in any manner whatsoever, any of the Proprietary Marks or any other marks which may be confusingly similar to any of the Proprietary Marks.

**6.4    Non-Exclusive License of Proprietary Marks.**

You understand and agree that your license to use the Proprietary Marks is non-exclusive; that we, in our sole discretion, can grant to other franchisees the right to use the Proprietary Marks and obtain the benefits of the System, in addition to the licenses and rights granted to you under this Agreement; and that we may develop and license other Proprietary Marks in conjunction with systems other than the System (including the system(s) for the Additional Concepts), on any terms and conditions we deem advisable. You will have no right or interest in any such other licenses, Proprietary Marks or systems.

**6.5    Notification of Infringement and Claims.**

You agree that you will notify us immediately of any apparent infringement of, or challenge to your use of any of the Proprietary Marks, or any claim by any person of any rights in any of the Proprietary Marks. You agree that you will not communicate with any person other than us and our legal counsel in connection with any such infringement, challenge or claim. We will have the sole discretion to take such action as we may deem appropriate to protect the Proprietary Marks and the exclusive right to control any litigation, Patent and Trademark Office proceeding, or other proceeding arising out of any such infringement, challenge, claim or otherwise relating to any Proprietary Marks. You agree to execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of our counsel, be necessary or advisable to protect and maintain our interests in connection with any such litigation or proceeding, or to otherwise protect and maintain our interests in the Proprietary Marks.

**ARTICLE 7.        TRADE SECRETS AND PROPRIETARY INFORMATION**

**7.1    Ownership and Use.**

In connection with the operation of the Franchised Business, you will from time to time become acquainted with certain information and materials that are proprietary to us. You and any person signing this Agreement under the heading "Acceptance of *Sections 7.1, 9.7, 14.5* and *14.7*" agree that you will keep confidential (except as reasonably necessary to operate the Franchised Business), and will not use for your own purposes (except in the operation of the Franchised Business), nor supply or divulge to any person, firm, association or corporation, any of our trade secrets or proprietary information as defined herein.

This requirement will remain in full force and effect during the Term of this Agreement and after its termination or expiration. Our trade secrets and proprietary information (hereinafter referred to collectively as "Proprietary Information" or "Confidential Information") include the following:

a.    The Operations Manuals and any amendments thereto;

b.    Information which relates in any manner to our business or the System, whether oral or reduced to writing, and which is not generally known to, or readily ascertainable by, other persons who might derive economic benefit from its disclosure or use; and

c.    Any other information which may be imparted to you from time to time and designated by us as confidential.

You and any person signing this Agreement under the heading "Acceptance of Sections 7.1, 9.7, 14.5 and 14.7" acknowledge and agree that the Proprietary Information and any business goodwill of the Franchised Business is our sole and exclusive property, and that you will preserve the confidentiality thereof. Upon termination or expiration of this Agreement, all items, records or documentation recording or incorporating any Proprietary Information will be immediately turned over by you to us or to our authorized representative.

## 7.2    Confidentiality Agreement.

You agree to adopt and implement all reasonable procedures prescribed by us from time to time to prevent the unauthorized use or disclosure of any of the Proprietary Information. We require that all of our officers, agents, directors, shareholders, trustees, beneficiaries, partners and on-site managers who may or are likely to obtain knowledge concerning the Proprietary Information (and who do not sign this Agreement under the heading "Acceptance of Sections 7.1, 9.7. 14.5 and 14.7") execute an agreement in the form set forth in our Operations Manuals and incorporated herein by reference, binding such person to preserve the confidentiality of the Proprietary Information ("Confidentiality Agreement") as part of the terms and conditions of such person's employment or association with you. You must obtain a Confidentiality Agreement signed by any such person prior to or at the same time that you begin employment of or association with that person. You must file a duplicate original of each Confidentiality Agreement with us.

## ARTICLE 8.        RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION

## 8.1    Relationship of the Parties.

You and we agree that this Agreement does not create a fiduciary relationship between you and us, that you are an independent contractor, and that nothing in this Agreement is intended to make either you or us a general or special agent, legal representative, subsidiary, joint venture, partner, employee or servant of the other for any purpose.

## 8.2    Indemnification of Franchisor.

You agree to indemnify and hold us and our affiliates (including our parent and subsidiary companies), and our stockholders, directors, officers, attorneys, employees, agents, successors and assignees harmless for, from and against any and all claims, liabilities, causes of action, demands, obligations, costs and expenses, including reasonable attorneys' fees,

arising out of or relating to your construction, ownership, management or operation of the Franchised Business ("Claims"), except for Claims successfully alleged to have resulted solely from our negligence or willful misconduct. Notwithstanding the foregoing, we will have the right, at our option, to defend any such claim, but you must reimburse us upon demand for the costs of such defense.

## 8.3    Indemnification of Franchisee.

We agree to indemnify and hold you and your affiliates, and their stockholders, directors, officers, employees, agents, successors and assignees harmless for, from and against any and all Claims, liabilities, causes of action, demands, obligations, costs and expenses, including reasonable attorneys' fees, arising out of any Claim of infringement or unfair competition in connection with your use of the Proprietary Marks, provided that such use is in accordance with the provisions of this Agreement.

## 8.4    Survival.

The indemnities and obligations set forth in this *Article 8* will continue in full force and effect subsequent to, and notwithstanding, the expiration or termination of this Agreement.

## ARTICLE 9.        OPERATING STANDARDS AND DUTIES OF FRANCHISE OWNER

### 9.1    General Operating Standards and Compliance with Operations Manuals.

You understand and acknowledge that every detail of the operation of the Franchised Business is important to us in order to develop and maintain high and uniform standards of quality, cleanliness, appearance, service, facilities and techniques, to increase the demand for the System, and to protect our reputation and goodwill and that of other *Great Steak & Potato* franchise owners. You also acknowledge that the actual operation of the Franchised Business will remain your sole responsibility (except as otherwise expressly provided herein), and that we have no responsibility to obtain customers for you. Mandatory services, specifications, standards and operating procedures prescribed from time to time by us in the Manuals will constitute provisions of this Agreement as is fully set forth herein. All references to this Agreement will be deemed to include all such mandatory services, specifications, standards and operating procedures set forth in the Operations Manuals.

### 9.2    Authorized Products and Services.

a.    You must limit your business at the Premises of your *Great Steak & Potato* restaurant as specified in the Operations Manuals, and agree that you will not, without our prior written approval, offer any menu items, beverages, products or services that are not authorized by us for *Great Steak & Potato* franchise owners, as set forth in the Operations Manuals. Any related or unrelated business not provided for in the Operations Manuals must have our prior written approval.

b.    You have complete discretion in establishing the minimum price you charge for your products. Although we may suggest pricing strategy, you will have the final pricing decision.

c.    We may conduct periodic promotional campaign during which a specified product or products are promoted at a specified price. During the promotional period, you may not

charge your customers more than the specified promotional price although you may charge less than the promotional price.

d.     We may conduct new marketing, research and development, branding and/or operational program tests, which will generally be conducted with experienced, existing franchisees and may include incentives and other rights that are not available to all franchisees. We reserve the right to sell some of the products associated with the *Great Steak & Potato* brand and Proprietary Marks to different retail outlets such as grocery chains or membership-based retailers, even if such retail outlets are located within your exclusive Territory set forth in *Section 1.2* above.

e.     You are required to accept debit and credit cards from consumers at the Franchised Business. Prior to the opening of your restaurant, you will be required to acquire an approved debit and credit card processing system to use during the operation of the Franchised Business. The components and specifications of this system are specifically identified in the Operations Manuals, including approved vendor(s) for such items. Additionally, you must utilize Franchisor's approved third party debit and credit card processor, as identified in the Operations Manuals, for processing all such debit and credit card transactions.

## 9.3     Specifications and Standards for Supplies; Approved Suppliers; Roll-Outs

a.     You must purchase certain required equipment and supplies utilized in the Franchised Business only from our designated approved suppliers as set forth in the Operations Manuals. If, during the term of this Agreement, we change designated approved suppliers for any of the required equipment and supplies utilized in the Franchised Business, you shall change to the new designated approved supplier within sixty (60) days of written notification of such change from us.

b.     If you desire to purchase or lease any equipment, supplies or inventory items required in the Operations Manuals but not previously approved by us or from sources not previously approved by us, you must submit to us sufficient specifications, photographs, drawings, and/or other information and samples sufficient to allow us to determine whether such equipment, supplies or inventory items meet our specifications. We may require that our representatives be allowed to inspect the facilities of the proposed supplier and revoke its approval upon the supplier's failure to meet any of our then current minimum standards and specifications. We may also require that samples from the proposed supplier be delivered, at no charge to us, either to us or to our designee for testing. A charge not to exceed the reasonable cost of the inspection and the actual cost of the test must be paid to us either by you or by the proposed supplier. We will notify you in writing within sixty (60) days of your request of our approval or disapproval of the proposed product or supplier, with such determination to be made is our sole and absolute discretion. You acknowledge and agree that our approval of any item or supplier of equipment, supplies or inventory not previously approved by us will not, in and of itself, make the supplier of that item an approved supplier for other *Great Steak & Potato* franchise owners in the System. We may, at our option, re-inspect the facilities and products of any approved supplier and revoke its approval upon the supplier's failure to meet any of our then current minimum standards and specifications. If you receive a written notice of revocation from us, you must stop selling disapproved products and stop purchasing from the disapproved supplier.

c.     We will provide to you a list of all recommended and required items of equipment, fixtures, supplies, smallwares and interior decor. This list will be included in the Operations

Manuals. Credit-worthy applicants may lease many of these items from third-party lenders. These items must be obtained only from designated approved suppliers as set forth in the Operations Manuals.

d. At any time or from time to time, Franchisor may at its sole option engage in new product roll-outs to add to or change the menu items offered for sale in the Franchised Business and/or the ingredients or supplier of ingredients utilized in the preparation of the menu items sold in the Franchised Business (the "Roll-Out"). If Franchisor engages in a Roll-Out, Franchisee shall participate in the changes that are the subject of such Roll-Out, including, but not limited to, offering the new menu items, changing the menu items, changing to the new supplier of the ingredients utilized in the preparation of the menu items, and/or changing to the new ingredients utilized in the preparation of the menu items. If Franchisor engages in a Roll-Out, it will notify Franchisee in writing of the details of the Roll-Out and provide Franchisee sixty (60) days from said written notification to take the applicable actions required by the Roll-Out.

**9.4    Compliance with Legal Requirements and Good Business Practices.**

You must, at your sole expense, operate the Franchised Business in full compliance with all applicable laws, ordinances and regulations. You must pay all costs and expenses incurred by, and in the conduct of, the Franchised Business, including but not limited to, all rent, salaries, taxes, disbursements, license or permit fees, traveling expenses and any other business expenses. You must notify us in writing within three (3) days of the commencement of any action, suit or proceeding, or of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect your ability to operate, or your financial condition or that of the Franchised Business. Any such notice must be accompanied by a copy of the complaint, order, writ, injunction, award, decree or other similar document. You must, in all dealings with your customers, suppliers, the public, and us adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business practice that may be injurious to the System or the goodwill associated with the Proprietary Marks.

**9.5    Maintenance of Insurance.**

At all times during the term of this Agreement, you must maintain in full force and effect comprehensive public liability insurance against claims for bodily and personal injury, death and property damage caused by or occurring in connection with the construction, ownership, operation or conduct of the Franchised Business. The insurance must also include coverage for product liability and fire claims.

Such insurance coverage must be maintained under one or more policies of insurance (each of which shall be primary coverage and shall not be contributory or secondary to any other coverage) containing minimum liability limits of One Million Dollars ($1,000,000.00), combined single limit (or greater if applicable state laws or regulations require) for each occurrence. Such insurance policy or policies must be "occurrence" policies and not "claims made" policies; must not provide for a deductible greater than One Thousand Dollars ($1,000.00) in the aggregate and must provide that no act or omission of ours or of any officer, director or employee of ours or any affiliate of ours shall invalidate or diminish any coverage thereunder.

Such insurance policies must be issued by insurance carriers rated AA or above. All liability insurance policies required by this Agreement must name us, our affiliates, and our

respective officers, directors, and employees as additional insureds; must contain a waiver by the insurance carrier of all subrogation rights against us and our affiliates, and our affiliates' respective officers, directors and employees; and, must provide that we will receive thirty (30) days prior written notice of termination, expiration, cancellation or modification of any such policy.   Upon thirty (30) days notice to you, we may require you to increase the minimum coverage of the insurance referred to above as of the next renewal date of any policy, and require different or additional kinds of insurance at any time, including excess liability (umbrella) insurance, to reflect inflation, identification of special risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances.

You must furnish to us annually a copy of the certificate of insurance or other evidence thereof.   We, at our option and in addition to our other rights and remedies under this Agreement, may, but will not be required to, obtain such insurance coverage on your behalf, and you must promptly execute any applications or other forms or instruments required to obtain any such insurance and pay to us, on demand, any costs and premiums incurred by us.   Your obligation to obtain and maintain the insurance described above will not be limited in any way by reason of any insurance maintained by us, nor will your performance of such obligations relieve you of any obligations under *Section 8.2* of this Agreement.

**9.6    Management of the Franchised Business.**

You are directly responsible for all aspects of operating the Franchised Business, and you agree that you will at all times use your best efforts to enhance the business of your *Great Steak & Potato* restaurant and the System.   The Franchised Business must be personally managed and directly operated by either you or another partner, shareholder or member of your business organization, or a manager, who must have successfully completed the Initial Training Program referred to in *Section 4.1* above.

If any manager leaves your employment or if your principal owner desires to later delegate control over the operation of the Franchised Business, a replacement manager must be designated by you and must complete the Initial Training Program referred to in *Section 4.1* above to our satisfaction.   You must immediately notify us of any change in management or supervisory personnel.

**9.7    Conflicting and Competing Interests.**

You agree that during the term of this Agreement, neither you, nor your officers, directors and holders of more than ten percent (10%) of your stock (if you are a corporation), nor your partners (if you are a partnership), nor your members who have a ten percent (10%) or greater interest (if you are a limited liability company), nor your designated manager will, directly or indirectly, maintain, engage in, have a controlling interest in, lend money to, consult with or otherwise assist any business that is engaged in the business of selling Philadelphia Cheesesteak sandwiches, fresh-cut French fries, and baked potatoes with all of the toppings.   If any of the persons named above do not sign this Agreement under the heading "Acceptance of *Sections 7.1, 9.7, 14.5* and *14.7*", then you agree to use your best efforts to obtain the execution by such person of a written agreement setting forth the foregoing in a form acceptable to us. You have a continuing obligation to obtain the execution of such written agreement.

**9.8    Inspections by Franchisor.**

For the purpose of this *Section 9.8*, you must make available to us, or our agents, such financial and other information concerning the Franchised Business at such locations as we may reasonably request (including our office and including via your POS System), and you must permit us, or our agents, to have full and free access to such information at your *Great Steak & Potato* restaurant during regular business hours without notice. Our agents and we will have the right to communicate freely with your employees, and make extracts from, and copies of, all such information. A representative of ours may make announced or unannounced inspections of your *Great Steak & Potato* restaurant to ensure compliance with all the requirements of this Agreement. You will permit our representative to inspect any part of the Franchised Business, including all books and financial accounts, at any time during normal business hours.

**9.9    Shareholder Guaranty.**

If you are a corporation, limited liability company, or other business entity, each of your shareholders, members, or other owners holding ten percent (10%) or more of any class of your stock or interests (and their respective spouses, if married) at the same time that you sign this Agreement, and as a condition to the legitimacy of this Agreement, must execute and deliver to us a Guaranty of Contract in the form of Exhibit 4 attached to this Agreement and incorporated by reference.

In the event any person who has not previously signed a Guaranty of Contract becomes the holder of ten percent (10%) or more of any class of your stock or ownership interests at any time after the execution of this Agreement, you must cause that person to immediately execute and deliver a Guaranty of Contract to us.

**9.10    Ownership Reports.**

If you are a corporation, you must, upon execution of this Agreement, provide us with acceptable evidence that all certificates evidencing shares of your issued and outstanding capital stock bear the following legend (or such similar legend as we may designate in order to be in compliance with applicable law), reflecting or referring to such restrictions:

> TRANSFER OF THIS CERTIFICATE IS LIMITED BY THE TERMS AND CONDITIONS OF THE FRANCHISE AGREEMENT DATED _____ BETWEEN KAHALA FRANCHISE CORP., A DELAWARE CORPORATION, AND _____.

If you issue additional shares of your capital stock in the future, all certificates evidencing such shares must bear a like legend.  If you are a partnership, a limited liability company or other entity, you must provide us with acceptable evidence that your partnership agreement, operating agreement, or other organizational documents contain provisions acceptable to us prohibiting transfer of any partnership or other ownership interest in your entity, except in compliance with the terms of this Agreement.  You must not cause or permit any such provision to be deleted or modified.

ARTICLE 10.        ADVERTISING AND PROMOTION

10.1    Advertising by Franchisor.

We (or at our election a third party which may be an affiliate of ours) will administer an Advertising Fund that will include your Advertising Fees and those of other franchise owners in the System. If an affiliate of ours administers the Advertising Fund or places advertising in connection with the System, such affiliate may be paid a fee that will not exceed the fee that would be payable to unrelated third parties for comparable services. Unless required by applicable law, we will have no obligation to create a trust account, escrow account or other special account for the Advertising Fund, and the monies comprising the Advertising Fund may be placed in our general account(s) if we desire. We may also reserve Advertising Fees for use in a subsequent year.

We or our designee will direct all advertising and promotional programs. We will have sole discretion over all creative concepts, materials and media used in such programs and the placement and allocation of such programs. The Advertising Funds will be used for marketing, advertising, production and media expenses to promote the *Great Steak & Potato* name, System, products and services. We are entitled to receive the following from the Advertising Fund: reimbursement of expenses, overhead, and employee salaries for services provided; and rent for office space provided to the fund. We are not required to use any specific amounts from the Advertising Fund in your market. However, we will use all amounts contributed by you to any Franchisor-approved regional advertising funds, if any (see *Section 5.3*) in the same geographic area in which your restaurant is located.

10.2    Advertising by Franchisee.

In addition to your Advertising Fees, if applicable, and your grand opening promotional advertising program required under *Section 5.3* above, and unless your *Great Steak & Potato* restaurant is located in an enclosed shopping mall or other enclosed structure identified in *Section 1.1* above, you agree to pay for a regular (white pages) and classified (Yellow Pages) telephone directory advertisement in the main directory distributed within your Territory, in such directory categories as we specify, utilizing forms of listing and classified directory advertisements approved by us. We also recommend that, in addition to your Advertising Fee, you spend at least two percent (2%) of your monthly gross sales on local advertising.

You understand and acknowledge that the products currently offered by the Franchised Business are an impulse purchase, not a destination product. As such, your own local marketing and advertising should be developed to maximize your particular customer base. You should not rely upon a marketing program or plan by the Franchisor in the success or failure of your own Franchised Business.

You must submit to us for our prior approval samples of all local advertising and promotional materials not prepared or previously approved by us. If written disapproval is not received by you within fifteen (15) days from the date of receipt by us of such materials, we will be deemed to have given the required approval.

Under no circumstances may you use the name of a public figure in connection with the Proprietary Marks or the Franchised Business without our prior written consent. We retain the sole and exclusive right to use the name, services or likeness of any public figure or character in advertising, endorsing or recommending the System. However, with our prior written approval,

you may use the name of a public figure in a bona fide endorsement or recommendation of the Franchised Business, but in such event, you will be solely responsible for the cost of such usage.

## ARTICLE 11.         ACCOUNTING PROCEDURES AND REPORTS

### 11.1   Maintenance of Records.

You shall keep full, complete, and accurate books and accounts in accordance with generally accepted accounting principles, and in the form and manner prescribed below or as from time to time further prescribed by us.  You agree to submit reports and data to us electronically if we advise you to do so.  Franchisee agrees:

a.     to submit to us on a Franchisor-approved form, on or before the close of business Monday of each week, a signed statement of weekly Gross Sales for the seven (7) day period ending at the close of business on the preceding Sunday;

b.     to submit to us, on or before the thirtieth (30th) day of each month, on a Franchisor-approved form, a profit and loss statement of the Franchised Business for the preceding calendar month prepared in accordance with generally accepted accounting principles;

c.     to submit to us, within ninety (90) days after the end of each calendar year, commencing with the opening of the *Great Steak & Potato* restaurant, on a Franchisor-approved form, a profit and loss statement for the year and a balance sheet (including a statement of retained earnings or partnership account) as of the end of the period;

d.     to submit to us, at the times required, such other periodic forms, reports and information as may from time to be time be prescribed by us;

e.     to preserve, in the English language and for the time periods set forth below, all accounting records and supporting documents relating to the Franchisee's operation of the *Great Steak & Potato* restaurant under this Agreement (referred to below as the "Records"), including:

1.   daily cash reports;

2.   cash receipts journal and general ledger;

3.   cash disbursements journal and weekly payroll register;

4.   monthly bank statements, and daily deposit slips and canceled checks;

5.   all tax returns, including personal returns of Franchisee, its officers, shareholders, partners and members;

6.   suppliers invoices (paid and unpaid);

7.   dated cash register tapes (detailed and summary);

8.   semi-annual balance sheets and monthly profit and loss statements;

9.   daily production, throwaway and finishing records and weekly inventories;

10.   records of promotion and coupon redemptions;

11.   records of all outside sales; and

12.   such other records as we may from time to time request.

f.   to record all sales on cash registers approved by us, as specified in the Operations Manuals;

g.   to file all federal and state tax returns of Franchisee on a timely basis and to provide copies of them to Franchisor. We may, where applicable, require that tax returns from all shareholders, members or partners of Franchisee be provided to us, if Franchisee is other than an individual;

h.   During the term of this Agreement, you shall preserve the Records for at least its current fiscal year and for the three (3) immediately preceding fiscal years. For three (3) years after the date of any transfer of an interest in this Agreement, the transferor of such interest will preserve the Records for its last three (3) fiscal years of operation under this Agreement. For three (3) years after the expiration of the term of this Agreement (or after any earlier termination), you shall preserve the Records for its last three (3) fiscal years of operation under this Agreement; and

i.   We will have the right to use (without identifying you except as required by law) any financial statements, sales reports, profit and loss statements or balance sheets provided by you in connection with our efforts to attract additional franchise owners to the System and, in connection therewith, you authorize us to disclose any information contained on such financial reports as may be required by any federal or state registration or disclosure law.

## 11.2   Audit by Franchisor.

We will have the right, at any time during business hours, and with or without prior notice to you, to inspect and audit, or cause to be inspected and audited, the business records, cash control devices, bookkeeping and accounting records, sales and income tax records and returns and other records of the Franchised Business, and your corporate, partnership or limited liability company books and records (if you are a corporation, partnership or limited liability company).

You agree that we may have access to any computers utilized by you for such purposes. You will fully cooperate with our representatives and independent accountants hired by us to conduct any such inspection or audit. In the event any such inspection or audit discloses an understatement of your Gross Sales for any period in question, you will pay to us, immediately after receipt of the inspection or audit report, any additional Royalty Fees or Advertising Fees due as a result of any such understatement, plus interest at the Default Rate from the date originally due until the date of payment.

In addition, in the event such inspection or audit is made necessary by your failure to furnish reports, supporting records or other information, as required herein, or to furnish such reports, records or information on a timely basis, or if an understatement of Royalty Fees or Advertising Fees for the period of any audit (which shall not be for less than one month) is determined by any such audit or inspection to be five percent (5%) or greater, you must reimburse us for such audit or inspection, including the charges of any independent accountants and/or attorneys and the travel expenses, room, board and compensation of such accountants and/or attorneys, and our employees.

The remedies in this *Section 11.2* will be in addition to all our other remedies and rights under this Agreement or under applicable law.

**11.3    Ownership Information.**

You must provide us with a list of the name, address, phone number, social security number, and ownership information of each officer, director, shareholder, partner, member (and of each officer, director and shareholder of a corporate partner) or any other person directly or indirectly holding an ownership interest in you on the Ownership Information Sheet attached to this Agreement as <u>Exhibit 1</u>. You must advise us in writing of any changes in such information within five·(5) days after such change is effective.

**ARTICLE 12.        ASSIGNMENT, SALE OR TRANSFER**

*Sections 12.1* through *12.4* apply to all transfers, except transfers by Franchisor, which are described in *Section 12.5*.

**12.1    Prior Consent of Franchisor to Assignment**

a.     For the purpose of this Agreement, "transfer" is defined as any act or circumstance by which ownership or control is shifted in whole or in part from any individual or entity to another; including, if Franchisee is a corporation, any changes in the present ownership of the stock of Franchisee (as of the Effective Date of this Agreement) or the issuance of additional stock of Franchisee and, if Franchisee is a partnership, limited liability company, or limited liability partnership, any change in or addition of partners or members.

b.     We are entering into this Agreement based upon our knowledge of and faith in the ability of Franchisee. Therefore, this Agreement and all the rights granted by it are personal to Franchisee and may not be assigned or transferred by Franchisee without the prior written consent of Franchisor. Any attempt to assign or transfer: (i) any right under this Agreement; (ii) any interest in any entity holding an interest in this Agreement; (iii) all or any portion of the Franchised Business; or (iv) any assets, including but not limited to, equipment, leasehold improvements, and goodwill, now owned by Franchisee or later acquired by Franchisee during the Term of this Agreement that are located at and/or utilized in the restaurant operations at the Site, without the prior written consent of Franchisor, will be null and void; and will give us the right to terminate this Agreement and your rights under it, in addition to any remedies which we may have for the breach of this covenant by reason of an attempted assignment or transfer.

c.     We shall not unreasonably withhold our consent to an assignment or transfer, so long as it is shown to the satisfaction of Franchisor that the proposed transferee can perform a franchisee's obligations under the then-current form of agreement required of new franchisees. The proposed transferee must execute the then-current form of franchise agreement and all other agreements, legal instruments, and documents used by us in the assignment of our franchises. The then-current form of franchise agreement, and other legal documents, may vary materially from the Agreements currently used by Franchisor, including the payment of higher royalty fees and advertising contributions.

**12.2    Advance Notice of Proposed Terms and Right of First Refusal**

a.     If you, or any shareholder, member or partner of Franchisee, has received and desires to accept a signed bona fide written offer from a third party to purchase: (i) Franchisee's

rights under this Agreement, or any part of it; (ii) any interest in any entity holding an interest in this Agreement; (iii) all or any portion of the Franchised Business; or (iv) any assets, including but not limited to, equipment, leasehold improvements, and goodwill, now owned by Franchisee or later acquired by Franchisee during the Term of this Agreement that are located at and/or utilized in the restaurant operations at the Site, and before making any binding commitment regarding such transfer, you shall notify us and provide us with a complete copy of the offer which must include for every proposed transferee: (1) Name, address and telephone number; (2) business experience and present occupation; and (3) credit rating and financial status. Franchisee must also include information as to the identity of all who will own an interest in this Agreement or in the Franchised Business after the completion of the transfer, their respective interests, and the proposed terms and conditions of sale and payment.

b.      Franchisor shall have the right and option, exercisable within thirty (30) days after the date Franchisor receives its copy of the offer, to purchase the interest proposed to be transferred, at the price and upon the same terms and conditions specified in the notice.

c.      If Franchisor does not exercise this option, and the terms of the unaccepted offer are altered, we must, in each such instance, be notified by Franchisee of the changed offer; and we will again have thirty (30) days to exercise our right to purchase on the altered terms. If Franchisor does not exercise its option, then the transfer may take place on the terms and price set forth in the notice; provided (1) Franchisor gives its written consent, (2) the transfer takes place no later than six (6) months from receipt of Franchisor's written refusal to exercise its option to purchase, and (3) all the conditions set forth in *Section 12.3* below are satisfied.

**12.3    Requirement for Consent to Transfer**

If a transfer of: (i) any right under this Agreement; (ii) any interest in any entity holding an interest in this Agreement; (iii) all or any portion of the Franchised Business; or (iv) any assets, including but not limited to, equipment, leasehold improvements, and goodwill, now owned by Franchisee or later acquired by Franchisee during the Term of this Agreement that are located at and/or utilized in the restaurant operations at the Site, is proposed and Franchisor does not exercise its right to purchase pursuant to the preceding Section, then Franchisor will consent to the transfer provided that:

a.      Each transferee is financially acceptable, not associated with a competitor of Franchisor, is of good moral character and reputation, and meets Franchisor's criteria, which includes: work experience and aptitude; ability to devote time and best efforts to the Franchised Business; residence in the locality where the Franchised Business is located; equity interest in the Franchised Business; literacy and fluency in the English language sufficient in the opinion of Franchisor to communicate with employees, customers and suppliers and to satisfactorily complete Franchisor's training; no conflicting interests; and other criteria and conditions that Franchisor applies to new franchisees;

b.      Following an analysis of the terms and conditions of the proposed transfer (the "Terms"), Franchisor, in its sole discretion, concludes that the Terms will not interfere with the financial feasibility of the future operation of the Franchised Business;

c.      Each transferee shall have completed the Initial Training Program for two individuals required under *Section 4.1* of this Agreement;

d.    Each transferee enters into all current forms of agreements then being required of new franchisees with Franchisor. The terms of the then-current franchise agreement may vary materially from the current Agreements used by Franchisor, including the payment of higher royalty fees and advertising contributions. Unless a longer period is agreed upon between Franchisor and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement; and unless a longer term is agreed upon by Franchisor, the transferee will not pay an Initial Franchise Fee as provided in *Section 5.1* of this Agreement;

e.    All obligations of Franchisee under this Agreement are fully paid and satisfied, Franchisee is not in default under any provisions of this Agreement or any other agreement with Franchisor; and Franchisee and transferee enter into a written Assignment of Franchise Agreement with Franchisor, including (except where prohibited by law) a general release by Franchisee of all claims against Franchisor;

f.    You or the transferee shall have paid to us a non-refundable Transfer Fee in the amount of (i) Twenty Thousand Dollars ($20,000.00) if the assignment or sale is consummated prior to the expiration of 24 months from the Effective Date of this Agreement, or (ii) Seven Thousand Five Hundred Dollars ($7,500.00) if the assignment or sale is consummated after 24 months from the Effective Date of this Agreement;

g.    In addition to the Transfer Fee in *Section 12.3(f)* above, Franchisee shall pay to Franchisor a non-refundable Training Fee of Two Thousand Five Hundred Dollars ($2,500.00) to cover the Franchisor's costs and expenses in providing the necessary training for the transferee of Franchisee (training is provided for two individuals, and a fee of $500 will be charged for each additional individual trained over two);

h.    The transferee agrees to complete all remodeling and improvements as required by us, within the time period specified by us; and

i.    Franchisee and any transferee agree not to assert any security interest, lien, claim or right now or in the future in this franchise, or the franchise granted to the transferee. Any security interest, lien, claim or right asserted with respect to any personal property at the Site identified in *Section 1.1* must not include any after-acquired property and must be subject, junior and subordinate to any security interest, lien, claim or right now or in the future asserted by Franchisor, its successors or assigns.

## 12.4   Death or Incapacity of Franchisee

a.    In the event of the death or incapacity of an individual Franchisee, or of any shareholder, partner, or member in a franchise which is a business entity, the legal representative of the individual Franchisee, or of the surviving shareholders, partners, or members in case of a business entity, may for a period of ninety (90) days from the date of death or incapacitation continue to operate the Franchised Business, provided that the operation is conducted in accordance with the terms of this Agreement and any other agreements with Franchisor.

b.    If a representative of Franchisee desires to continue the operation of the Franchised Business beyond the ninety (90) day period, then prior to the expiration of this period, the legal representative of the individual Franchisee or the shareholder, partner, or member of Franchisee must apply jointly with all surviving shareholders, partners, or members in writing, for the right to transfer the Franchised Business (or the interest of the deceased or incapacitated shareholder, partner, or member in the Franchised Business in the case of a business entity), to the person or

persons (whether spouse, heir, devisee, purchaser, surviving shareholder, partner, member, corporation, or any other person), as the legal representative and the surviving shareholders, partners, or members may specify. The application for transfer will be treated in the same manner as any other proposed transfer under this Agreement.

     c.    If the legal representative and all surviving shareholders, partners or members (if any) do not comply with the provisions of the preceding paragraph, or do not propose a transferee acceptable to us under the standards set forth in this Agreement, all rights licensed to Franchisee under this Agreement will terminate immediately and automatically revert to Franchisor. Franchisor shall have the right and option, in its sole discretion, exercisable upon such termination, to purchase all removable furniture, fixtures, signs, equipment and other chattels, but not leasehold improvements, at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. Franchisor shall give notice of its intent to exercise the option no later than twenty-one (21) days prior to termination.

## 12.5    Assignment by Franchisor.

You agree and affirm that we may, without your prior consent, sell ourselves, our assets, our Proprietary Marks and/or our System to a third-party; may go public; may engage in private placement of some or all of our securities; may merge, acquire other corporations, or be acquired by another corporation; and/or may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring. You further agree and affirm that we have the right, now or in the future, without your prior consent, to purchase, merge, acquire or affiliate with an existing competitive or non-competitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities, and to operate, franchise or license those businesses and/or facilities as *Great Steak & Potato* restaurants operating under the Proprietary Marks or any other marks following our purchase, merger, acquisition or affiliation, regardless of the location of these facilities, which you acknowledge may be proximate to your Franchised Business, but not within your exclusive Territory identified in *Section 1.1* above. With regard to any of the above sales, assignments and dispositions, you expressly and specifically waive any claims, demands or damages arising from or related to the loss of our name, Proprietary Marks (or any variation thereof) and System and/or the loss of association with or identification of Kahala Franchise Corp. (dba *Great Steak & Potato*) as us under this Agreement.

This Agreement will inure to the benefit of the successors and assigns of Franchisor. In conjunction with one or more of the transactions contemplated above or as otherwise determined by us, we have the right to assign our rights and obligations under this Agreement to any person or entity, without your prior consent. Upon such assignment, we will be relieved of all obligations or liabilities then existing or thereafter able to be asserted under this Agreement.

## 12.6    Restrictions on Security Interests and Subfranchising.

Except as otherwise set forth below, you shall not in any event have the right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Agreement in any manner whatsoever, nor subfranchise or otherwise Transfer, or attempt to subfranchise or otherwise Transfer the Franchised Business so long as it is operated as the Franchised Business, or to Transfer or subfranchise a portion, but not all, of your rights hereunder without the express prior written permission of Franchisor, which permission may be withheld for any

reason whatsoever in Franchisor's sole discretion. Notwithstanding anything contained herein to the contrary, you shall have the right to pledge your accounts receivable, net of royalties and rent, without our prior written consent for the sole purpose of obtaining financing for the operation of the Franchised Business provided you are in full compliance with all of the terms and conditions of this Agreement, and any other agreement, arrangement or understanding with us.

**ARTICLE 13.        RENEWAL OF FRANCHISE**

Subject to the terms and conditions described below, you will have the right to renew your license to operate the Franchised Business for the shorter of the following: (i) ten (10) years; or (ii) the term of the new lease for the Premises of the Franchised Business, including any renewal options thereto. In the event you desire to renew your license, you must give us written notice to that effect at least one hundred twenty (120) days prior to the expiration date of the Term. In addition to giving the written notice of renewal referred to above in a timely manner, in order to have the right to renew the license to operate the Franchised Business for an additional term, you must also meet each of the following requirements:

a.        You must not then be in default under this Agreement, and no event shall have occurred that, with the giving of notice, the passage of time, or both, would constitute a default under this Agreement;

b.        You must be in complete compliance with the terms of this Agreement and the then-current Operations Manuals;

c.        You must not have received more than three (3) written notices of default or breach of this Agreement during its term, nor more than two (2) such notices during the five years immediately preceding the Effective Date of the proposed renewal;

d.        You must have the existing right to maintain possession of the Premises of your *Great Steak & Potato* restaurant for a term co-extensive with the term of the renewal, or you must have secured and developed suitable substitute premises approved by us;

e.        You and we must execute a renewal franchise agreement (which will be in the form of the franchise agreement then customarily used by us in the granting of franchises in connection with the System) and all other agreements, legal instruments, and documents then customarily used by us in the granting of franchises in connection with the System. The renewal franchise agreement will not provide for the payment of an Initial Franchise Fee, and its terms may materially differ from the terms of this Agreement, including the payment of higher royalty fees and advertising contributions. The renewal franchise agreement will supersede this Agreement, but will not terminate your liability to perform any obligations which you have not yet performed under this Agreement, or which survive the termination of this Agreement; nor will the renewal franchise agreement terminate or supersede any Guaranty of Contract or Confidentiality Agreement executed pursuant to this Agreement;

f.        The equipment, fixtures and signage used in connection with the operation of the Franchised Business must either meet our then-existing specifications and standards, or you must agree to replace or refurbish such items, and otherwise modify the methods of operation of the Franchised Business at your cost, in order to comply with our specifications and standards then applicable to new franchise owners;

g.     You must be current on all financial obligations to us;

h.     You shall have paid to us a Renewal Fee in the amount of Five Thousand Dollars ($5,000.00); and

i.     You must sign the current form of Franchise Agreement and other agreements then being required of new franchisees, and return these agreements, properly executed, before the expiration of this Agreement.

If you do not meet any of the requirements for renewal, we will give you a written notice to that effect which will specify the requirements not met.  The written notice will be given to you within sixty (60) days after you deliver to us your written notice of intent to renew.

## ARTICLE 14.      DEFAULT AND TERMINATION

### 14.1    Default; Termination.

Franchisee will be in default under this Agreement:

a.     If Franchisee becomes insolvent or makes an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by Franchisee, or if such a petition is filed against and consented to by Franchisee, or is not dismissed within thirty (30) days; or if Franchisee is adjudicated bankrupt; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and is consented to by Franchisee or is not dismissed within thirty (30) days; or if a receiver or other custodian is appointed; or if proceedings for composition with creditors under any state or federal law is instituted by or against Franchisee; or if the real or personal property of the Franchised Business is sold at levy thereupon by any sheriff, Marshall or constable;

b.     If Franchisee fails to pay, perform, observe or comply with any of Franchisee's duties and obligations under this Agreement, including failure to pay any sum due Franchisor under this Agreement (including, but not limited to, Royalty Fees and Advertising Fees); or if Franchisee fails to carry out in all respects its obligations under any lease, sublease, mortgage, equipment agreement, promissory note, vender account, conditional sales contract or other contract materially affecting the Franchised Business, to which the Franchisee is a party or by which Franchisee is bound, whether or not we are a party thereto;

c.     If Franchisee's lease or sublease for the Premises of the Franchised Business is terminated for reason of default by Franchisee;

d.     If you fail within thirty (30) days of the entry of a final judgment against Franchisee in an amount exceeding Two Thousand Dollars ($2,000) to discharge, vacate or reverse the judgment or to stay its execution pending appeal, or to discharge any judgment which is not vacated or reversed within thirty (30) days after expiration of the stay of execution;

e.     If we determine that a serious health or safety problem exists at the Franchised Business, in which case, we may require you to immediately correct the problem or cease operating until the problem is corrected;

f.      If you are convicted of a felony, a crime involving moral turpitude, or any other crime or offense that is reasonably likely to adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or our interest therein;

g.      If you abandon the Franchised Business;

h.      If you close or relocate the Franchised Business, without the express advance written consent of Franchisor;

i.      If you fail to maintain an independent contractor relationship with Franchisor;

j.      If you have negligently or knowingly either inaccurately reported or failed to report any information as part of your application or qualification as a Franchisee;

k.      If Franchisee or any of its principals commit an act, or permit an act to be committed, which violates any federal, state or local law which adversely impacts the Franchised Business;

l.      If you fail to participate in any Roll-Out detailed in *Section 9.3* of this Agreement after 60 days elapses from the date we notify you of the Roll-Out;

m.      If Franchisee violates any of the provisions of *Sections 2.3, 3.2, 9.2, or 9.3* including, but not limited to, selling only those products and services authorized by Franchisor, purchasing such authorized products only from suppliers who are approved in writing by Franchisor, and utilizing and/or switching to any of Franchisor's designated approved and/or exclusive suppliers, including a supplier who has entered into a national or regional master supplier agreement with Franchisor; or

n.      If you Transfer or attempt to Transfer any rights or obligations under this Agreement to any third party in violation of the provisions of *Article 12* of this Agreement.

o.      If Franchisee or any officer, director, manager, member, or partner (as applicable) becomes subject to U.S Executive Order 13224.

## 14.2    Opportunity to Cure.

Thirty Day Cure Period – Except as otherwise provided in this *Section 14.2*, you will have the right to cure your default under this Agreement within thirty (30) days after written notice of default from us is received or refused, as the case may be. Notwithstanding the foregoing, the following lesser periods will apply under the circumstances described:

a.      Seven Day Cure Period - A seven (7) day cure period will apply if you fail, refuse, or neglect to pay when due to us any monies owing to us (including, but not limited to, Royalty Fees and Advertising Fees), or to any Advertising Fund, or if you fail to maintain the insurance coverage set forth in this Agreement;

b.   24 Hour Cure Period - A twenty-four (24) hour cure period will apply to the violation by you of any law, regulation, order or our standards relating to health, sanitation or safety; or if you cease to operate the Franchised Business for a period of forty-eight (48) hours without the prior written consent of Franchisor; provided, however, that if the Franchised Business is abandoned, no cure period will apply.

c.   No Cure Period - No cure will be available (1) if Franchisee is in default under or breaches its covenants or obligations under Sections 9.7, 14.1(a), 14.1(c), 14.1(f), 14.1(g), 14.1(h), or 14.1(o), or (2) if Franchisee intentionally underreports weekly Gross Sales, falsifies financial data, fails to promptly provide upon Franchisor's request financial data and records specified in this Agreement, or otherwise commits an act of fraud with respect to its rights or obligations under this Agreement; or (3) if Franchisee is in default under or breaches its covenant against competition set forth in Section 14.5 of this Agreement; or (4) if Franchisee is in default under or breaches its covenant to observe and obey all applicable laws, rules, ordinances and regulations set forth in Section 9.4, or (5) if Franchisee repeatedly fails to comply with the provisions of this Agreement, whether or not subsequently cured; or (6) if Franchisee, having twice previously cured a default or breach of this Agreement, commits the same breach or default again.

Statutory Cure Period - If a statute in the state in which the Franchised Business is located requires application of that state's law, and that state's statute requires a cure period for the applicable default which is longer than any cure period specified in this Article 14, the statutory cure period will apply.

### 14.3   Remedies

a.   Interest and Costs - If you fail to remit when due any payments required under this Agreement, you agree to pay, in addition to the unpaid amounts, all collection costs, reasonable attorneys' fees, and interest on the unpaid amounts at eighteen percent (18%) per annum or the highest permissible rate. If you fail to cure a default, following notice, within the applicable time period set forth in Section 14.2, or if this Agreement is terminated as a result of your default, you shall pay to us all damages, costs and expenses, including, without limitation, interest at eighteen percent (18%) per annum, or the highest permissible rate, and reasonable attorneys' fees and costs, incurred by us as a result of any such default or termination; and the interest and all damages, costs and expenses, including reasonable attorneys' fees, may be included in and form part of the judgment awarded to us in any proceedings brought by us against you.

b.   Waiver of Punitive Damages - Both Franchisor and Franchisee waive to the full extent permitted by law, any right they otherwise may have had to claim, pursue, demand or receive any exemplary or punitive damages arising out of or related in any way to the business relationship created by this Agreement and its addenda, appendices, exhibits and attachments.

c.   If you breach or default in any of the terms of this Agreement, we may enforce it by injunction, specific performance, or any other remedy available under this Agreement, at law or in equity, including termination. These remedies are not exclusive and we may use any other remedy available. In addition, we may elect to terminate this Agreement and all Franchisee's rights under it as set forth in Section 14.4. If we become aware of a serious health or safety problem in the Franchised Business, we may require you to immediately take corrective action

and/or cease operations until the problem is remedied. We may terminate this Agreement immediately upon notice if you fail to cease operations as required, or fail to completely correct the problem within twenty-four (24) hours after receipt of notification from us; or if you refuse to accept or pick up the notification, then after delivery (as defined in *Section 15*) of notification from us.

d.    If you breach or default in any of the terms of this Agreement, we have the right to have a receiver appointed to take possession, manage and control the assets of the Franchised Business, collect the profits, and pay the net income for the operation of the Franchised Business as ordered by a court of competent jurisdiction. The right to appoint a receiver will be available regardless of whether waste or danger of loss or destruction of the assets exists, and without the necessity of notice to Franchisee.

## 14.4    Effect of Termination or Expiration.

If you fail to cure any default to our satisfaction, within the applicable period following notice from us, we may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. This termination will be effective immediately upon receipt (or delivery, as defined below, if you refuse or fail to pick up the notice) of a written notice of termination from us.

Notwithstanding the foregoing, this Agreement will immediately terminate upon the occurrence of any event set forth in *Sections 9.7, 14.1(a), 14.1(c), 14.1(g) or 14.1(h)*, without notice or opportunity to cure or notice of termination. Upon termination or expiration of this Agreement, we can advise all suppliers of *Great Steak & Potato* proprietary food items and other supplies bearing any of the Proprietary Marks or service marks to cease delivering the items and products to you.

Upon any termination of this Agreement (whether pursuant to *Sections 14.1, 14.2 or 14.3* above or otherwise), or upon expiration of the Term, you must immediately cease to hold yourself out to the public as a franchise owner of the System, and you must comply with the following:

a.    Immediately pay to us or any affiliate of ours all sums owing from you to us or such affiliate, including the monthly Royalty Fees and Advertising Fees, for any period prior to the date of termination, and all amounts owed for services and/or supplies or other items purchased by you from us or any affiliate of ours, or that were financed by us or any affiliate of ours, or which we or any affiliate of ours loaned to you, together with any interest or late fees accrued thereon;

b.    Immediately cease to use, by advertising or in any manner whatsoever, the Proprietary Marks, any trade secrets, any confidential information, any benefits of the System or any part thereof, any methods associated with the Proprietary Marks or the System, any forms, Operations Manuals, slogans, signs, sign posts, marks, symbols, or devices used in connection with the operation of the Franchised Business, or any Proprietary Information; and you must deliver all such materials to us within ten (10) days of the termination date;

c.    Immediately turn over to us in good condition, without charge to us, the Operations Manuals and all copies or reproductions thereof, all advertising materials, stationery and printed forms of the Franchised Business, and all other Proprietary Information relating to

the operation or business goodwill of the Franchised Business. If we do not recover any such items, such items shall be valued at their then-current replacement cost, for purposes of determining the damages owing by you to us for failure to return such items, if we pursue a damage claim as a result thereof;

d.    Immediately discontinue all advertising as a franchise owner of the System, and thereafter refrain from any advertising that would indicate that you are or ever were a franchise owner or licensee of ours, or otherwise were affiliated with us or the System;

e.    Immediately take such steps as may be necessary or appropriate to:

(i)    delete your listing in the yellow pages or any other directory, if applicable, and terminate any other listings which might indicate that you are or were a franchisee or licensee of ours, or otherwise were affiliated with us or the System; and

(ii)    transfer to our designee or us any telephone numbers used by you in connection with the Franchised Business. You acknowledge that between you and us, we have the sole right to the interest in all telephone numbers and directory listings associated with any Proprietary Marks, and you authorize us and appoint us and any officer or agent of ours, as your attorney-in-fact, to direct the telephone company and all listings agencies to accept such direction, or this Agreement, as conclusive evidence of our exclusive rights in such telephone numbers and directory listings and its authority to direct their transfer;

f.    Immediately take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to your use of any Proprietary Mark. You acknowledge that between you and us, we have the sole right to the interest in all such fictitious or assumed names or equivalent registration, and you authorize us and appoint us and any officer or agent of ours as your attorney-in-fact, to effect the termination or cancellation of such fictitious or assumed names or equivalent registrations should you fail or refuse to do so, and the appropriate federal, state, and local agencies may accept your direction or this Agreement as conclusive evidence of our exclusive rights in such fictitious or assumed names or equivalent registrations, and its authority to direct their termination or cancellation.;

g.    Comply with the confidentiality requirements and the covenant against competition in this Agreement for the specified period. Franchisee acknowledges that he/she, or (if an entity) its, authorized representative has carefully reviewed the confidentiality requirements and the covenant against competition in this Agreement; and that Franchisee has agreed to be bound by all the requirements and covenants;

h.    Maintain at a place made known to us all books, records and reports required under this Agreement for a period of not less than three (3) years after the date of termination or expiration of this Agreement, to allow us to make a final inspection of your books and records for the purpose of verifying that all amounts owing have been paid; and

i.    Furnish to us, within thirty (30) days after the effective date of termination or expiration of this Agreement, evidence satisfactory to us regarding your compliance with the foregoing obligations.

If you fail to do any of the foregoing, we may pursue against you and/or any guarantor of your obligations under this Agreement any remedy available at law or in equity.

We have the right, but not the obligation, to purchase from you any assets or property (but not leasehold improvements) used in the operation of the Franchised Business that we may specify, at fair market value as of the time of termination, exclusive of personalized materials with no value to us, and inventory and supplies not reasonably required in the operation of the Franchised Business. If Franchisee and Franchisor cannot agree upon a purchase price, then the purchase price will be the average of three independent appraisals of the Franchised Business. Franchisor and Franchisee shall each select an appraiser qualified to evaluate a business of this kind and the third appraiser will be one agreed upon by the other two appraisers. If a price cannot be arrived at within sixty (60) days after the termination of this Agreement, then Franchisor may withdraw its election to exercise its option under this *Section 14.4.*

**14.5    Confidentiality; Covenant Not to Compete.**

a.      You acknowledge that much of the information imparted to you by us is confidential, constitutes trade secrets and remains the sole exclusive property of Franchisor. Confidential Information includes: (1) ingredients, recipes, and methods of preparation of food products; (2) methods of operation of *Great Steak & Potato* restaurants; (3) information about products, services, or procedures before they become public knowledge; and (4) other information disclosed to you through confidential notifications and the confidential Operations Manuals. You further acknowledge that our Confidential Information and trade secrets are unique and novel to Franchisee. You shall not disclose any such information, except as authorized by us. You shall return all materials such as manuals (including the Operations Manuals), recipes, menus, brochures and the like, and other materials received from us, to us upon the termination of this Agreement for any cause.

b.      Before disclosing Confidential Information or trade secrets to its employees or other representatives, Franchisee shall require those people to sign confidentiality agreements in a form supplied by, or approved by, Franchisor, binding those people not to disclose the information except as may be authorized in the agreement. You agree you will take all steps necessary at your own expense, to protect the Confidential Information and trade secrets mentioned in this Agreement. Neither Franchisee nor any employee of Franchisee will divulge this information to anyone without our prior written consent.

c.      During the term of this Agreement and for a period of two (2) years after its termination for any cause, Franchisee shall not engage in any business in competition with any *Great Steak & Potato* restaurant. The provisions of this Agreement bind Franchisee in any capacity, including as a franchisee, sole proprietor, partner, limited partner, member, employer, franchisor, stockholder, officer, director or employee. For purposes of this paragraph, "competition" means the franchising, ownership, or operation of a restaurant similar to a *Great Steak & Potato* outlet at the location identified in *Section 1.1* of this Agreement, or within a geographical area consisting of: (1) during the term of this Agreement, anywhere else; and (2) after termination of this Agreement, a ten (10) mile radius from the location of any *Great Steak & Potato* restaurant of Franchisor, its third party licensees or its third party franchisees, including the restaurant licensed by this Agreement. The terms "*Great Steak & Potato* restaurant" and "*Great Steak & Potato* outlet" include not only the restaurants and outlets now in existence, but also those established at a later date. The term of this covenant will be extended by any time consumed in litigation to enforce it in both trial and appellate courts. If a court of competent jurisdiction determines that the restrictions in this paragraph are excessive in time, geographic scope, or otherwise, the court may reduce the restriction to the level that provides the maximum restriction allowed by law.

d.      During the Term of this Agreement, and for a period of two (2) years after its expiration or termination for any cause, you shall not divert or attempt to divert any business, customers, or potential customers of the *Great Steak & Potato* System to any competitor, by direct or indirect inducement or otherwise. In addition, you shall not at any time do or perform any act, directly or indirectly, which harms the goodwill or reputation of Franchisor or the System.

e.      If you, any of your officers, directors or shareholders (if you are a corporation), or any of your members or managers (if you are a limited liability company), or any partner of yours (if you are a partnership), ("Restricted Person(s)") have not signed this Agreement under the heading "Acceptance of *Sections 7.1, 9.7, 14.5,* and *14.7*" or is not a party to this Agreement, you agree that you will use your best efforts to cause such Restricted Persons to execute an agreement in a form and substance acceptable to us, which incorporates the provisions set forth in this *Section 14.5* and in *Sections 7.1, 9.7,* and *14.7* of this Agreement. This will be a continuing obligation on your part, and will apply to any person who becomes a Restricted Person at any time during the Term of this Agreement.

**14.6    Continuing Obligations.**

All your obligations that expressly survive the expiration or termination of this Agreement, or by the implicit nature thereof require performance after the expiration or termination of this Agreement, will continue in full force and effect (subsequent to, and notwithstanding, the expiration of the Term or termination of this Agreement), until they are satisfied in full or by their nature expire.

**14.7    Right to Use.**

Upon any expiration of the Term or termination of this Agreement, we will have the exclusive right to use and incorporate in the System, for the benefit of ourselves and other franchise owners in the System, any modifications, changes and improvements developed or discovered by you or any Restricted Person in connection with the Franchised Business, without liability or obligation to the developer thereof.

**14.8    Remedies.**

Upon violation of any of the covenants contained in this *Article 14*, it may be difficult to determine the resulting damages to us, and therefore, in addition to any other remedies we may have, we will have the right to make application in a court of competent jurisdiction for temporary and permanent injunctive relief, without the necessity of proving actual damages.

**ARTICLE 15.       NOTICES**

All notices specified by this Agreement or required by law must be in writing and given by personal delivery or sent by certified mail, return receipt requested to the address(es) set forth at the beginning of this Agreement or to such other address(es) as the parties may designate in writing prior to the giving of any notice. Notices to Franchisee may also be given at the location of the Franchised Business or any franchised restaurant/outlet of Franchisee; or at the residence of Franchisee (if an individual), or at the residence of the principal shareholder(s), partner(s), or member(s) of Franchisee (if a business entity). Notices will be deemed to be "delivered" when actually left in the custody of an adult agent, employee or resident at a place of business or

residence if given by personal delivery; or if given by certified mail, when deposited with the U.S. Postal Service with proper address and postage paid.

## ARTICLE 16.     CONSTRUCTION AND ENFORCEMENT; MISCELLANEOUS

### 16.1    Independent Contractors.

The relationship between Franchisor and Franchisee is that of independent contractors. Franchisee is in no way to be deemed a partner, joint venturer, agent, employee, or servant of Franchisor. You have no authority to bind Franchisor to any contractual obligation or incur any liability for or on behalf of Franchisor. You shall install a sign within the Franchised Business, at a location and in a form designated by us, indicating that you are an independent contractor and are the owner of the Franchised Business. You shall identify yourself as an independent owner of the Franchised Business in all dealings with customers, lessors, contractors, suppliers, public officials, employees, and others. You shall put notices of this independent ownership on signs, forms, stationery, advertising, and other materials as we may at any time require.

### 16.2    Severability and Substitution of Provisions.

Except as provided to the contrary in this Agreement, each Article, Section, subsection, term and provision of this Agreement, and any portion thereof, will be considered severable, and if, for any reason, any such portion of this Agreement is held to be invalid, contrary to, or in conflict with any applicable present or future law or regulation in a final, non-appealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which we are a party, that ruling will not impair the operation of, or have any other effect upon, such other portions of this Agreement as may otherwise remain valid, and such other portions will continue to be given full force and effect and bind the parties to this Agreement.

If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of, or refusal to renew, this Agreement than is required under this Agreement, or the taking of some other action not required under this Agreement, or if under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by us is invalid or unenforceable, the prior notice and/or other action required by such law or rule will be substituted for the comparable provisions of this Agreement, and we will have the right, in our sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. You agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision of this Agreement, as though it were separately stated in and made a part of this Agreement, that may result from striking from any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which we are a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Such modifications to this Agreement shall be effective only in such jurisdiction, unless we elect to give them greater applicability, and otherwise shall be enforced as originally made and entered into in all other jurisdictions.

### 16.3    Applicable Law and Forum; Waiver of Jury

Except to the extent that the United States Trademark Act of 1946, as amended (15 U.S.C., § 1051 et seq.) or the franchising laws of any state that may be applicable, the laws of the State of Arizona govern all rights and obligations of the parties under this Agreement.

Franchisor and Franchisee agree that any appropriate state or federal court located in Maricopa County, Phoenix, Arizona has exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement and is the proper forum in which to adjudicate the case or controversy. The parties hereto irrevocably submit to the jurisdiction of any such court. THE PARTIES AGREE THAT ALL DISPUTES ADMITTED TO THE COURT PURSUANT TO THIS SECTION SHALL BE TRIED TO THE COURT SITTING WITHOUT A JURY, NOTWITHSTANDING ANY STATE OR FEDERAL CONSTITUTIONAL OR STATUTORY RIGHTS OR PROVISIONS.

**16.4    No Guarantee of Franchisee's Success.**

Franchisee has been informed and acknowledges its understanding that because of the highly competitive nature of the business involved, successful operation of its *Great Steak & Potato* restaurant in its Territory will depend in part, upon the best efforts, capabilities, management, and efficient operation by Franchisee; as well as the general economic trend and other local marketing conditions.

**16.5    Existence of Various Forms of Franchise Agreements.**

Franchisee acknowledges that present and future franchisees of Franchisor and Franchisor's area licensors operate under a number of forms of franchise agreements and consequently, Franchisor's obligations and rights with respect to its various franchisees may differ materially in certain instances. The existence of different forms or versions of the franchise agreement does not entitle Franchisee to benefit from any such difference; nor does it operate to alter or amend the agreement of the parties set forth in this Agreement.

**16.6    Franchise Owner May Not Withhold Payments.**

You agree that you will not, on grounds of alleged or actual nonperformance or breach by us of any of our obligations under this Agreement, withhold payment of any Royalty Fees, Advertising Fees, amounts due to us or any of our affiliates for goods and/or services purchased by you, or any other amounts due us or any of our affiliates.

**16.7    Remedies Are Cumulative.**

The rights and remedies of the parties to this Agreement are cumulative, and no exercise or enforcement by either party of any right or remedy under this Agreement shall preclude the exercise or enforcement by such party of any other right or remedy under this Agreement to which such party may be entitled by law to enforce.

**16.8    Interpretation.**

All the terms and provisions of this Agreement will be binding upon and inure to the benefit of the successors and assigns of the parties. However, nothing in this paragraph may be construed as a consent by us to the assignment or transfer of this Agreement or any rights by you.

**16.9    Waiver.**

Failure of Franchisor to insist upon the strict performance of any term, covenant or condition contained in this Agreement will not constitute or be construed as a waiver or

relinquishment of Franchisor's rights to enforce thereafter any such term, covenant or condition and it will continue in full force and effect.

**16.10  Litigation Expense.**

If an action at law or suit in equity is brought to establish, obtain or enforce any right by either of the parties to this Agreement, the prevailing party in the suit or action, in the trial and/or appellate courts, will be entitled to reasonable attorneys fees to be recovered from the other party as well as that party's costs and disbursements incurred in such suit or action.

**16.11  Cross Default.**

A default by Franchisee under this Agreement will be deemed a default of all Franchise Agreements between Franchisee and Franchisor (and/or any of its predecessors.)  A default by Franchisee under any other Franchise Agreement between Franchisor (and/or any of its predecessors), and Franchisee will be deemed a default under this Agreement.  A default by the Guarantor(s) of this Agreement or any other Franchise Agreement Guaranty of Contract (including Franchisor and/or any of its predecessors), will be deemed a default of this Agreement.

**16.12  Cross Termination.**

If this Agreement is terminated as a result of a default by Franchisee, Franchisor may, at its option, elect to terminate any or all other franchise agreements between Franchisee and Franchisor (and/or any of its predecessors.)  If any other franchise agreement between Franchisee and Franchisor (and/or any of its predecessors), is terminated as a result of a default by Franchisee, Franchisor may, at its option, elect to terminate this Agreement.  It is agreed that an incurable or uncured default under this Agreement or any other franchise agreement between Franchisee and Franchisor (and/or any of its predecessors), will be grounds for termination of this Agreement and/or any and all franchise agreements between Franchisee and Franchisor (and/or any of its predecessors), without additional notice or opportunity to cure.

**16.13  No Third Party Beneficiaries.**

This Agreement is not intended to benefit any other person or entity except the named parties hereto and no other person or entity shall be entitled to any rights hereunder by virtue of so-called "third party beneficiary rights" or otherwise.

**16.14  Binding Effect; Modification.**

This Agreement is binding upon the parties to this Agreement and their respective executors, administrators, personal representatives, heirs, permitted assigns and successors in interest. No amendment, change, or modification of this Agreement shall be binding on any party unless executed in writing by you and us.

**16.15  Entire Agreement; Nature and Scope; Construction.**

THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CHANGED EXCEPT BY A WRITTEN DOCUMENT SIGNED BY BOTH PARTIES.  The preambles and exhibit(s) are part of this Agreement, which constitutes the entire understanding and agreement of the parties, and there are no other oral or written understandings or agreements between us and you relating to the subject matter of this

Agreement. Any representation(s) not specifically contained in this Agreement made prior to entering into this Agreement do not survive subsequent to the execution of this Agreement. We and you have entered into this Agreement for the sole purpose of authorizing you to use the intellectual property rights licensed by this Agreement in the operation of a single business operation at the designated location during the Term of this Agreement in which those specific items designated by us for sale and use in such locations are offered for sale and use in individual, face-to-face transactions with patrons visiting this fixed location (and equivalent telephone or mail transactions accepted as a convenience to that customer group). All consideration being furnished by us to you during the course of performance of this Agreement has been determined based on the limited rights and other limitations expressed herein. No other rights have been bargained for or paid for. This provision is intended to define the nature and extent of the parties' mutual contractual intent, there being no mutual intent to enter into contract relations, whether by agreement or by implication, other than as set forth above. The parties further acknowledge that these limitations are intended to achieve the highest possible degree of certainty in the definition of the contract being formed, in recognition of the fact that uncertainty creates economic risks for both parties which, if not addressed as provided in this Agreement, would affect the economic terms of this bargain.

Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.

**16.16  Terminology.**

In addition to any other definitions or meanings set forth herein, the following terms shall have the following meanings as used herein and shall be deemed to include all persons who succeed to the interest of the original:

The term "affiliate" means any person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with any person;

The term "person" means any natural person, corporation, partnership, trust or other entity or form of organization;

The term "will" and "shall" shall be synonymous, and shall be mandatory and not discretionary, unless otherwise specifically provided herein;

The use of the terms "includes" and including" in any provision of this Agreement followed by specific examples used shall not be construed to limit application of the provision to the specific examples use; and

The term "you" as used herein is applicable to one or more persons, a corporation or a partnership, as the case may be, and the singular usage includes the plural and the masculine and neuter usages include the other and the feminine and the possessive. If two or more persons are at any time franchisee hereunder, their obligations and liabilities to us shall be joint and several. References to "you" and "assignee" which are applicable to an individual or individuals shall mean the principal owner(s) of the equity or operating control of you or the assignee, if you or the assignee is a corporation or partnership.

**16.17  Counterparts.**

This Agreement may be executed in multiple counterparts, but all such counterparts shall constitute but one and the same Agreement.

**16.18  Offerings.**

If you are a corporation, partnership or other entity, and if you intend to offer securities, partnership interests or other ownership interests in yourself through any public or private offering, you shall not use any Proprietary Marks in such public or private offering, except to reflect your franchise relationship with us; nor shall you misrepresent your relationship with us by any statement or omission of an essential statement. You shall indemnify and hold us harmless from any liability in connection with such offering. Nothing in the foregoing shall modify the provisions of *Article 12* of this Agreement, and no such offering shall be made without first complying with any applicable provisions of *Article 12* of this Agreement.

**16.19  Time.**

Time is of the essence of each and every provision of this Agreement.

**16.20  Gender, Name and Captions.**

Words in the singular number include the plural when the sense requires (and vice-versa). The Table of Contents and the captions are inserted only for convenience and are not a part of this Agreement or a limitation of the scope of the particular paragraph to which each refers.

**16.21  Nature of Liability.**

If Franchisee consists of two (2) or more persons, whatever the form of business entity through which the persons control Franchisee, then all these persons will be jointly and severally liable under the provisions of this Agreement.

**ARTICLE 17.        ACKNOWLEDGMENTS AND REPRESENTATIONS OF FRANCHISEE**

**17.1   Certain Representations and Warrants of Franchisee.**

Franchisee represents and warrants that the following statements are true and accurate:

a.     Franchisee does not seek to obtain the Franchised Business for speculative or investment purposes and has no present intention to sell or transfer or attempt to sell or transfer the Franchised Business and/or the Franchise.

b.     Franchisee understands and acknowledges the value to the System of uniform and ethical standards of quality, appearance and service described in and required by the Operations Manuals and the necessity of operating the Franchised Business under the standards set forth in the Operations Manuals.   Franchisee represents that it has the capabilities, professionally, financially and otherwise, to comply with the standards of Franchisor.

c.     If Franchisee is a corporation, Franchisee is duly incorporated and is qualified to do business in the state and any other applicable jurisdiction within which the Franchised

Business is located.

d.    The execution of this Agreement by Franchisee will not constitute or violate any other agreement or commitment to which Franchisee is a party.

e.    Any individual executing this Agreement on behalf of Franchisee is duly authorized to do so and the Agreement shall constitute a valid and binding obligation of the Franchisee and, if applicable, all of its partners, members, or shareholders, if Franchisee is a partnership, limited liability company, or corporation.

f.  .    Franchisee has, or if a partnership, corporation or other entity, its partners or its principals have, carefully read this Agreement and all other related documents to be executed by it concurrently or in conjunction with the execution hereof, that it has obtained, or had the opportunity to obtain, the advice of counsel in connection with the execution and delivery of this Agreement, that it understands the nature of this Agreement, and that it intends to comply herewith and be bound thereby.

g.    Franchisee has read and understands the information and disclosures made in the Uniform Franchise Offering Circular provided to Franchisee as acknowledged in *Section 17.3(c)*. Franchisee understands and acknowledges that estimates for initial start up expenses are estimates only. Franchisee understands that there can be and likely will be additional start-up expenses. Franchisee has had the opportunity to and has consulted with their attorney and accountant and business advisors before entering into this Agreement.

h.    Franchisee acknowledges and understands that Franchisor's past experience indicates that owner-operated outlets generally perform better than absentee owners with hired managers. This does not mean that you will operate your Franchised Business better or that a manager is not going to operate your Franchised Business successfully. The food business is a personal business and your success is dependent upon your business skill and judgment. This includes your choice of employees you hire to serve the public. Your skill in hiring the right people to work in your Franchised Business is very important in determining whether people decide to purchase menu items from your Franchised Business or from another store in the same vicinity.

i.    Franchisee understands and acknowledges that ownership of a franchise and franchised business carries certain risks. These risks include the loss of your initial investment, other continued financial losses such as rent payments due under lease obligations and other contractual obligations, the loss of your time and energy in starting up and running your Franchised Business, and loss of earnings and investment income from your investment in the Franchised Business. Franchisee understands and acknowledges that it may make money and may lose money and is entering this business venture with this express understanding. Franchisee is not relying upon anything which is not contained within this Agreement in determining and deciding to become a Franchisee.

j.    Notwithstanding the foregoing, you understand and agree that the System must not remain static if it is to meet (without limitation) presently unforeseen changes in technology, competitive circumstances, demographics, populations, consumer trends, social trends and other market place variables, and if it is to best serve the interests of us, you and all other franchisees. Accordingly, you expressly understand and agree that we may from time to time change the components of the System, including, without limitation, altering the products, programs, services, methods, standards, forms, policies and procedures of that System;

abandoning the System altogether in favor of another system in connection with a merger, acquisition or other business combination or for other reasons; adding to, deleting from or modifying those products, programs and services which your Franchised Business is authorized and required to offer, modifying or substituting entirely the building, Premises, equipment, signage, trade dress, décor, color schemes and uniform specifications and all other unit constructions, design, appearance and operation attributes which you are required to observe hereunder; and, changing, improving, modifying or substituting the Proprietary Marks. You expressly agree to comply with any such modifications, changes, additions, deletions, substitutions and alterations. You shall accept, use and effectuate any such changes or modifications to, or substitution of, the System as if they were part of the System at the time that this Agreement was executed. Except as provided herein, we shall not be liable to you for any expenses, losses or damages sustained by you as a result of any of the modifications contemplated hereby.

     k.     Franchisee represents that neither Franchisee nor any of its officers, directors, managers, members, or partners (as applicable) are subject to U.S. Executive Order 13224.

## 17.2    Additional Information Respecting Franchisee.

     a.     Attached hereto as <u>Exhibit 1</u> is a schedule prepared by Franchisee which contains complete information respecting the owners, partners, members, officers and directors, as the case may be, of Franchisee.

     b.     The address (written notice of any change in this information after the Effective Date must be delivered to Franchisor pursuant to *Section 15* hereof) where Franchisee's financial and other records are maintained is:

<div align="center">

Matthew Cheesesteak, Inc.
c/o Nabil Makhmareh
1901 Brier Glen Drive
Plainfield, IL 60586

</div>

     c.     Franchisee has delivered to Franchisor or will deliver concurrent herewith, complete and accurate copies of all organizational documents relating to Franchisee, including without limitation, all partnership agreements, certificates of partnership, operating agreements, articles or certificates of incorporation, by-laws and shareholder agreements, including all amendments, side letters and other items modifying such documents.

     d.     The initial term (see also *Section 1.4* hereof) of this Agreement expires concurrent with the expiration of the term of the lease with the landlord for the Store, excluding any extensions or other renewal option terms, but not to exceed ten (10) years from the Effective Date of this Agreement.

## 17.3    Acknowledgements of Franchisee.

     a.     Franchisee acknowledges that it has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that the success of this business venture involves substantial business risks and will largely depend upon the ability of Franchisee. Franchisor expressly disclaims making, and Franchisee acknowledges that it has not received or relied on, any warranty or guarantee, express or implied, as to the potential

<div align="center">- 45 -</div>

volume, profits or success of the Franchised Business contemplated by this Agreement.

Franchisee Initials _NM/____

b.    I hereby certify that no employee of Franchisor, and no other person speaking on Franchisor's behalf, has: (i) made any oral, written, visual, or other representation, agreement, commitment, claim, or statement that stated or suggested any level or range of actual or potential sales, costs, income, expenses, profits, cash flow, or otherwise; or (ii) made any oral, written, visual, or other representation, agreement, commitment, claim, or statement from which any level or range of actual or potential sales, costs, income, expenses, profits, cash flow, or otherwise might be ascertained, related to a *Great Steak & Potato* franchise, that is different form, contrary to, or not contained the *Great Steak & Potato* Uniform Franchise Offering Circular; or (iii) made any representation, agreement, commitment, claim or statement to me that is different from, contrary to, or not contained in, the *Great Steak & Potato* Uniform Franchise Offering Circular.    I acknowledge and agree that Franchisor does not make or endorse, nor does it allow any of its employees or other persons speaking on its behalf to make or endorse, any oral, written, visual, or other representation, agreement, commitment, claim, or statement that states or suggests any level or range of actual or potential sales, costs, income, expenses, cash flow, or otherwise with respect to a *Great Steak & Potato* franchise.

Franchisee Initials _UW____

c.    Franchisee acknowledges that Franchisee has received, read and understands this Agreement and the related Exhibits, Attachments and agreements and that Franchisor has afforded Franchisee sufficient time and opportunity to consult with advisors selected by Franchisee about the potential benefits and risks of entering into this Agreement.

Franchisee Initials _NW____

d.    I understand that the Franchise Agreement, including any amendments and exhibits, contains the entire agreement between Franchisor and me concerning the *Great Steak & Potato* franchise, and that any prior oral or written statements that are not set out in the Franchise Agreement, including any amendments and exhibits, will not be binding.    I acknowledge and agree that franchisor does not permit any representations, agreements, commitments, claims, or statements or approve any changes in the Franchise Agreement or any of the amendments and exhibits to the Franchise Agreement, except by means of a written amendment or addendum signed by all parties to the Franchise Agreement.

Franchisee Initials _UW____

e.    You acknowledge receipt of this Agreement with all blanks completed and with any amendments and exhibits at least five (5) business days prior to execution of this Agreement. In addition, you acknowledge receipt of our Uniform Franchise Offering Circular at the earliest of (i) the first personal meeting between you and us (or our agent) at which time the sale or possible sale of a franchise to you was discussed, or (ii) ten (10) business days prior to the execution of this Agreement or your payment of any monies to us or our agent.

Franchisee Initials _UW____

f.    You acknowledge, as detailed in *Section 2.3* of this Agreement, that you must, at your own cost and expense, use <u>only</u> our designated and approved third party architect and

project management firm and general contractors, as detailed in the pre-opening section of the Operations Manuals, for the design and construction oversight of your Franchised Business. Except for the Firm designated and approved by Franchisor, no other architect or project management firm may be used by you for the design and construction oversight of your Franchised Business.

Franchisee Initials __VWA____

## ARTICLE 18.    SUBMISSION OF AGREEMENT

### 18.1    No Offer by Franchisor.

The submission of this Agreement to Franchisee does not constitute an offer and this Agreement shall become effective only upon the execution thereof by Franchisor and Franchisee. THIS AGREEMENT SHALL NOT BE BINDING ON FRANCHISOR UNLESS AND UNTIL IT SHALL HAVE BEEN ACCEPTED AND SIGNED BY THE PRESIDENT OR OTHER EXECUTIVE OFFICER OF FRANCHISOR. THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL AND UNLESS FRANCHISEE SHALL HAVE BEEN FURNISHED BY FRANCHISOR WITH ANY DISCLOSURE, IN WRITTEN FORM, AS MAY BE REQUIRED UNDER OR PURSUANT TO APPLICABLE LAW.

### [THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]

**IN WITNESS WHEREOF** the parties have duly executed and delivered this Agreement as of the day and year first above written.

FRANCHISEE:                          MATTHEW CHEESESTEAK, INC.

By: _Nabil Makhlouseh_
Its: _president_

FRANCHISOR:                          KAHALA FRANCHISE CORP., a Delaware corporation

By: _Walter J. Schmidt_
Its: _Executive VP & CFO_

## LIST OF EXHIBITS TO FRANCHISE AGREEMENT:

Exhibit 1    Ownership Information Sheet

Exhibit 2    Required Lease Terms

Exhibit 3    Electronic Funds Transfer Authorization

Exhibit 4    Guaranty of Contract, Unit Franchise Agreement

Exhibit 5    Addendum to Franchise Agreement and Related Franchise Documents for Non-Traditional Locations (applicable only for Non-Traditional Locations)

Exhibit 6    State Specific Addendum (applicable only for the following states: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Washington, & Wisconsin)

## EXHIBIT 1

### OWNERSHIP INFORMATION SHEET

FRANCHISEE'S SHAREHOLDERS, PARTNERS, MEMBERS AND/OR PRINCIPAL OFFICERS

(*Please circle each answer*)

1.  Are you a Partnership?              Yes / (No)
2.  Are you a Corporation?              (Yes) / No
3.  Are you a Limited Liability Company?   Yes (No)

4.  If you are a Partnership or Limited Liability Company, please complete the following:

### PARTNERSHIP/LIMITED LIABILITY COMPANY

| Name (each partner) | Percentage Ownership | Residence Address | Home Phone | Work Phone | Social Security Number |
|---|---|---|---|---|---|
| NABIL S Makhamreh | 100% | 1901 Brier Glen dr Plainfield, IL 60586 | 815 439 9895 | 630 933 6981 | 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 |

5.  If you are a Corporation, please complete the following:

### CORPORATION

| Name (each shareholder) | Number of shares | Residence Address | Home Phone | Work Phone | Social Security Number |
|---|---|---|---|---|---|
| Nabil S Makhamreh | 1 | 1901 Brier Glen Drive Plainfield, IL 60586 | 815 439 9895 | ~~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~~ 630-933 6981 | 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 |

**EXHIBIT 2**
**REQUIRED LEASE TERMS**


The Terms and Conditions in the Attached Lease Addendum must be included in the Franchisee's lease for the location of the Franchised Business via execution of the attached Lease Addendum or through modifications to the actual lease agreement

# LEASE ADDENDUM

## TO

## LEASE AGREEMENT

Dated _____, 200__ between

_____ and _____
Landlord Name                              Tenant/Franchisee Name

1.     **Use of Premises.**

During the term of the Franchise Agreement (or, if shorter, the term of the Lease), the Premises may be used only for the operation of a quick service restaurant under the *Great Steak & Potato* System, Proprietary Marks, Trade names, and logos, which specialize in the sale of genuine Philadelphia Cheesesteak sandwiches, fresh-cut French fries, fresh-squeezed lemonade, and baked potatoes with all of the toppings and other fast food-related menu items. Landlord consents to Tenant's use of such marks, tag lines, signs, décor items, color schemes, and related components of the *Great Steak & Potato* franchise System as *Great Steak & Potato* may prescribe for the franchisees of its System.

2.     **Assignment and Notices.**

a.     Notwithstanding anything to the contrary in this Lease, Tenant shall have the right to assign this Lease and all rights hereunder, to Kahala Franchise Corp., ("*Great Steak & Potato*"), an affiliate of *Great Steak & Potato*, or to a franchisee of *Great Steak & Potato* (duly approved as such by *Great Steak & Potato* and meeting the franchise requirements of *Great Steak & Potato* as of the date hereof) upon the expiration or earlier termination of that certain Franchise Agreement dated _____, 20__ (the "Franchise Agreement"), by and between *Great Steak & Potato* and Tenant without obtaining Landlord's consent and without the imposition of any assignment fee or similar charge. Landlord shall not accelerate the rent owed hereunder in connection with such assignment(s), so long as *Great Steak & Potato*, its affiliate(s) or its franchisees assumes in writing the obligations of Tenant under the Lease. Nothing in this Section 2(a) shall serve to extend the term of the Lease or provide *Great Steak & Potato* any occupancy rights, options to renew or other rights not expressly set forth to Tenant in the Lease.

b.     Landlord agrees to furnish *Great Steak & Potato* with copies of any and all letters and notices to Tenant pertaining to the Lease and the Premises at the same time that such letters and notices are sent to Tenant. Landlord further agrees that, if it intends to terminate the Lease, the Landlord will give *Great Steak & Potato* the same advance written notice of such intent as provided to Tenant, specifying in such notice all defaults that are the cause of the proposed termination. *Great Steak & Potato* shall have the right to cure, at its sole option, any such default within the time periods granted to Tenant under the Lease. If neither Tenant or *Great Steak & Potato* cures all such defaults within said time periods (or such longer cure periods as may be specifically permitted by the Lease), then the Landlord may terminate the Lease, re-enter the Premises and/or exercise all other rights as set forth in the Lease.

c.      Prior to the expiration or termination of the Lease, *Great Steak & Potato* shall have the right to enter the Premises to make any reasonable modifications or reasonable alterations necessary to protect *Great Steak & Potato* interest in the *Great Steak & Potato* business and the Proprietary Marks and System (as such terms are defined in the Franchise Agreement), or to cure any default under the Franchise Agreement or any development agreement entered into by *Great Steak & Potato* and the Tenant or under the Lease, and Landlord agrees that *Great Steak & Potato* shall not be liable for trespass or any other crimes or tort.

3.    **Notices.**

All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid, facsimile, telegram or telex (provide that the sender confirm the facsimile, telegram or telex by sending an original confirmation copy by certified transmission), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other parties.

If directed to Tenant, the notice shall be addressed to:

Attn: _____
Facsimile: _____

If directed to Landlord, the notice shall be address to:

Attn: _____
Facsimile: _____

If directed to *Great Steak & Potato*, the notices shall be addressed to:

Kahala Franchise Corp.
7730 E. Greenway Road, Suite 104
Scottsdale, AZ 85260
Attn:   Legal Department
Facsimile:  (480) 443-1972

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by telex or facsimile shall be deemed given on the business day of transmission, provided confirmation is made as provided above. Any notice sent by expedited delivery service or registered or certified mail shall be deemed given three (3) business days after the time of mailing. Any change in the foregoing addresses shall be effected by giving fifteen (15) days written notice of such change to the other parties.

4. **Amendments.**

Landlord and Tenant will not amend, renew, extend or otherwise modify this Lease in any manner which would materially affect any of the foregoing provisions without *Great Steak & Potato* prior written consent.

5. **Third Party Beneficiary.**

Landlord and Tenant agree that *Great Steak & Potato* is a third party beneficiary of the Lease.

6. **Miscellaneous.**

The terms and conditions of this Lease Addendum will supersede any Conflicting terms of the Lease. Any capitalized term not specifically defined in this Addendum shall have the meaning ascribed to such term in the Lease or Franchise Agreement, as applicable.

**[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Addendum in duplicate as of the day and year set forth in the Lease Agreement.


**"LANDLORD"**

_____, a(n) _____

_____

By:_____
Title:_____


**"TENANT"**

_____, a(n) _____

By:_____
Title:_____

By:_____
Title:_____

**EXHIBIT 5**

**ADDENDUM TO FRANCHISE AGREEMENT AND RELATED FRANCHISE DOCUMENTS FOR NON-TRADITIONAL LOCATIONS**

**(Applicable only for Non-Traditional Locations)**

**EXHIBIT 6**

**STATE SPECIFIC ADDENDUM**

**(Applicable only for the following states:**
California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North
Dakota, Rhode Island, South Dakota, Washington, & Wisconsin)

## AMENDMENT TO KAHALA FRANCHISE CORP.

### FRANCHISE AGREEMENT & RELATED FRANCHISE DOCUMENTS

### FOR THE STATE OF ILLINOIS

The Kahala Franchise Corp. Franchise Agreement between _____ ("Franchisee") and Kahala Franchise Corp., a Delaware Corporation ("Franchisor"), dated _____ (the "Agreement") shall be amended by the addition of the following language, which shall be considered an integral part of this Agreement (this "Amendment"):

### ILLINOIS LAW MODIFICATIONS

1.    The Illinois Attorney General's Office requires that certain provisions contained in franchise documents be amended to be consistent with Illinois law, including the Franchise Disclosure Act of 1987, III. Comp. Stat. Ch. 815 para. 705/1 –705/44 (1994). To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

    a.  Illinois Franchise Disclosure Act paragraphs 705/19 and 705/20 provide rights to the Franchisee concerning non-renewal and termination of the Agreement. If the Agreement contains a provision that is inconsistent with the Act, the Act will control.

    b.  If the Franchisee is required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule of order under the Act, such release shall exclude claims arising under the Illinois Franchise Disclosure Act, and such acknowledgements shall be void with respect to claims under the Act.

    c.  If the Agreement requires litigation to be conducted in a forum other than the State of Illinois, the requirement is void under the Illinois Franchise Disclosure Act. The Illinois Franchise Disclosure Act will govern the Agreement with respect to Illinois franchisees. The provisions of the Agreement concerning jurisdiction and venue will not constitute waiver of any right conferred on you by the Illinois Franchise Disclosure Act.

    d.  If the Agreement requires that it be governed by a state's law, other than the State of Illinois, to the extent that such law conflicts with the Illinois Franchise Disclosure Act, the Act will control. The Illinois Franchise Disclosure Act will govern the Agreement with respect to Illinois franchisees. The provisions of the Agreement concerning governing law will not constitute a waiver of any right conferred on you by the Illinois Franchise Disclosure Act.

    e.  To the extent that Sections 17.3(a) and 17.3(c) of the Agreement requires Operator to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Act, or a rule or order under the Act, such release shall exclude claims arising under the Illinois Franchise Disclosure Act, and

such acknowledgements shall be void and hereby deleted with respect to claims under the Act.

f.   Illinois law requires fourteen calendar days' disclosure prior to the signing of a binding agreement or any payment to the franchisor. This amends Item 23, the receipt to this Offering Circular and Section 17.3(c) of the Agreement with respect to this fourteen day time period.

g.   Section 41 of the Illinois Franchise Disclosure Act states that "any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void."

h.   Nothing in the Agreement will limit or prevent the enforcement of any cause of action otherwise enforceable in Illinois or arising under the Illinois Franchise Disclosure Act of 1987, as amended.

2.      Each provision of this Amendment shall be effective only to the extent that the jurisdictional requirements of the Illinois Franchise Disclosure Act, with respect to each such provision, are met independent of this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Amendment to the Franchise Agreement on this ____ day of _____, 200__.

FRANCHISOR:

KAHALA FRANCHISE CORP.,
a Delaware corporation

By: _____
Name: Walter Schultz
Title: Executive VP- CEO

FRANCHISEE:

MATTHEW CHEESESTEAK, INC., an
Illinois corporation

By: _____
Name: Nabil S MaKhamreh
Title: prisdent

## AMENDMENT TO KAHALA FRANCHISE CORP.
## FRANCHISE AGREEMENT
### (Monthly EFT)

THIS ADDENDUM (the "Addendum") dated _____, 20___, to the Franchise Agreement dated _____, 20___ for the Traditional *Great Steak & Potato* location at Eastland Mall, 1615 East Empire Street, Space FC-G, Bloomington, IL 61701 (the "Franchise Agreement" or "Agreement") by and between Kahala Franchise Corp., a Delaware corporation, doing business as "*Great Steak & Potato*" ("Franchisor") and Matthew Cheesesteak, Inc., an Illinois corporation ("Franchisee"), is entered into by such parties to amend the Agreement as set forth herein. To the extent this Addendum contains terms and conditions that differ from those contained in the Agreement, this Addendum shall control. The parties agree that a concept or principle provided in one Section of this Addendum shall apply and be incorporated into all other provisions of the Franchise Agreement in which the concept or principle is also applicable, notwithstanding the absence of any specific cross reference thereto. All capitalized terms not otherwise defined herein will have the same meanings ascribed to such terms in the Agreement.

1.    Section 5.2, "Royalty Fee", shall be deleted in its entirety and replaced with the following:

"For the period of time commencing on the date that you sign this Agreement, and for the duration of the Term of this Agreement, you must pay to us a monthly royalty fee equal to the greater of the following: (i) six percent (6%) of total Gross Sales (as defined below); or (ii) $1,600.00 for the Term of this Agreement (the "Royalty Fee"). In the event of a unilateral termination of this Agreement by you, we shall be entitled to the average of the prior 6-month (or if less than 6 months, the Term) royalties multiplied by the remaining number of months on the initial Term of this Agreement, or any extension thereof, less a discount of eight percent (8%).

The Royalty Fee shall be due and payable no later than the Fifteenth (15th) calendar day of each month, which month shall end on the last calendar day of the preceding month in which applicable Gross Sales were earned from the Franchised Business. If the Fifteenth (15th) calendar day is a Saturday or Sunday, the monthly Royalty Fee will be due on the next business day. If the Fifteenth (15th) calendar day is a bank holiday, the monthly Royalty Fee will be due on the preceding banking business day. The monthly Royalty Fee shall be paid by electronic funds transfer, as detailed below.

You are required to report Gross Sales to our designated accounting office via facsimile or other approved electronic communication medium, as set forth in the Operations Manuals, by the close of business on the Seventh (7th) day of each month for the preceding month, commencing on the Effective Date and continuing through the Term of the Franchise Agreement. You shall be required to establish a Depository Account at the time you execute this Agreement as set forth in *Section 5.4* below. Payment of Royalty Fees, Advertising Fees (as defined in this *Article 5*), and all other fees due under this Agreement to us shall be made via electronic transfer of funds from the Depository Account described in *Section 5.4* below. To accomplish this electronic transfer of funds from the Depository Account, you must complete,

sign and deliver to us a current Electronic Funds Transfer Authorization in the form attached to this Agreement as _Exhibit 3_.

As used in this Agreement, "Gross Sales" means all sales, money or things of value, received or receivable, directly or indirectly, by Franchisee on account of the Franchised Business, less applicable sales taxes and any documented refunds, credits and allowances given by you to customers in accordance with the Operations Manuals, but without deducting any of Franchisee's costs and expenses."

2.    In Section 5.3, "_Advertising Fees_", the word "weekly" is hereby deleted and replaced with the word "monthly".

3.    Section 5.4, "_Depository Account_", shall be deleted in its entirety and replaced with the following:

"You are required to establish, at the time you execute this Agreement, and maintain a depository account (the "Depository Account") at a bank or other federally insured financial institution (the "Depository"). You will initially deposit $3,000 into the Depository Account and are required to maintain a balance of $3,000 in the Depository Account at all times by replenishing the Depository Account to $3,000 after Franchisor makes withdrawals. On the Seventh (7th) calendar day of each month, you must submit a report to us regarding the monthly period which ended on the last calendar day of the preceding month, including details on Gross Sales and other statistical data as specified from time to time by us or the Operations Manuals. We will withdraw funds electronically on the Fifteenth (15th) calendar day of each month from the Depository Account. The withdrawals are based upon the figures Franchisee reports and constitute Royalty Fees and Advertising Fees as described in _Sections 5.2_ and _5.3_ of this Agreement. If you do not submit a report by the Seventh (7th) calendar day of any month, we may estimate the Royalty Fee and Advertising Fee based upon prior reports and withdraw the estimated amounts up to the entire $3,000. We will return any overage within 30 days of our receipt of your report(s). We shall not be responsible to you for any interest charges for any overage collected due to your failure to timely report your sales. Additionally, we shall not be responsible for any bank service charges incurred by you which result in the withdrawal of funds from your Depository Account. You shall instruct the Depository to disburse each month to our designated bank, via electronic funds transfer by the close of business on the Fifteenth (15th) calendar day of each month (or (i) the preceding banking business day if the Fifteenth (15th) calendar day is a bank holiday, or (ii) the next business day if the Fifteenth (15th) calendar day is a Saturday or Sunday), the monthly Royalty Fee and Advertising Fee and other fees due for that month, which month shall end on the last calendar day of the preceding month. Under no circumstances shall such access to the Depository Account be deemed control or joint control of the Depository Account by Franchisor. You shall pay us Fifty Dollars ($50.00) for each electronic funds transfer attempted from your Depository Account pursuant to this _Section 5.4_ that is returned for non-sufficient funds. You shall also reimburse us for all extraordinary costs incurred by us in collecting or attempting to collect funds due Franchisor from the Depository Account (for example, without limitation, charges for non-sufficient funds, uncollected funds or other discrepancies in deposits or

maintenance of the Depository Account balance in accordance with the terms hereof). The Depository Account shall be established and maintained solely for the purposes set forth in this *Section 5.4* and the Operations Manuals."

4.    In Section 5.12, "<u>Late Report, Non-Sufficient Funds and Default Fees</u>", the word "weekly" is hereby deleted and replaced with the word "monthly".

5.    Section 5.13, "<u>Audit Fees</u>", the first sentence of the second paragraph shall be deleted and replaced with the following: "You agree that we may have access to any computers utilized by you for such purposes and will have the ability at all times via modem to obtain daily, weekly, and monthly sales reports and other financial records that the POS System provides."

6.    In Section 11.1, "<u>Maintenance of Records</u>", paragraph "a" shall be deleted in its entirety and replaced with the following:

"a.    to submit to us on a Franchisor-approved form, on or before the close of business on the Seventh (7th) day of each month, a signed statement of monthly Gross Sales for the preceding month, which month ends on the last calendar day of the month."

7.    In Section 11.1, "<u>Maintenance of Records</u>", paragraph "e.3" shall be deleted in its entirety and replaced with the following:

"3.    cash disbursements journal and monthly payroll register;"

8.    In Section 11.1, "<u>Maintenance of Records</u>", paragraph "e.9" shall be deleted in its entirety and replaced with the following:

"9.    daily production, throwaway and finishing records and monthly inventories;"

9.    Paragraph "c" of Section 14.2, "<u>Opportunity to Cure</u>", shall be deleted in its entirety and replaced with the following:

"c.    <u>No Cure Period</u> - No cure will be available (1) if Franchisee is in default under or breaches its covenants or obligations under *Sections 9.7, 14.1(a), 14.1(c), 14.1(f), 14.1(g), or 14.1(h)*, or (2) if Franchisee intentionally underreports monthly Gross Sales, falsifies financial data, fails to promptly provide upon Franchisor's request financial data and records specified in this Agreement, or otherwise commits an act of fraud with respect to its rights or obligations under this Agreement; or (3) if Franchisee is in default under or breaches its covenant against competition set forth in *Section 14.5* of this Agreement; or (4) if Franchisee is in default under or breaches its covenant to observe and obey all applicable laws, rules, ordinances and regulations set forth in *Section 9.4*, or (5) if Franchisee repeatedly fails to comply with the provisions of this Agreement, whether or not subsequently cured; or (6) if Franchisee, having twice previously cured a default or breach of this Agreement, commits the same breach or default again."

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Addendum to the Franchise Agreement on this _____ day of _____, 20___.

**FRANCHISOR:**

**KAHALA FRANCHISE CORP., a Delaware corporation**

By: _____
Name: _____
Title: _____

**FRANCHISEE:**

**MATTHEW CHEESESTEAK, INC., an Illinois corporation**

By: _____
Name: Nabil S Makhamreh
Title: president

**EXHIBIT 4**

**GUARANTY OF CONTRACT
FRANCHISE AGREEMENT**

**RECITALS**

A.    The undersigned are shareholders, partners, members, or other persons or entities interested in effecting the grant or transfer of this Franchise Agreement.

B.    Without this guaranty, Franchisor cannot be assured that there are sufficient assets to operate the franchise, or to protect Franchisor in the event of a default by Franchisee.

C.    Franchisor is willing to enter into the Franchise Agreement only if the undersigned personally guarantee faithful performance of all the terms of the Franchise Agreement.

**AGREEMENT**

1.    In consideration of the above recitals, the undersigned personally guarantee the prompt and complete performance of all the covenants and conditions contained in the foregoing Franchise Agreement.

2.    This guaranty is effective until all terms of the Franchise Agreement have been satisfactorily performed or otherwise discharged by Franchisee. The undersigned will not be released from any obligations under this guaranty so long as any claim of Franchisor against Franchisee arising out of the Franchise Agreement is not settled or discharged in full.

3.    Franchisor is not required to proceed first against the Franchisee, but may proceed first against the undersigned or any of them alone or concurrent with proceeding against Franchisee.

4.    Franchisee and Franchisor may from time to time alter or modify the Franchise Agreement between themselves, possibly changing or increasing the extent of the undersigned's obligation under this contract. The undersigned consent to any and all modifications or amendments of the Franchise Agreement and the documents and Operations Manuals referred to in the Franchise Agreement, without requiring notice to them or their consent as guarantors.

5.    The undersigned will have the benefit of any modifications or obligations of Franchisee under the Franchise Agreement and will also have the benefit of any settlement, compromise, or adjustment of any claims of Franchisee arising out of the Franchise Agreement. The undersigned agree specifically to be bound by the confidentiality requirements and the covenant against competition in the Franchise Agreement.

6.    The undersigned waive notice of acceptance of this guaranty and notice of non-performance or non-payment by Franchisee of any of its obligations or liabilities under the Franchise Agreement.

7.    A default by the Guarantor(s) under this Agreement will be deemed a default under all Franchise Agreements guaranteed by the Guarantor(s).

8.      Guarantor(s) jointly and severally agree(s) to pay all costs and expenses (including underreporting) incurred by Franchisor in enforcing this Guaranty; and assume all liability for all losses, costs, attorney's fees, and expenses that Franchisor incurs as a result of a default by Franchisee, including those fees and expenses incurred in a bankruptcy proceeding involving Franchisee.

9.      The Guaranty is personal to the undersigned and the obligations and duties imposed herein may not be delegated or assigned; provided, however, that this Guaranty shall be binding upon the successors, assigns and personal representatives of the undersigned. This Guaranty shall inure to the benefit of Franchisor, its affiliates, successors and assigns.

10.     In the event that any one or more provisions contained herein shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Guaranty shall be construed to bind the undersigned to the maximum extent permitted by law that is subsumed within the terms of such provision as though it were separately articulated herein.

11.     This Guaranty shall be interpreted and construed under the laws of the State of Arizona, which laws shall prevail in the event of any conflict of law. Any appropriate state or federal court located in Maricopa County, Phoenix, Arizona has exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement and is the proper forum in which to adjudicate the case or controversy, and the parties hereto irrevocably submit to the jurisdiction of any such court. THE PARTIES AGREE THAT ALL DISPUTES ADMITTED TO THE COURT PURSUANT TO THIS SECTION 11 SHALL BE TRIED TO THE COURT SITTING WITHOUT A JURY, NOTWITHSTANDING ANY STATE OR FEDERAL CONSTITUTIONAL OR STATUTORY RIGHTS OR PROVISIONS.

12.     Each of the undersigned acknowledges that (i) it is a condition to the granting of the Franchise Agreement to Franchisee that each of the undersigned shall execute and deliver this Guaranty to Franchisor, (ii) that Franchisor has entered into the Franchise Agreement in reliance upon the agreement of the undersigned to do so, and (iii) that, as owners of the Franchisee, the undersigned have received adequate consideration to support their execution of this Guaranty. This Guaranty does not grant or create in the undersigned any interests, rights or privileges in any Franchise or Franchise Agreement.


_____          Date: 4 - 9 - 0 7 _____
Nabil Makhamreh, an Individual

## PERSONAL ACCEPTANCE OF SECTIONS 7.1, 9.7, 14.5, AND 14.7

Each of the undersigned individually and personally accepts and agrees to be bound by the provisions of Sections 7.1, 9.7, 14.5, and 14.7 of the foregoing Franchise Agreement.

_Nabil Makhamreh_ Nabil Makhamreh, an Individual
(signature)

Date: 4-9-07

## PERSONAL ACCEPTANCE OF SECTIONS 7.1, 9.7, 14.5, AND 14.7

Each of the undersigned individually and personally accepts and agrees to be bound by the provisions of Sections 7.1, 9.7, 14.5, and 14.7 of the foregoing Franchise Agreement.

_____ Nabil Makhamreh, an Individual
(signature)

Date: 4-9-07

F.A. – Eastland Mall - GSP





   

 -state-

FRANCHISES

A-Z Listing    Investment Range    Industries    Area Development / Master License Opportunities



Great Steak & Potato

**The concept for The Great Steak & Potato Company was formed in 1982 – with the opening of our first store in Dayton, Ohio.**

**Great Steak & Potato**
INDUSTRIES
Fast Casual
Sandwich / Deli
Quick Service

INVESTMENT RANGE:
$100,000-$250,000

**for more information**
Fill out a request form > 

Our concept was a simple one. A "meat and potatoes" fast-food operation, providing a unique visual, sensory and eating experience for the customer, with the emphasis on low cost and high value for the customer and a low operating cost and high return for the store.

Our signature items - genuine Philadelphia Cheesesteak sandwiches; fresh-cut French fries; fresh-squeezed lemonade; chicken; ham and veggie "Philadelphias;" baked potatoes with all the toppings.

Our signature attractions are only the finest, freshest Ingredients. Grilled and prepared to order, right in front of the customer.

Today The Great Steak & Potato Company consists of hundreds of stores (20 of which are company owned with the remainder franchisee owned) in 40 states, Canada, the United Kingdom and Middle East.

There are several thousand chain employees system-wide. We provide an optional centralized computer accounting service with both food and labor cost programs. We realize controlled growth of at least 25 stores per year.

That's The Great Steak & Potato Company

REQUEST MORE INFORMATION

Company:*

First Name:*

Last Name:*

Email:*

Address:

City:

State:

Zip*:


RESTAURANT

- HOME
  - Restaurant Directory
    - Quick Service
    - Hottest Concepts
    - Quick Submit

## Quick Profile

**Great Steak & Potato Company, The**

**Required Capital**
$100,000

**Units** 240

**Required Net Worth**
$250,000+

**Started** 1982

At The Great Steak & Potato Company, we share a belief that every individual has the right to attain - and enjoy - his or her personal potential. We believe that the sky is the limit - and that there should be no barrier to reaching this limit. That's why we have made The Great Steak & Potato Company one of the easiest franchises to own - and operate - in all of retailing today.

## Restaurant Picker

**Pick an investment range...**
**Pick a sector...**
We'll find the franchise that matches your requirements.

Select Industry 

Select Investment





## Great Food and Ease of Operation - That's The Great Steak & Potato Company.


Since 1982, The Great Steak & Potato Company has been serving the finest Cheesesteak sandwiches in hundreds of locations throughout the U.S., Canada and abroad. Our recipe - freshness. We use the finest ingredients, prepared to order, to ensure the freshest, most delicious eating experience.

### A True "Meat and Potatoes" Concept

The Great Steak & Potato Company's concept is a simple one. A "meat and potatoes" fast food operation that provides a unique visual, sensory and eating experience, with an emphasis on low cost and high value for the customer and a low operating cost and high return for the store.

Signature items, the one's The Great Steak & Potato Company are famous for, include:

- Genuine Philadelphia Cheesesteak Sandwiches
- Fresh-Cut French Fries
- Fresh-Squeezed Lemonade
- Chicken, Ham and Veggie "Philadelphia's"
- Baked Potatoes with all the Toppings
- Easy to operate and all of the support you need from an experienced operator.

At The Great Steak & Potato Company, we share a belief that every individual has the right to attain - and enjoy - his or her personal potential. We believe that the sky is the limit - and that there should be no barrier to reaching this limit.

That's why we have made The Great Steak & Potato Company one of the easiest franchises to own - and operate - in all of retailing today.

Opening a Great Steak & Potato restaurant is not new to us - we currently own and operate 20 restaurants ourselves. While each store is unique, we strive to make the process as easy as possible. We work with the franchisee to complete construction drawings, hire contractors and train employees.

Search by Company
Name

At no time do we leave your side. From planning to set-up to opening to ongoing store operation, we are there to assist you and keep you a productive member of The Great Steak & Potato Company team.

## A Variety of Location Options

The Great Steak & Potato Company offers a variety of location configurations for store units and business options.



- Free Standing Units
- Mall Units
- Strip Center Locations
- Airport Food Courts

## Experience The Great Steak & Potato Company

The Great Steak & Potato Company not only has a tremendous, unparalleled success record, but also the proven experience only obtained from a system with hundreds of franchises already established. We invite you to learn more about The Great Steak & Potato Company franchise program and share the experience.

## Franchise with Us

As one of the fastest growing franchising and marketing companies in North America, The Great Steak & Potato Company Restaurants are owned by the Kahala Corporation, a privately held corporation dedicated to the design, development and marketing of quick service restaurants.

Kahala supports its franchisees by providing seasoned real estate guidance, ongoing operational support, and turnkey marketing programs designed to optimize profitability and boost register receipts.

We are currently licensing area development deals as well as franchise agreements for all of Kahala's branded concepts, which includes a variety of good-for-you branded concepts that are in step with today's growing trend towards low-fat, nutritious eating. They include Blimpie, Cereality, Cold Stone Creamery, Frullati Cafe, Great Steak & Potato, Johnnie's NY Pizzeria, Nrgize, Ranch 1, Rollerz, Samurai Sam's, Surf City Squeeze and TacoTime - all of which deliver strong unit economics, people-pleasing menus and operational ease. Kahala is also offering co-branded opportunities to both existing franchisees as well as new prospects.

Please note interested parties should have at least $100,000 to invest.

**To request information about Great Steak & Potato Company, The, simply complete the Express Request form provided below.**

Information Request Form

*First Name:

*Last Name:

*Email:

*Confirm Email:

*Phone:

Best Time        ◉ Day  ○ Evening




# Entrepreneur.com

URL: http://www.entrepreneur.com/business-opportunities/greatsteakandpotato/192078.html



### Great Steak & Potato

Great Steak & Potato™ A "meat and potatoes" fast-food operation, providing a unique visual, sensory and eating experience for the customer.



We are known simply as "Great Steak" to our many loyal customers. What is our recipe for loyalty? Freshness. Everything is prepared using the freshest ingredients.

Great Steak & Potato is a "meat and potatoes" fast-food operation, providing a unique visual, sensory and eating experience for the customer, with the emphasis on low cost and high value for the customer and a low operating cost and high return for the store. Our signature items include genuine Philadelphia Cheesesteak sandwiches; fresh-cut French fries; fresh-squeezed lemonade; chicken; ham and veggie "Philadelphias;" baked potatoes with all the toppings.

Today, Great Steak & Potato consists of hundreds of stores (20 of which are company owned with the remainder franchisee owned) in 40 states, Canada, the United Kingdom and Middle East.

**Interested in a Great Steak Franchise?** At The Great Steak & Potato Company, we share a belief that every individual has the right to attain (and enjoy) his or her personal potential. We bring an unparalleled success record along with proven experience of hundreds of Great Steak franchises to bear upon the success of your franchise opportunity with us. We invite you to share this experience with us as a Great Steak franchisee.

We are currently looking to expand in the following states: AZ, CA, CT, DE, FL, GA, IL, MD, MI, MN, NV, NJ, NY, NC, OH, OR, SC, TX, VA, WA, WV.




**Kahala**

Copyright © 2008 Entrepreneur.com, Inc. All rights reserved. Privacy Policy







**Menu / Nutrition**

## Great Steak & Potato Company Store Menu

Items May Vary By Location.



**Fresh Grilled Sandwiches**

Great Steak – Grilled steak with onions and provolone cheese

Chicken Philly – Chicken breast with onions and Swiss cheese

Super Steak – Grilled steak with onions, green peppers, mushrooms and provolone cheese.

Chicken Teriyaki – Chicken breast with onions, teriyaki sauce and Swiss cheese

Ham Delight – Grilled ham with pineapple and Swiss cheese

Turkey Philly – Turkey breast with onions and Swiss cheese

Ham Explosion – Ham with onions, green peppers, mushrooms and Swiss cheese

Veggie Delight™ – Onions, green peppers, mushrooms, black olives, cucumbers with provolone and Swiss cheese.

All Sandwiches served with mayo, lettuce and tomato. Regular size 7" or Large size 12"



**Baked Potatoes**

The Great Potato – Grilled steak, ham, or turkey with onions, topped with Cheddar cheese sauce

Bacon And Cheese

The King – Cheese, bacon, sour cream & chives

Sour cream and chives

Broccoli and Cheese        Chili And Cheese

All potatoes served with margarine

### Fresh Cut Fries



Hand cut and cooked in 100% cholesterol free peanut oil
Small • Regular • Large • Cheese Sauce

### Salads



The Great Salad – Fresh bed of lettuce with carrots, red cabbage, tomatoes and cucumbers. Topped with grilled meat, onions and cheese.

Garden Salad – Fresh bed of lettuce with carrots, red cabbage, tomatoes and cucumbers.

### Kid's Meal

Chicken nuggets, fries, and a small soft drink

 ### Beverages

We proudly feature Pepsi products and iced tea. fresh squeezed lemonade, coffee, orange juice and milk available.

### Breakfast

Steak & Egg Sandwich – Steak grilled with onions,

Biscuit or Croissant with • Ham, egg and cheese

egg and American cheese.

- Bacon, egg and cheese
- Egg and cheese
- Ham and cheese.

Fresh Cut Home Fries        Ham & Egg Sandwich – Ham grilled with onions, egg and American cheese.

## Nutrition Information

- Download Great Steak & Potato Nutritionals

We encourage you to educate yourself about our menu items. To view nutritional information for all of our menu items, click here. If you have further questions regarding the nutritional information, you may contact us at nutrition@kahalacorp.com.

| Home | Who We Are | Locations | Great Steak Owners | Franchise Opportunities | Menu |
| Contact Us | Careers | Reviews | Gift Certificates |

## Charley's Grilled Subs                                      ⊠

Restaurant chain featuring fresh made-to-order Philly style grilled steak and chicken subs as well as gourmet fries and freshly squeezed lemonade.

Upper Level, Food Court
630-629-8500

www.charleyssteakery.com

```
        CHARLEYS GRILLED SUBS
        YORKTOWN SHOPPING CENTER
        LOMBARD, IL  630-629-8500


      #0142              IN
      1 CHICKEN        4.29
      1 FRY CMBO       2.39
      1 CMBODRNK
      1 SODA
      ------------------------------
              SUBTOTAL           6.68
              TAX 1        .62
        TOTAL                   7.30
              CASH              8.00
              CHANGE             .70



      CASHIER1 CSHR
      00°`·°·°7 ·°° 10·0°      W/S#01 P1
```






# YORK ⚹ TOWN
YORK TOWN CENTER.COM

Shopping Hours | Monday - Saturday, 10am - 9pm | Sunday, 11am - 6pm

Holiday, restaurant and some retail hours may vary.
See yorktowncenter.com for details.

DIRECTO

# YORKTOWN CENTER
THE SHOPS ON BUTTERFIELD



# Lower Level

# The Shops at Yorktown

# Yorktown Center Property Map

## Key

- Free-standing Stores and Kiosks
- $ Cash Station
- Elevator
- Escalator
- ? Information Center
- Long/Pehrson Associates
  Yorktown Management Offices
  Highland Yorktown, LLC
  Yorktown Holdings, LLC
- ⊕ Restrooms
- Treehouse Adventure Play Area
- Yorktown Express Train
- Located on Property Map

### Services
- Andersen, Renewal By
- Cha Sailor Spa (coming soon)
- Sun Ridge Eye Care
- Cole Taylor Bank
- Fifth Third Bank
- Firestone Auto Center
- Information Center
- JC Penney Optical / Portrait Studio
- Studio, Styling Salon
- Watch and Jewelry Repair
- Michelangelo Gallery
- Mid American Research
- Nuvish MedSpa
- The Picture People
- U.S. Post Office
- Vision Works
- Yorktown Shoe Repair

### Simply Beautiful Day Spa
- Snippet's Mini Cuts
- Victoria's Secret Beauty
- Yorktown Barber Shop
- Yorktown Cleaners

336  Aeropostale
299  Bandolino Shoes
      Charlotte Russe
322  Forever 21 Department Store
      Marshalls
      Mirabell Shoes
313  Naturalizer
298  Payless Shoe Source

### Men's
332  ALDO
322  Journeys
      ALDO
298  Mirabell Shoes
      Payless Shoe Source

### Athletic
317  Champs
303  Finish Line
      Foot Locker
298  Payless Shoe Source
316/345  Sports Authority
318  Steve and Barry's

295  Emporium Luggage
342  Gabler's Paradise
      Gabler's Newsstand
324  General Nutrition Center
316  K-B Toys
      Lids
      Love From Chicago
      Michelangelo Gallery
      The Right Start
      Silver Leaf Vacation Store
316/345  Sports Authority
325  Sports 'n More
303  Sunglass Hut
310  Too Cool
5     Tupperware
      Vision Works

### Specialty Shops
21   Andersen, Renewal By
297  Brewery Collectibles
      Burr Ridge Eye Care
356  Claire's Boutique

### The Plaza Food Court
      Arby's (coming soon)
      Auntie Anne's Pretzels
      Charley's Grilled Subs (coming soon)
      Cinnabon

### Restaurants
10   Abodo Grill
      Boudin Bakery
      Brio Tuscan Grille
      Buca di Beppo
22   The Capital Grille
      Claim Jumper Restaurant
329  D.O.C. American Bistro
      & Wine Bar
337  Ed Debevic's
      Egg Harbor Café

      Dairy Queen
      Holy Mackerel!
320  Lucky Strike Lanes
      PA Sushi Bar Restaurant
      Rock Bottom Brewery
      Sbarro
      Sarku Japan
      Subway
      Taco Bell
      The Hot Dog Lady of Elmhurst (coming soon)
      Henry Cray's

### Specialty Food
10   Caribou Coffee
32   Fannie May Candies
      Frankie's Deli
      Fuzziwig's Candy Factory
329  Gloria Jean's Coffees
      Mrs. Field's Cookies
337  Rocky Mountain Chocolate Factory

### Entertainment
      AMC 18 Theater
320  AMC Premium Cinema
      Lucky Strike Lanes

### Hotel
      The Westin
      Yorktown Center

### The Shops At Yorktown
21   Andersen, Renewal By
      Carson Pirie Scott
32   Firm Foundation
      Frankie's Deli
33   Joe's Tailor Shop
      Lane's End
      Shoe Carnival
      Simply Beautiful
      Yorktown Cleaners

* Please note, store is not correct with store listed on Directory

* Wireless Internet



History    News    Careers    Brotherly Love    Contact Us    Franchising

Restaurant Locator
Menu & Nutrition
Customer Feedback

Get detailed Nutritional Information here!

# Menu & Nutrition



| Steak | Chicken | Deli | Gourmet Fries | Grilled Salads | Lemonade |
|-------|---------|------|---------------|----------------|----------|
| Philly CheeseSteak | Philly Chicken | Turkey Cheddar Melt | Cheese & Bacon | Grilled Chicken | Original |
| Philly Steak Deluxe | Chicken Buffalo | Philly Ham & Swiss | Ranch & Bacon | Grilled Steak | Kiwi |
| BBQ Cheddar Steak | Chicken Teriyaki | Ultimate Club | Ultimate | Chicken Teriyaki | Raspberry |
| Bacon 3cheese Steak | Chicken Bacon Club | Philly Veggie | (Cheese, Ranch & Bacon) | Buffalo Chicken | |

## It's more than a way to make a sandwich!



Copyright ©2008 GOSH Enterprises Inc.

http://www.charleyssteakery.com/menu.htm    8/18/2008

# Charley's Grilled Subs

*Help improve Wikipedia by supporting it financially.*

## From Wikipedia, the free encyclopedia

(Redirected from Charley's Steakery)

**Charley's Grilled Subs** is a sandwich chain with 312 locations in 39 states in the United States, and 10 countries, including Japan, United Arab Emirates, Venezuela, South Korea, Germany and Guam. Formerly known as **Charley's Steakery**, the franchise was established in 1986 on the campus of Ohio State University in Columbus, Ohio. Charley's specializes in fresh, made-to-order grilled subs and wraps, capitalizing on recent health food trends. The restaurant features such sandwiches as the Philly cheesesteak, chicken teriyaki, and Buffalo chicken. Charley's also serves salads and gourmet fries, and is famous for its signature lemonades.

Charley's Grilled Subs locations have traditionally been found in malls and airports across the United States. Now, the chain is refocusing on strip center and free-standing locations.

| Charley's Grilled Subs | |
|---|---|
|  | |
| **Type** | Public |
| **Founded** | 1986 |
| **Headquarters** | Columbus, Ohio, USA |
| **Key people** | Charley Shin |
| **Industry** | Restaurants |
| **Website** | Charley's Grilled Subs |

## References

- Johnson-Elie, Tannette (2006-12-05). "Mixing kindness with business", Milwaukee Journal Sentinel.

- Naylor, June (2004-02-20). "Charlie's is hot on the grill (free preview)", Fort Worth Star-Telegram.

- Chan, Candy Kit Har (1994-11-25). "Steaking His Claim: Crafty Charley Shin Proves Fast Food, Franchising", AsianWeek.

## External links

- Official website
- Official Hoopsteaks Entry

*This restaurant-related article is a stub. You can help Wikipedia by expanding it.*
Retrieved from "http://en.wikipedia.org/wiki/Charley%27s_Grilled_Subs"
Categories: Companies based in Columbus, Ohio | Food companies of the United States | Franchises | Companies established in 1986 | Restaurants in Ohio | Fast-food sub restaurants | Restaurant stubs
Hidden category: Articles lacking in-text citations

- This page was last modified on 23 June 2008, at 01:44.
- All text is available under the terms of the GNU Free Documentation License. (See Copyrights for details.) Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.

# Galesburg.com
### Home of The Register-Mail

✦ Back   ✦ Home                                    Share:  ⊠ E-mail  🖶 Print  ⊙ Comment  Digg   del.icio.us

## Charlie's Grilled Subs opens on U.S. 150

**By MATT HUTTON**
**The Register-Mail**
*Posted Apr 12, 2008 @ 04:46 PM*

GALESBURG — Don't call the new restaurant on U.S. 150 fast food — it's "quick serve."

Charley's Grilled Subs, 711 U.S. 150 East, opened last week in the old Subway location. "It's been very good," said co-franchisee Jennifer Nichols. "We're very pleased."

Co-franchisee Chad Patel said he thought there was a market for something at the location. So, he did some research and found out about an Ohio-based franchise called Charley's, which has 450 stores and counting, and said it was "unique and different."

"It's all natural. There are no preservatives at all," he said. "Everything is cooked fresh, made to order."

Charley's signature sandwich is the Philly cheese steak, made with "100 percent sirloin" steak, grilled right in front of you. They also feature a variety of grilled chicken subs as well.

There is room to sit and eat or you can order to go. While the prices might seem a little higher compared to some fast food, and of course Patel points out Charley's is "quick serve," a value meal with an eight-inch sandwich, drink and steak fries can be had for under $7. For a little extra, you can upgrade to "gourmet" fries covered in bacon and cheese sauce.

The first Charley's was opened in 1986 in Columbus, Ohio, by Charley Shin. He came up with the idea after a trip to New York. Shin took a wrong turn and stumbled into South Philadelphia and had his first cheese steak. Hooked, he began testing recipes on his college buddies. In 1991, he began to franchise the business.

The Galesburg location will be open for breakfast, lunch and dinner starting at 5 a.m. to 10 p.m. everyday.

mhutton@register-mail.com

Copyright © 2008 GateHouse Media, Inc. Some Rights Reserved.
Original content available for non-commercial use under a Creative Commons license, except where noted.

# Combos

## Fries Combo
*to any Sub*
regular Fries & regular Drink

## Gourmet Combo
*to any Sub*
Gourmet Fries & regular Drink

## Low Carb Wrap
*to wrap any Sub*



# Charley's Story

## About the Cheese Steak
Originated in the 1930's by Italian immigrants living in South Philadelphia. Others called "steak hoagies," the Cheesesteak was prepared with thinly sliced steak, sautéed with grilled onions, topped with provolone cheese, and served on an Italian roll.

## A Wrong Turn...
On the way to NYC during a family vacation, Charley took a wrong exit and landed in South Philadelphia where he enjoyed his first Cheesesteak. Totally hooked, he took his findings back home and began creating Cheesesteaks for his friends.

## A Loan from Mom...
In 1986, Charley's Philly Steaks was born. Using the interest borrowed his Mom's savings and opened his first restaurant. The tiny, 12 seat eatery, featuring fresh grilled subs, fries and lemonade was an instant hit.

## Charley's Mission:
At Charley's Grilled Subs, our mission is to encourage and strengthen our neighbors. In the spirit of brotherly love, we hope to nourish your hearts with the simple pleasure of a great Cheesesteak.

Enjoy!

**Customer Comments: 1 800 437 8325**





# Charley's
GRILLED SUBS

## Takeout Menu

*Get Grilled!*

www.charleys.com

## Steak Subs

### CheeseSteak
Steak, grilled onions, Provolone cheese, lettuce, tomato and Mayonnaise

### Steak Deluxe
Steak, grilled onions, green peppers, mushrooms, Provolone cheese, lettuce, tomato and Mayonnaise

### Cheddar Steak
Steak and onions with Teriyaki BBQ sauce, Cheddar cheese, lettuce and tomato

### Chicken Cheese Steak
Grilled chicken and onions with Teriyaki Teriyaki sauce, Swiss cheese, lettuce and tomato

### CheeseSteak
Steak, crisp bacon, Provolone, Swiss and Cheddar cheese, lettuce, tomato and Mayonnaise

### CheeseSteak
Ham, Provolone cheese, lettuce, tomato and Mayonnaise




Chicken, grilled onions, green peppers, mushrooms, Provolone cheese, lettuce, tomato and Mayonnaise

Grilled chicken and onions with spicy Buffalo sauce, Provolone cheese, banana peppers, lettuce, tomato and Ranch dressing

Chicken, ham, Swiss cheese, lettuce, tomato and Honey Mustard

Chicken, crisp bacon, Swiss cheese, lettuce, tomato and Mayonnaise

Cheddar Cheese
Cheddar & Bacon

Ranch & Bacon
Ultimate Gourmet

d
Chicken Strips, reg Fries and reg Beverage

## Grilled Deli Subs

### Turkey Cheddar Melt
Turkey breast, Cheddar cheese, tomato and Honey Mustard

### Ultimate Club
Turkey breast, ham, crisp bacon, Cheddar cheese, lettuce, tomato and Mayonnaise

### Italian Deli
Salami, ham, Provolone cheese, Seasoning, banana peppers, lettuce, tomato and Italian dressing

### Philly Ham & Swiss
Ham, Swiss cheese, lettuce, tomato and Mayonnaise

### Philly Veggie
Grilled onions, green peppers, mushrooms, tomato, Provolone, Swiss and Cheddar cheese, lettuce and Ranch dressing



Breakfast Sandwich
Bacon, Egg & Cheese            Sausage, Egg & Cheese
Ham, Egg & Cheese              Egg & Cheese

Two Eggs Scrambled
Served w/Hashbrowns & toast

Omelet Platter
Served w/Hashbrowns & toast
• Ham          • Vegetarian
               • Western

• Hashbrowns                   Toast
Orange Juice                   Coffee











Village of Lombard, 255 East Wilson Avenue, Lombard, IL  60148

# FAX Cover Sheet

### FAX (630) 620-8222

DATE: 8/7/08

TO: Gregory J Ellis

COMPANY: _____

FROM: Marie Esposito , VILLAGE OF LOMBARD

TOTAL PAGES, Including cover sheet: 22

COMMENTS: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

If there is any difficulty reading this transmittal, please contact the Village of

Lombard at (630) 620-5700.  Thank you.



# INTER-DEPARTMENTAL BUILDING PERMIT ROUTING FORM

HTE NUMBER: 08.551 _ _ _ _

DATE RECEIVED: 4-23-08

OWNER'S NAME: Long Pehrson

PROPERTY ADDRESS: 10 FC Yorktown

PROPERTY OWNER'S PHONE NUMBER: 630 629 7330

P.I.N. #: 06-29-101-007

TYPE OF PERMIT: DEMO + Build out (Charlies Grilled subs)

# BEFORE ISSUANCE:

| DEPARTMENT | APPROVED | DENIED | DATE |
|---|---|---|---|
| Planning | N/A | | |
| Engineering | NA | | |
| Building | | | |
| Fire Prevention | | | |
| Finance** | | | |

*\*PLEASE RETURN TO B.I.S. BY:_____

| AGENCY | NOT APPLIC. | APPROVED | DENIED | DATE |
|---|---|---|---|---|
| Glenbard Wastewater | | | | |
| Health Dept. | | | | |

COMMENTS:

_____
_____
_____

# IS THERE A BOND REQUEST FORM ATTACHED?
### YES ☐    or    NO ☐

WB_____ VS_____

BL_____ AR_____

SA_____

5-8-08

I am changing the plumer contractor in my permi to APEX Plumbing at

630-889-3700

3119 West Irving Park

Chicago, IL,

773-477-7714

Nabil Makhamch
charly's Grilled sub
FC-10 Yorktown shopping center

(Bill) Nabil Maklenroh
        815-483-6454

W00022/0022

A PERMIT MAY BE CANCELLED AT T APPLICANT'S REQUEST WITHIN 6 MONTH OF ORIGINAL PERMIT ISSUANCE. THE APPLICANT IS THEN ENTITTLED TO A REFUND AMOUNTING TO 50% OF THE PERMIT FEE PORTION ONLY OF THE FEES CHARGED. NO PORTION OF THE PERMIT PROCESSING FEES WILL BE REFUNDED.

# VILLAGE OF LOMBARD
### BUILDING DEPARTMENT
255 E. Wilson Avenue (630) 620-5750
FAX: (630) 629-2374 • TDD: (630) 620-5812

Date Received 5-8-08
Date Called 5-9-08
Date Issued 5/9/08

## BUILDING PERMIT APPLICATION

PARCEL NO. 06-29-101-007

PERMIT NO. 08-706

Application Is Hereby Made For Address 203 Yourktown shopping Suite No. FC 10

Lot# _____ Block# _____ Subdivision _____

Residential _____ Commercial ✗ Industrial _____ New Structure _____ Alteration _____ Addition _____ Sign _____ Garage _____

Driveway _____ Electrical _____ Plumbing _____ Other ✗ demolition, interior

Tenant Charley's Grilled Subs   Total Estimated Cost ▓▓▓▓▓
(New) or Existing   HVAC Cost $ _____

Long Pehrson

| | ADDRESS | PHONE | FOR OFFICE USE ONLY | |
|---|---|---|---|---|
| | | | Ins. | Lic. |
| Property Owner ~~Footen I Mathearthe~~ | 1901 Brief Glen Drive Plainfield, IL 60586 | 630-933-6981 | | |
| Gen. Contractor PROFESSIONAL HOME IMP. | 343 W.ALLERTON AVE MILW. WISC | 414-737-0876 | | |
| Designer | | | | |
| Excavator | | | | |
| Carpenter | | | | |
| Plumber | | | | |
| Sewer | | | | |
| Electrician | | | | |
| Concrete | | | | |
| Heating | | | | |
| Brick | | | | |
| Roofer | | | | |
| Drywall | | | | |
| Iron or Steel | | | | |
| Insulation | | | | |
| Fire Prot. | | | | |
| Fire Alarm ~~Fox Valley~~ | ~~275 ...~~ | | | |
| Paving ~~Fire + Safety Co~~ | | | | |
| Elevator | | | | |

## I HEREBY CERTIFY THAT I, AS APPLICANT, IF I AM NOT THE OWNER OF THE PROPERTY IN RELATION TO WHICH THIS APPLICATION IS BEING FILED, HAVE OBTAINED THE PERMISSION OF THE OWNER OF SAID PROPERTY TO FILE THIS APPLICATION.

I hereby certify that all of the information contained herein is true and correct and that all contractors and subcontractors to be engaged in any of the work for which this permit is issued shall comply with all pertinent local ordinances.

BILL — cell 815-483-6454

Applicant's Name (please print) Ned J McKenzie

Address: 1901 Brief Glen Drive

City: Plainfield, IL, 60586 Phone: 630-933-6981

Applicant's Signature: Bill McKenzie

A PERMIT MAY BE CANCELLED AT TH,
APPLICANT'S REQUEST WITHIN 6 MONTHS
OF ORIGINAL PERMIT ISSUANCE. THE
APPLICANT IS THEN ENTITLED TO A REFUND
AMOUNTING TO 50% OF THE PERMIT FEE
PORTION ONLY OF THE FEES CHARGED. NO
PORTION OF THE PERMIT PROCESSING FEES
WILL BE REFUNDED.

# VILLAGE OF LOMBARD
## BUILDING DEPARTMENT
255 E. Wilson Avenue  (630) 620-5750
FAX: (630) 629-2374 • TDD: (630) 620-5812

Date Received _4-23-08_

Date Called _____

Date Issued _____

## BUILDING PERMIT APPLICATION

PARCEL NO. _06-29-101-007____ 10FC_          PERMIT NO. _08-551_

Application Is Hereby Made For Address _203 Yorktown, Lombard IL_ Suite No. _1o FC_

Lot# _____ Block# _____ Subdivision _____

Residential _____ Commercial _____ Industrial _____ New Structure _____ Alteration _____ Addition _____ Sign _____ Garage _____

Driveway _____ Electrical _____ Plumbing _____ Other _Remodel Existing Location for Restaurant DEMO_ _+Build_

Tenant _Charley's Grilled Subs_  Total Estimated Cost $ ▓▓▓▓▓▓
New   or   Existing

HVAC Cost $ _____

| | ADDRESS | PHONE | FOR OFFICE USE ONLY | |
|---|---|---|---|---|
| | | 630 629 7330 | Ins. | Lic. |
| Property Owner _Faten I Makhmreh_ | _1901 Brier Glen Drive Plainfield, IL 60586_ | _630-933-6981_ | | |
| Gen. Contractor _Professional Home Improvmnt_ | _343 W Allerton Ave Milwaukee, WI 53207_ | _414-737-6876_ | | |
| Designer _NA_ | | | | |
| Excavator _N/A_ | | | | |
| Carpenter _NA_ | | | | |
| Plumber _APEX PLUMBING Plumber_ | _3119 W. IRVING PARK RD CHGO Itasca, IL_ | _773-477-7714 630-932-1901_ | | _OK_ |
| Sewer _NA_ | | | | |
| Electrician _Gnarsky Electric_ | _333 S Main St Lombard, Il 60148_ | _630-889-1944_ | _OK_ | _OK_ |
| Concrete _NA_ | | | | |
| Heating _NA_ | | | | |
| Brick _NA_ | | | | |
| Roofer _NA_ | | | | |
| Drywall _Gen Contractor_ | | | | |
| Iron or Steel _Gen Contractor_ | | | | |
| Insulation _NA_ | | | | |
| Fire Prot. _Fox Valley_ | _ELGIN_ | _847 695 5990_ | | |
| Fire Alarm _NA_ | | | | |
| Paving _NA_ | | | | |
| Elevator _NA_ | | | | |

I HEREBY CERTIFY THAT I, AS APPLICANT, IF I AM NOT THE OWNER OF THE PROPERTY IN
RELATION TO WHICH THIS APPLICATION IS BEING FILED, HAVE OBTAINED THE PERMISSION
OF THE OWNER OF SAID PROPERTY TO FILE THIS APPLICATION.  Cell 815-483-6451

I hereby certify that all of the information contained
herein is true and correct and that all contractors
and subcontractors to be engaged in any of the
work for which this permit is issued shall comply
with all pertinent local ordinances.

X Applicant's Name (please print) _Bill Faten I Makhamreh_
Address: _1901 Brier Glen Drive_
City: _Plainfield IL 60586_ Phone: _630-933-6981_
Applicant's Signature: _Nabil Makhamreh_

A PERMIT MAY BE CANCELLED AT TH
APPLICANT'S REQUEST WITHIN 6 MONTHS
OF ORIGINAL PERMIT ISSUANCE. THE
APPLICANT IS THEN ENTITLED TO A REFUND
AMOUNTING TO 50% OF THE PERMIT FEE
PORTION ONLY OF THE FEES CHARGED. NO
PORTION OF THE PERMIT PROCESSING FEES
WILL BE REFUNDED.

# VILLAGE OF LOMBARD
## BUILDING DEPARTMENT
255 E. Wilson Avenue   (630) 620-5750
FAX: (630) 629-2374 • TDD: (630) 620-5812

Date Received _4-23-08_
Date Called _____
Date Issued _5/19/08_

## BUILDING PERMIT APPLICATION

PARCEL NO. _06-29-101-007_          PERMIT NO. _#08-551_

Application Is Hereby Made For Address: _10-FC YORKTOWN CENTER_ Suite No. _FOOD COURT_

Lot# _____ Block# _____ Subdivision _____

Residential _____ Commercial _X_ Industrial _____ New Structure _____ Alteration _X_ Addition _____ Sign _____ Garage _____

Driveway _____ Electrical _____ Plumbing _____ Other _INTERIOR REMODEL_

Tenant _CHARLEY'S GRILLED SUBS_ (New) or Existing    Total Estimated Cost $ ▓▓▓

HVAC Cost $ _____

| | ADDRESS | PHONE | FOR OFFICE USE ONLY | |
| --- | --- | --- | --- | --- |
| | | | Ins. | Lic. |
| Property Owner LOUIS PETERSON | 203 YORKTOWN CENTER LOMBARD | 629-7330 | | |
| Gen. Contractor 3J's CONST. | 7229 W. 90th PL. BRIDGEVIEW 60455 | 708-233-1430 | | |
| Designer STRANGE ARCHITECTURE | 4511 ORIOLE LN PLAINFIELD 60586 | 815-557-1635 | | |
| Excavator NA | | | | |
| Carpenter GENERAL CONTR | | | | |
| Plumber SUBIA CONSTRUCTION | 7722 W. 99th ST. BRIDGEVIEW 60455 | 708-268-9101 | ✓ | OK |
| Sewer NA | | | | |
| Electrician SUNLIGHT MECHANICAL | 8807 S. MADISON BURR RIDGE 60521 | 1-312-671-1106 | OK | OK |
| Concrete NA | | | | |
| Heating NA | | | | |
| Brick NA | | | | |
| Roofer NA. | | | | |
| Drywall GENERAL CONTR. | | | | |
| Iron or Steel NA | | | | |
| Insulation NA | | | | |
| Fire Prot. FOX VALLEY FIRE/SAFETY | 2730 PINNACLE ST. ELGIN 60123 | 224-293-5335 / 847-695-8290 | ✓ | OK |
| Fire Alarm | | | | |
| Paving | | | | |
| Elevator | | | | |

**I HEREBY CERTIFY THAT I, AS APPLICANT, IF I AM NOT THE OWNER OF THE PROPERTY IN
RELATION TO WHICH THIS APPLICATION IS BEING FILED, HAVE OBTAINED THE PERMISSION
OF THE OWNER OF SAID PROPERTY TO FILE THIS APPLICATION.**

I hereby certify that all of the information contained
herein is true and correct and that all contractors
and subcontractors to be engaged in any of the
work for which this permit is issued shall comply
with all pertinent local ordinances.

Applicant's Name (please print) _FADEN S. MAKHAMREH_
Address: _1901 BRIER GLEN DR._
City: _PLAINFIELD_ _60586_ Phone: _933-6981_
Applicant's Signature: _____

VILLAGE OF LOMBARD -- PE   1
255 East Wilson Avenue
Lombard, IL  60148
630/620-5750--Fax:630/629-2374--TDD:630/620-5812

```
Application Number  . . . .  08-00000551            Date   5/19/08
Property Address  . . . . .  10 YORKTOWN FOOD CT
Parcel Number:               06-29-101-007
Tenant nbr, name                CHARLEY'S GRILLED SUBS.
Application type description  ADDITION/ALTERATION  COMMERCIAL
Property Zoning  . . . . .   COMM SHOP DIST PLAN DEV
Application valuation . . .    25000
```

```
Owner                               Contractor
----------------------              -------------------------
LONG PEHRSON                        OWNER
203 YORKTOWN
LOMBARD              IL
```

```
---  Structure Information 000 000  OTHER
     Construction Type . . . . . .  OTHER
```

| Permit | ADDITION/ALTERATION PERMIT COM |
|---|---|
| Additional desc . |  |
| Permit Fee . . : | 235.00 | Plan Check Fee . . | .00 |
| Issue Date . . : |  | Valuation . . . . | 25000 |
| Expiration Date . : | 11/15/08 |  |  |

```
    Qty   Unit Charge  Per                        Extension
                            BASE FEE                    235.00
```

| Permit | ELECTRIC PERMIT COMMERCIAL |
|---|---|
| Additional desc . |  |
| Permit Fee . . : | 340.00 | Plan Check Fee . . | .00 |
| Issue Date . . : |  | Valuation . . . . | 0 |
| Expiration Date . : | 11/15/08 |  |  |

```
    Qty   Unit Charge  Per                        Extension
                            BASE FEE                    340.00
```

| Permit | PLUMBING PERMIT COMMERCIAL |
|---|---|
| Additional desc . |  |
| Permit Fee . . : | 375.00 | Plan Check Fee . . | .00 |
| Issue Date . . : |  | Valuation . . . . | 0 |
| Expiration Date . : | 11/15/08 |  |  |

```
    Qty   Unit Charge  Per                        Extension
                            BASE FEE                    375.00
```

```
Other Fees . . . . . . . .  ADMINISTRATIVE FEE 10%        101.00
                            PLAN REVIEW COMMERCIAL         60.00
```

| Fee summary | Charged | Paid | Credited | Due |
|---|---|---|---|---|
| Permit Fee Total | 950.00 | 950.00 | .00 | .00 |
| Plan Check Total | .00 | .00 | .00 | .00 |
| Other Fee Total | 161.00 | 161.00 | .00 | .00 |
| Grand Total | 1111.00 | 1111.00 | .00 | .00 |

---

```
    I HEREBY CERTIFY THAT IF I, AS APPLICANT, AM NOT THE OWNER
OF THE PROPERTY IN RELATION TO WHICH THIS APPLICATION IS
BEING FILED, HAVE OBTAINED THE PERMISSION OF THE OWNER OF
SAID PROPERTY TO FILE THIS APPLICATION.
SIGNATURE:
```

# INTER-DEPARTMENTAL BUILDING PERMIT
# ROUTING FORM

HTE NUMBER: _08-634_____

DATE RECEIVED: _4/30/08_____

OWNER'S NAME: _LONG PEHRSON_____

PROPERTY ADDRESS: _10 YORKTOWN FOOD CT._

PROPERTY OWNER'S PHONE NUMBER: _630 629-7330_

P.I.N. #: _06-29-101-007_____

TYPE OF PERMIT: _SIGN/ELEC._____

# BEFORE ISSUANCE:

| DEPARTMENT | APPROVED | DENIED | DATE |
|---|---|---|---|
| Planning | N/A | | |
| Engineering | NA | | 5/1/08 |
| Building | | | |
| Fire Prevention | | | |
| Finance** | | | |

**PLEASE RETURN TO B.I.S. BY: _____

| AGENCY | NOT APPLIC. | APPROVED | DENIED | DATE |
|---|---|---|---|---|
| Glenbard Wastewater | | | | |
| Health Dept. | | | | |

COMMENTS:

_____

_____

_____

# IS THERE A BOND REQUEST FORM ATTACHED?
## YES ☐      or      NO ☐

WB_____ VS_____

BL_____ AR_____

A PERMIT MAY BE CANCELLED AT THE
APPLICANT'S REQUEST WITHIN 6 MONTHS
OF ORIGINAL PERMIT ISSUANCE.   THE
APPLICANT IS THEN ENTITILED TO A REFUND
AMOUNTING TO 50% OF THE PERMIT FEE
PORTION ONLY OF THE FEES CHARGED.  NO
PORTION OF THE PERMIT PROCESSING FEES
WILL BE REFUNDED.

# VILLAGE OF LOMBARD
## BUILDING DEPARTMENT
255 E. Wilson Avenue   (630) 620-5750
FAX: (630) 629-2374 • TDD: (630) 620-5812

Date Received __4/30/07__
Date Called __LMJ-2-08__
Date Issued __5-8-08__

## BUILDING PERMIT APPLICATION

PARCEL NO. _06-29-101-007 10YTFC_          PERMIT NO. __08-634__

Application Is Hereby Made For Address: _203 YORKTOWN CENTER_ _____ Suite No. _____

Lot# _____ Block# _____ Subdivision _____

Residential ____ Commercial _X_ Industrial ____ New Structure ____ Alteration ____ Addition ____ Sign _X_ Garage ____

Driveway ____ Electrical ____ Plumbing ____ Other _____

Tenant _NEW  CHARLEY'S_          Total Estimated Cost $ ████████ -
      New   or   Existing

HVAC Cost $ _____

(TENANT) LONG PEARSON          ADDRESS          PHONE

| | | | | FOR OFFICE USE ONLY |
|---|---|---|---|---|
| | | | | Ins. | Lic. |
| Property Owner CHARLIES GRILLED SUBS | 203 YORKTOWN CENTER | MIA 630-7330 | | | |
| Gen. Contractor FOX VALLEY SIGNS | 219 W. GALENA / AURORA, IL 605X | 630-896-3143 | | | |
| Architect | | | | | |
| Excavator | | | | | |
| Carpenter | | | | | |
| Plumber | | | | | |
| Sewer | | | | | |
| Electrician SCHNEIDER ELECTRIC | 1167 SOMONAUK RD/ SOMONAUK, IL 60552 | MARK 630-649-2261 | | ✓ | ✓ |
| Concrete | | | | | |
| Heating | | | | | |
| Brick | | | | | |
| Roofer | | | | | |
| Drywall | | | | | |
| Iron or Steel | | | | | |
| Insulation | | | | | |
| Fire Prot. | | | | | |
| Fire Alarm | | | | | |
| Paving | | | | | |
| Elevator | | | | | |

**I HEREBY CERTIFY THAT I, AS APPLICANT, IF I AM NOT THE OWNER OF THE PROPERTY IN
RELATION TO WHICH THIS APPLICATION IS BEING FILED, HAVE OBTAINED THE PERMISSION
OF THE OWNER OF SAID PROPERTY TO FILE THIS APPLICATION.**

I hereby certify that all of the information contained
herein is true and correct and that all contractors
and subcontractors to be engaged in any of the
work for which this permit is issued shall comply
with all pertinent local ordinances.

Applicant's Name (please print) _DON CAMPBELL / FOX VALLEY SIGNS_
Address: _219 W GALENA BLVD_
City: _AURORA, IL 60506_          Phone: _630-896-3143_
Applicant's Signature: _Don Campbell_  FOX VALLEY SIGNS

VILLAGE OF LOMBARD PERMIT
255 East Wilson Avenue
Lombard, IL 60148
630/620-5750--Fax:630/629-2374--TDD:630/620-5812

```
Application Number    . . . .    08-00000634           Date    5/08/08
Property Address   . . . . .     10 YORKTOWN FOOD CT
Parcel Number:                   06-29-101-007
Tenant nbr, name                       CHARLEY'S SUBS
Application type description      SIGN PERMIT APPLICATION
Property Zoning      . . . .      COMM SHOP DIST PLAN DEV
Application valuation . . . .     6500
```

```
Owner                                    Contractor
-------------------------------          -------------------------------
LONG PEHRSON                             SCHNEIDER ELECTRIC
203 YORKTOWN                             MARK SCHNEIDER
LOMBARD          IL 60148                1167 SOMONAUK ROAD
(630) 629-7330                           SOMONAUK              IL 60552
                                         (630) 649-2261
```

```
Permit    . . . .       ELECTRIC PERMIT COMMERCIAL
Additional desc . .
Permit Fee   . . . .        100.00          Plan Check Fee . .         .00
Issue Date   . . . .                        Valuation  . . . .           0
Expiration Date . .     11/04/08
```

```
    Qty   Unit Charge  Per                                  Extension
                              BASE FEE                        100.00
```

```
Permit    . . . .       SIGN PERMIT
Additional desc . .
Permit Fee   . . . .         75.00          Plan Check Fee . .         .00
Issue Date   . . . .                        Valuation  . . . .           0
Expiration Date . .     11/04/08
```

```
    Qty   Unit Charge  Per                                  Extension
                              BASE FEE                         75.00
```

```
Other Fees   . . . . . . . . .     ADMINISTRATIVE FEE 10%      30.00
```

| Fee summary | Charged | Paid | Credited | Due |
|---|---|---|---|---|
| Permit Fee Total | 175.00 | 175.00 | .00 | .00 |
| Plan Check Total | .00 | .00 | .00 | .00 |
| Other Fee Total | 30.00 | 30.00 | .00 | .00 |
| Grand Total | 205.00 | 205.00 | .00 | .00 |

I HEREBY CERTIFY THAT IF I, AS APPLICANT, AM NOT THE OWNER
OF THE PROPERTY IN RELATION TO WHICH THIS APPLICATION IS
BEING FILED, HAVE OBTAINED THE PERMISSION OF THE OWNER OF
SAID PROPERTY TO FILE THIS APPLICATION.
SIGNATURE:

# INTER-DEPARTMENTAL BUILDING PERMIT
## ROUTING FORM

HTE NUMBER: 08 . 7 06 _ _ _ _ _

DATE RECEIVED: 5-8-08

OWNER'S NAME: Long Pehrson

PROPERTY ADDRESS: 10 Yorktown FC

PROPERTY OWNER'S PHONE NUMBER: 630-933-6981

P.I.N. #: 06-29-101-007

TYPE OF PERMIT: Interior Demo

# BEFORE ISSUANCE:

| DEPARTMENT | APPROVED | DENIED | DATE |
|---|---|---|---|
| Planning | N/A | | |
| Engineering | NA | | 5/8/08 |
| Building | | | |
| Fire Prevention | | | |
| Finance** | | | |

**PLEASE RETURN TO B.I.S. BY: _____

| AGENCY | NOT APPLIC. | APPROVED | DENIED | DATE |
|---|---|---|---|---|
| Glenbard Wastewater | | | | |
| Health Dept. | | | | |

COMMENTS:

_____

_____

_____

# IS THERE A BOND REQUEST FORM ATTACHED?
## YES ☐    or    NO ☐

WB____ VS____

BL____ AR____

VILLAGE OF LOMBARD
255 East Wilson Avenue
Lombard, IL 60148
630/620-5750--Fax:630/629-2374--TDD:630/620-5812

```
Application Number  . . . . .    08-00000706          Date    5/09/08
Property Address   . . . . .     10 YORKTOWN FOOD CT
Parcel Number:                   06-29-101-007
Tenant nbr, name  . . . . . .              CHARLEY'S GRILLED SUBS
Application type description      WRECKING PERMIT APPLICATION COMMERCIAL
Property Zoning . . . . . .       COMM SHOP DIST PLAN DEV
Application valuation . . . .      1200
```

```
Owner                                Contractor
------------------------             --------------------------
LONG PEHRSON                         OWNER

LOMBARD           IL
```

```
Structure Information 000 000  OTHER
Construction Type . . . . .    OTHER
```

```
Permit          . . .   WRECKING PERMIT COMMERCIAL
Additional desc .
Permit Fee  . . . :       85.00        Plan Check Fee . .        .00
Issue Date  . . . :                    Valuation  . . . .          0
Expiration Date . :    11/05/08
```

```
     Qty   Unit Charge  Per                                    Extension
                               BASE FEE                             85.00
---------------------------------------------------------------------------
 Other Fees . . . . . . . . .   ADMINISTRATIVE FEE 10%             30.00
---------------------------------------------------------------------------
 Fee summary        Charged      Paid        Credited        Due
 ---------------    --------    --------     --------       --------
 Permit Fee Total     85.00       85.00          .00            .00
 Plan Check Total       .00         .00          .00            .00
 Other Fee Total      30.00       30.00          .00            .00
 Grand Total         115.00      115.00          .00            .00
```

I HEREBY CERTIFY THAT IF I, AS APPLICANT, AM NOT THE OWNER
OF THE PROPERTY IN RELATION TO WHICH THIS APPLICATION IS
BEING FILED, HAVE OBTAINED THE PERMISSION OF THE OWNER OF
SAID PROPERTY TO FILE THIS APPLICATION.
SIGNATURE:

# VILLAGE OF LOMBARD
## BUILDING DEPARTMENT
255 E. Wilson Avenue   (630) 620-5750
TDD: (630) 620-5812
## BUILDING PERMIT

PERMIT NO.

PARCEL NO. _____

LOT _____ BLOCK _____ SUB. _____

Date Issued _____

Address No. _____ Street

RECEIPT NO. _____

| ACCOUNTING CODE | DESCRIPTION | | AMOUNT | |
|---|---|---|---|---|
| 1010.532540 | Building | 4005 | 235 | 00 |
| 1010.532560 | Driveway | 4015 | | |
| 1010.532570 | Electrical | 4020 | 340 | 00 |
| 1010.532580 | Plumbing | 4095 | 375 | 00 |
| 1010.532600 | Sewer | 4105 | | |
| 1010.532590 | Water | 4120 | | |
| 1010.532610 | HVAC | 4045 | | |
| 1010.532620 | Swim. Pool | 4115 | | |
| 1010.532630 | Elevator | 4025 | | |
| 1010.532640 | Sign | 4110 | sep permit | |
| 1010.532650 | Fire Supp. Sys. | 4040 | sep permit | |
| 1010.532660 | Fire Alm. Sys. | 4035 | sep permit | |
| 1010.532670 | Moving | 4065 | | |
| 1010.532680 | Wrecking | 4125 | | |
| 1010.532700 | Misc. | 4060 | | |
| 1010.532730 | Cert. of Completion | 4010 | | |
| 1010.604560 | Plan. Review | 3090 | 60 | 00 |
| 1010.532690 | Renewal | 4100 | | |
| 1010.604390 | Administration | 3000 | 101 | 00 |
| | | | | |
| | **SUB TOTAL BUILDING** | | 1,111 | 00 |
| 1010.604400 | Planning Review | 3085 | | |
| 1010.604410 | Sign Plan Review | 3135 | | |
| | | | | |
| 1010.532740 | Misc. | 4055 | | |
| | | | | |
| | **SUB TOTAL PLANNING** | | | |
| 1010.604350 | P.W. Inspection | 3070 | | |
| 1010.604420 | Eng. Plan Review | 3095 | | |
| 1010.532740 | Fill/Grading | 4030 | | |
| 1010.532760 | Misc. | 4050 | | |
| | | | | |
| | **SUB TOTAL ENGINEERING** | | | |
| 1010.303010 | Const. Deposit | 8300 | | |
| 1010.303500 | Misc. Deposit | 8310 | | |
| | **SUB TOTAL DEPOSIT** | | | |

# APPROVED

Plan Review Approved        Date _____

Engineering Review Approved   Date _____

Building Review Approved      Date _____

Date Issued                  _____

**REFUNDS SHALL BE PAYABLE TO:**

Name _____

Address _____

City _____ Zip _____

Phone _____

**SPECIAL CONDITIONS:  YES ☐   NO ☐**

| | | | | |
|---|---|---|---|---|
| 5100.604590 | Unmetered Water | 1225 | | |
| 5100.604660 | Water Meter | 1200 | | |
| 5200.604680 | Water Connection | 1215 | | |
| 5100.604690 | Water Tap | 1230 | | |
| 5200.604790 | Sewer Connection | 1210 | | |
| | **SUB TOTAL WATER & SEWER** | | | |
| | | | | |
| 5100.307400 | ORD. # 1007 | 8350 | | |
| 5100.305300 | ORD. # 3196 | 8355 | | |
| 5100.666710 | ORD. # | 8360 | | |
| 5100.666710 | ORD. # | 8360 | | |
| 5100.666710 | ORD. # | 8360 | | |
| 5100.666710 | ORD. # | 8360 | | |
| | **SUB TOTAL ORDINANCES** | | | |
| | **GRAND TOTAL** | | 1,111 | 00 |

# PLUMBING FIXTURE COUNT

- WATER HEATER: _____ @ # _____ EACH......... _____ EXIST
- GAS PIPING & METER........................... _____
- FIRST PLUMBING FIXTURE................... $105.00
- REMAINING FIXTURES: 6 @ # 20 EACH.. $120.00

SUB-TOTAL... 225.00

## INSPECTION FEES:

- UNDERGROUND: 1 @ # 50 EACH......... $50.00
- ROUGH-INS: 1 @ # 50 EACH......... $50.00
- VENT/STACK TEST: _____ @ # _____ EACH......... _____
- FINALS: 1 @ # 50 EACH......... $50.00

SUB-TOTAL... 150.00

PLUMBING TOTALS....... $375.00

# ELECTRICAL FIXTURE COUNT

- SERVICE SIZE: _____ AMPS @ # _____ .......... EXIST
- INSPECTIONS: 3 @ # 60 EACH............ $180.00
- CIRCUIT COUNTS:
  - 1-4 @ # _____ _____
  - 5-9 @ # _____ _____
  - 10-14 @ # 160 ............... $160.00
  - 15-50 @ # _____ /CIRCUITS OVER 14 CIRCUITS
    X _____ CKTS..... _____
  - 51+ CIRCUITS: # _____ X _____ CKTS..... _____
- LITE POLES: _____ @ # _____ EACH............... _____
- MOTORS: FIRST MOTOR: # _____
    REMAIMNG MOTORS: # _____ X _____ MOTORS...... _____

ELECTRICAL TOTALS...... 340.00

FC-10
charly's Grilled sub

list of contracters:

1.3js construction ( G C )
7229 w90th place
bridgeview ill 60455
Tel: 708-233-1430
708-932-5349

2.subia construction (plumbing contracter)
~~7226 w90th place~~ 7722 W. 99th ST
bridgeview ill 60455
Tel:708-268-9101

3.sunlight mechanical (electrical contracter)
8807 s. madison
burrighe ill 60527
Tel:1312-671-1106



# DuPage County Health Department

Central Office
111 North County Farm Road
Wheaton, IL 60187-3988
Telephone: (630) 682-7400
www.dupagehealth.org



Plan Review
#_____

April 22, 2008

Mr. Troy Strange
Strange Architecture
4511 Oriole Lane
Plainfield, IL 60586

Dear Troy:

**PLAN APPROVAL FOR:**        Charley's Grilled Subs located at 203 Yorktown, Lombard, IL

The plans dated April 11, 2008, received on April 18, 2008, for the above food service facility have been approved by this Department. This plan approval is dependent upon incorporating the items noted from the attached itemized list onto the plans by May 6, 2008 (see enclosure).

**The following inspections are required:**

- **Underground plumbing installations**
  (as it pertains to the food service equipment).

- **Pre-final inspection.**
  Without approval from the DuPage County Health Department, food and drystock cannot be received into the establishment.

- **Final inspection.**
  The establishment must also receive the final inspection prior to opening. A certificate of occupancy can then be obtained through the municipality.

Allow 72 hours advance notice to be given when scheduling each inspection. Any further changes to the plans or the plan review form must receive advance approval. If you have additional questions and/or to schedule inspection(s), please contact me at 630-682-7979, extension 7197.

Sincerely,

Steve Corrigan, L.E.H.P.
Plan Reviewer
Environmental Health Services

SC:gc

Enclosure:        Reminder List

cc:        Ted Kiioris, Groupwise, Village of Lombard, Building Department
           Susan Duhig, Groupwise, East Public Health Center Supervisor
           Stefanie Lessentien, Groupwise, East Public Health Center Area Sanitarian

# FOX VALLEY
# SIGNS

4/25/08

ENCLOSED FIND AN APPLICATION FOR A SIGN PERMIT
@ CHARLEYS GRILLED SUBS
203 YORKTOWN CENTER
LOMBARD, IL -

ALSO ENCLOSED FIND A COPY OF
(1) LANDLORD APPROVAL FROM MALL MANAGEMENT
(2) DRAWINGS SHOWING PLACEMENT ON FASCIA
& DETAILED DRAWING DESCRIBING LETTER SET
(3) COPY OF CURRENT ELECTRICIAN LICENSE
(4) COPY OF CURRENT CTI FOR OUR ELECTRICIAN

ANY QUESTIONS OR COMMENTS PLEASE CALL ME-

SINCERLY
DON @
FOX VALLEY SIGNS

**tel; (630) 896-3113  fax; (630) 896-3117**
**219 w. GALENA BLVD. AURORA IL. 60506**

THE APPROVAL OF THESE PLANS IS SUBJECT TO ALL APPLICABLE CODES OF THE VILLAGE OF LOMBARD AND ALL ON-SITE/FIELD INSPECTIONS

REQUIRED Charley's GRILLED SUBS

APPROVED PLANS MUST BE AVAILABLE TO ALL INSPECTORS AT ALL TIMES DURING CONSTRUCTION

SCALE: ½" = 1'

LANDLORD APPROVAL

No Exception Taken
Make Corrections Noted
Revise and Resubmit

Checking is only for general conformance with the Yorktown Architectural and Tenant Signage Criteria Standards. This review does not relieve the tenant or it's agents of their obligations to conform to all applicable building code and mall standards and criteria. The Tenant and/or it's agents are responsible for verifying all existing conditions and dimensions within the leased space.

This document has been reviewed on behalf of Yorktown Mall and it's management.

AD MILLER YOUNGQUIST, P.C.

Date: 4/15/08

By: _____

X

BUILDING DEPT.

REVIEWED FOR _____

CODE COMPLIANCE _____

DATE: 5/1/08

Charley's Logo
L.E.D. ILLUMINATED 20" PUSH-THRU LOGO W/ 1'-2 ½" CHANNEL LETTERS

Charley's Logo
BACKER: .125" ALUMINUM PAINTED TO MATCH 7725-66 FOREST GREEN W/ 7725-25 SUNFLOWER VINYL.
RETURNS: .063" ALUMINUM 5" DEEP PAINTED WHITE.
FACE: .090" ALUMINUM PAINTED WHITE W/ PUSH-THRU ACRYLIC "Charley's".
ILLUMINATION: RED L.E.D.
TRANSFORMERS: POWER SUPPLIES AS REQ'D.

Grilled Subs Channel Letters
BACK: 5.060" ALUMINUM
RETURNS: .040" ALUMINUM 5" DEEP TO MATCH 7725-66 FOREST GREEN.
FACE: 3/16" RED PLEX W/1" GREEN TRIM CAP PAINTED TO MATCH 7725-66 FOREST GREEN.
ILLUMINATION: RED L.E.D.
TRANSFORMERS: POWER SUPPLIES AS REQ'D.

FASCIA
POWER SUPPLY
.050" ALUMINUM
L.E.D.
3/16" ACRYLIC
.040" ALUMINUM LETTER RETURN

CHANNEL LETTER W/ L.E.D., SECTION DETAIL

Charley's Grilled Subs
LOMBARD, IL    DSN 807050005    REVISED 4.9.08

EAGLE SIGN®

(TAPPCORD)
APPROVAL

- ALL ELECTRICAL FEEDS
& POWER SOURCES WILL
BE BEHIND WALL NOT
VISIBLE TO THE PUBLIC

- ANY DISCONNECT SWITCHES
ETC. REQUIRED BY THE
MUNICIPALITY SHALL BE
PAINTED TO MATCH
ADJACENT SURFACES

No Exception Taken   ☒

Make Corrections Noted

Revise and Resubmit

Checking is only for general conformance with the Yorktown Architectural and Tenant Signage Criteria Standards. This review does not relieve the tenant or it's agents of their obligations to conform to all applicable building code and mall standards and criteria. The Tenant and/or it's agents are responsible for verifying all existing conditions and dimensions within the leased space.

This document has been reviewed on behalf of Yorktown Mall and it's management.

AUMILLER YOUNGQUIST, P.C.

Date: 4/15/08

By: _____

EXIST. NEUTRAL PIER

BOTTOM OF EXIST. SOFFIT

9'-0"

Charley's GRILLED SUBS

15'-0"

EXIST. NEUTRAL SOFFIT

EXIST. EXHAUST HOOD

EXIST. NEUTRAL PIER

1'-11"  1'-4"

2'-0"

6'-9"

6'-9"

3'-9"

2'-10"

8'-0"

Charley's Grilled Subs
LOMBARD, IL    DWG 50700003    REVISED 4.9.06

This design is the property of Eagle Sign Co.
and all rights to its use or reproduction has been reserved.
© 2006 Eagle Sign Co.

EAGLE SIGN.



SCALE: ½" = 1'



# GRILLED SUBS

L.E.D. ILLUMINATED 20" LOGO W/ 1-2 ½" CHANNEL LETTERS

*Charley's Logo & Channel Letters (L.E.D.)*

*Charley's Logo*
BACKS: .050" ALUMINUM
RETURNS: .040" ALUMINUM 5" DEEP TO MATCH 3630-126 DK EMERALD GREEN.
FACE: 3/16" WHITE PLEX W/ 1" WHITE TRIMCAP ALONG W/ 3630-33 RED VINYL "Charley's",
3630-126 DK EMERALD GREEN & 3630-25 SUNFLOWER YELLOW APPLIED FIRST SURFACE.
ILLUMINATION: WHITE L.E.D.
TRANSFORMERS: POWER SUPPLIES AS REQD.

*Grilled Subs Channel Letters*
BACKS: .050" ALUMINUM
RETURNS: .040" ALUMINUM 5" DEEP TO MATCH 3630-126 DK EMERALD GREEN.
FACE: 3/16" RED PLEX W/1" GREEN TRIM CAP PAINTED TO MATCH 3630-126 DARK EMERALD GREEN.
ILLUMINATION: RED L.E.D.
TRANSFORMERS: POWER SUPPLIES AS REQD.

FASCIA
POWER SUPPLY
.050" ALUMINUM
L.E.D.
3/16" ACRYLIC
.040" ALUMINUM LETTER RETURN

ELECTRIC DISCONNECT SWITCH LOCATED ON SIDE OF CHANNEL LETTER

CHANNEL LETTER W/ L.E.D.s, SECTION DETAIL

The designs are the property of Eagle Sign Co. and all rights to its use or reproduction are reserved. © 2008 Eagle Sign Co.

**EAGLE SIGN.**

Charley's Grilled Subs
LOMBARD, IL   DSN 80703002

SITE ADDRESS: 203 YORKTOWN CENTER LOMBARD, IL.

SIGNAGE SQUARE FOOT CALCULATIONS 20" X 157"

DEMO FG-10 Tower 'n Shopping Center

Floor tiles
Wall tiles
Front counter
ceiling tile

DEMO LIMITED
TO THIS SCOPE

Full permit - 8-551

BUILDING DEPT.

REVIEWED FOR INT. OSMO

CODE COMPLIANCE_____TL_____

DATE:_____5/9/08_____

THE APPROVAL OF THESE
PLANS IS SUBJECT
TO ALL APPLICABLE
CODES OF THE VILLAGE
OF LOMBARD AND ALL
ON-SITE/FIELD INSPECTIONS